David S. Gingras, #021097
**Gingras Law Office, PLLC**
4802 E. Ray Road, #23-271
Phoenix, AZ 85044
Tel.: (480) 264-1400
Fax: (480) 248-3196
David@GingrasLaw.com

Attorney for Defendants

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| General Steel Domestic Sales, LLC, | Case No: _____ |
| Plaintiff, | **[Pending In The U.S. District Court, District of Colorado, Case No. 1:14-cv-01932-REB-CBS]** |
| v. | |
| Ethan Daniel Chumley and Atlantic Building Systems, LLC | **DECLARATION OF DAVID S. GINGRAS IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL COMPLIANCE WITH SUBPOENA TO XCENTRIC VENTURES, LLC** |
| Defendants. | |

I, David S. Gingras, declare as follows:

1.     My name is David Gingras.  I am a United States citizen, a resident of the State of Arizona, am over the age of 18 years, and if called to testify in court or other proceeding I could and would give the following testimony which is based upon my own personal knowledge.

2.     I am an attorney licensed to practice law in the States of Arizona and California, I am an active member in good standing with the State Bars of Arizona and California and I am admitted to practice and in good standing with the United States Court of Appeals for the Sixth and Ninth Circuits, the United States District Court for the District of Arizona and the United States District Courts for the Northern, Central, and Eastern Districts of California and the District of Colorado.

GINGRAS LAW OFFICE, PLLC
4802 E. Ray Road, #23-271
PHOENIX, AZ 85044

3.     I represent Defendants Ethan Chumley ("Chumley") and Atlantic Building Systems, LLC d/b/a Armstrong Steel Corporation ("Armstrong"; collectively "Defendants") in litigation currently pending in the United States District Court for the District of Colorado, Case No. 14-cv-1932-RED-CBD (the "Colorado litigation").

4.     Attached hereto as Exhibit A is a true and correct copy of the current operative Complaint in the Colorado litigation; ECF Doc. #49.

5.     Attached hereto as Exhibit B is a true and correct copy of Defendants' Answer filed in the Colorado litigation; ECF Doc. #57.

6.     Attached hereto as Exhibit C is a copy of a subpoena dated January 20, 2015 issued to non-party Xcentric Ventures, LLC ("Xcentric"). Xcentric is the owner and operator of a website located at www.RipoffReport.com.

7.     Xcentric's statutory agent for service of process is attorney Maria Crimi Speth. On January 20, 2015, I emailed Ms. Speth and asked if she would be willing to accept service of the subpoena via email. On January 21, 2015, Ms. Speth responded and stated that she would agree to accept service via email, without waiving any objections to the subpoena. Copies of emails reflecting this conversation are attached hereto as Exhibit D.

8.     On February 4, 2015, I received Xcentric's response to the subpoena, a copy of which is attached hereto as Exhibit E. In addition to other objections, Xcentric's response stated:

> Notwithstanding the objection, Xcentric does not object to making a reasonable search for and production of complaints, reviews, and comments received from third parties regarding General Steel, so long as the results are covered by a protective order limiting the disclosure of the information to the purposes of the litigation. (emphasis added)

9.     Because Xcentric's response indicated that it would agree to produce certain information subject to a protective order, on February 4, 2015, I emailed Ms. Speth and informed her that a protective order had already been issued by the Court in

GINGRAS LAW OFFICE, PLLC
4802 E. RAY ROAD #23-271
PHOENIX, AZ 85044

2

**DECLARATION OF DAVID S. GINGRAS ISO
MOTION TO COMPEL**

1    Colorado.  Attached hereto as <u>Exhibit F</u> is a copy of my email to Ms. Speth, and attached
2    hereto as <u>Exhibit G</u> is a copy of the protective order issued by the Court in Colorado
3    which was included with my email to Ms. Speth.

4         10.    After a week passed without any further response, on February 11, 2015 I
5    contacted Ms. Speth to ask about the status of Xcentric's response to the subpoena.  Later
6    that same day Ms. Speth responded and said: "I will try to move it along."  A copy of Ms.
7    Speth's email is attached hereto as <u>Exhibit H</u>.

8         11.    After two more days passed with no response, on February 13, 2015 I
9    attempted to reach Ms. Speth by phone but reached her voicemail.  I then followed up
10   with another email to her later that same day, a copy of which is attached hereto as
11   <u>Exhibit I</u>.  Ms. Speth never responded to my February 13th email, nor have I received any
12   further production of information from Xcentric.

13        12.    Attached hereto as <u>Exhibit J</u> is a true and correct copy of the Findings,
14   Conclusions, and Order of Judgment dated December 7, 2004 entered in an action
15   entitled *State of Colorado v. General Steel Domestic Sales, LLC*, Case No. 04 CV 143
16   filed in Jefferson County District Court, Colorado.

17

18        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of
19   the United State of America that the foregoing is true and correct

20        DATED this 10th day of March, 2015.

21                  **GINGRAS LAW OFFICE, PLLC**
22                  /s/ David Gingras
23                  David S. Gingras
                    Attorney for Defendants
24

25

26

27

28

GINGRAS LAW OFFICE, PLLC
4802 E. Ray Road, #23-271
PHOENIX, AZ 85044

3

Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-01932-REB-CBS

GENERAL STEEL DOMESTIC SALES, LLC, d/b/a
GENERAL STEEL CORPORATION, a Colorado limited liability company,

Plaintiff,

v.

ETHAN DANIEL CHUMLEY, individually; and ATLANTIC BUILDING SYSTEMS, LLC, a
Delaware corporation, doing business as ARMSTRONG STEEL CORPORATION.

Defendants.

---

## AMENDED COMPLAINT

---

Plaintiff General Steel Domestic Sales, LLC, d/b/a General Steel Corporation, a

Colorado limited liability company ("General Steel"), by and through its undersigned

counsel, for its Amended Complaint against the above-named Defendants, states and

alleges as follows:

### JURISDICTION AND VENUE

1.      This Court has original jurisdiction over this civil action pursuant to 28

U.S.C. § 1338(a) and (b), 1331, 15 U.S.C. 1121(a).  By this action, General Steel

asserts claims which arise under the Lanham Act, common law defamation, and other

related common law tort claims.

2.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a)

over claims herein which are not based upon federal statute, since these claims are so

related to claims in this action that are within the Court's original jurisdiction that they

form part of the same case or controversy.

3.       Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c)

and 1400(a) because the Defendants transact business, are subject to personal

jurisdiction, and therefore, reside or may be found in this judicial district.  In addition,

Defendants' tortious conduct and statutory violations claimed herein occurred in this

judicial district.

## THE PARTIES

4.       Plaintiff General Steel is a Colorado limited liability company having its

principal place of business located in Jefferson County at 10639 Bradford Road,

Littleton, CO 80127.

5.       Defendant Ethan D. Chumley ("Chumley") is an individual who, upon

information and belief, resides in Douglas County at 6533 Lost Canyon Ranch Road,

Castle Rock, CO 80104.

6.       Defendant Atlantic Building Systems LLC d/b/a Armstrong Steel

Corporation, is a Delaware Corporation with its principal place of business in Arapahoe

County at 5889 Greenwood Plaza Boulevard, Greenwood Village CO 80111.

## FACTS

7.       General Steel is one of the nation's leading direct sellers of pre-

engineered steel building systems.

8.       Defendants Chumley and Armstrong have been sued twice in the United

States District Court for the District of Colorado for false advertising.  *General Steel*

*Domestic Sales, LLC v. Chumley, et al.;* Civil Action No. 10-cv-01398-PAB-KLM and *General Steel Domestic Sales, LLC v. Chumley, et al.;* Civil Action No. 13-cv-00769-MSK-KMT.

9.     In May 2013, Judge Philip Brimmer issued a 39 page ruling and Order finding Defendants Chumley and Armstrong liable for willful false advertising targeting General Steel. (**Exhibit 1**; Order dated May 7, 2013.)

10.    Defendants Chumley and Armstrong have made it their practice to retaliate against General Steel through false and misleading internet publications. Defendants Chumley and Armstrong use the internet as an illicit weapon to harm General Steel and drive business for themselves.

11.    Defendants Chumley and Armstrong's long-time attorney, Paul M. Grant, has a long history of filing lawsuits against General Steel and related people/entities and has made it part of his business enterprise to solicit, create, provoke and file cases and lawsuits against Plaintiff for over seven (7) years, and as partially listed on his current law firm website at < http://www.ggklaw.com/Paul_M._Grant>  where all but one published opinion over Mr. Grant's twenty (20) legal year career relates to General Steel.

12.    Google AdWords® is an online advertising service that places advertising copy at the top or bottom of, or beside, the list of results Google displays for a particular search query. The advertiser controls the keywords that trigger an advertisement, advertising text and placement of the ads. Yahoo/Bing has a similar system for its search engine advertising platform which operates on the same principles.

13.     In or about early 2014, Defendants commenced a Google AdWords[®] Pay-Per-Click negative advertising campaign targeting Plaintiff General Steel.

14.     In or about early 2014, Defendants commenced a Yahoo/Bing Pay-Per-Click negative advertising campaign targeting Plaintiff General Steel.

15.     Defendants' run ads daily that display Google AdWords[®] and Yahoo/Bing advertisements prominently, normally at the top of the first internet page of ad results, when consumers search Google and Yahoo/Bing for the Plaintiff's company name "General Steel" or "General Steel Buildings."

16.     When General Steel customers, prospective customers, or others search Google and Yahoo/Bing for Plaintiff's company using the words "General Steel" or "General Steel Buildings" Defendants' pay Google AdWords[®] and Yahoo/Bing to display advertising, the same or similar to the below text:

>  **Don't Send Them A Deposit - ArmstrongSteelBuildings.com**
>  **Ad www.armstrongsteelbuildings.com/**
>  **Until You've Seen These Lawsuits. Read This Before It's Too Late!**

See **Exhibit 2** hereto.

>  **Before You Send a Deposit - Do Your Research First**
>  **Ad www.armstrongsteelbuildings.com/ (855) 882-6555**
>  **Read This Before It's Too Late!**
>  **View Gallery - Virtual Building - Design It Online -**
>  **1.800.345.4610**

See **Exhibit 3** hereto.

In December 2014, Defendants began running banner ads on Google with new content as follows:

>  **Steel Building \*Lawsuits\* - ArmstrongSteelBuildings.com**
>  www.armstrongsteelbuildings.com/ +1 800-345-4610

4

4.8  rating for armstrongsteelbuildings.com
**Rock Limo Lost $125,383 in Deposits \*Beware\* Research Before You Buy!**
**Court Rulings · Lawsuits · Buyer Beware · Complaints**

See, **Exhibit 4,** Google screenshot dated 12-22-14 for search for "General Steel".  This

ad by Defendants first appeared on the internet on or about December 22, 2014.


**Read Customer \*LAWSUITS\***
www.armstrongsteelbuildings.com/ +1 800-345-4610
4.7 rating for armstrongsteelbuildings.com
**"General Told Her 'We Will Keep You In Court Until We Break You' "**
**Court Rulings · Lawsuits · Buyer Beware · Complaints**

See, **Exhibit 5,** Google screenshot dated 12-3-14 for search for "General Steel".  This

ad by Defendants first appeared on the internet on or about December 3, 2014.

These new December 2014 ads by Defendants are false and misleading and

illegal "content" being created and marketed by Defendants to harm General Steel and

take business from General Steel.  The December 22, 2014 ad that is now running is

false and defamatory advertising.  In regard to the "Rock Island Limo" posting of

December 22, 2014 (which is running each day on the internet), the content of the

banner ad is false and defamatory.  After a two-day arbitration hearing, an arbitrator

found that Rock Island Limo had breached its contract with General Steel and that Rock

Island Limo was entitled to no relief on its claims.  The new ad falsely portrays to every

person searching the internet for General Steel that they should "beware" of doing

business with General Steel and implies that they will "lose their deposit" like Rock

Island supposedly did if they do business with General Steel.  Rock Island, however, did

not lose its deposit, but rather breached its contract with General Steel. The December

1, 2014 ad that "General Told Her 'We Will Keep You In Court Until We Break You,'" is

also a false and defamatory ad.  This new banner ad content is apparently lifted from a ten year old ruling in a court case.  This content is being marketed in Defendants' Google banner advertising to disparage General Steel and falsely advertise about General Steel to sway consumers to not do business with General Steel and instead go to Armstrong Steel's websites and buy from Armstrong.

17.    The Google AdWords® and Yahoo/Bing advertisements links to the webpage <http://www.armstrongsteelbuildings.com/steel-building-industry-newsroom/?pi_ad_id=41413019706&gclid=CITLopnf074CFeY-Mgod1ngA1Q>.

18.    Defendants have replicated the Google AdWords® campaign on the Yahoo/Bing advertising platform. (**Exhibit 6** hereto).

19.    The web page includes code <robots.txt> which precludes archiving so that that historical data and changes to the web page content cannot be tracked by such services as Google or archive.org, making it difficult to track changes to the language used on the web page. Defendants have also made efforts to block General Steel from seeing its malicious false ads by blocking the ads from being seen from General Steel's office location.

20.    Clicking through the Armstrong Steel hyperlinks takes the viewer to Armstrong Steel's website page captioned "Industry Related Legal Matters" purporting to provide a list of all lawsuits brought by, or filed against, companies in the steel building market. (The associated advertisements and landing page are hereinafter referred to as The "Industry Related Legal Matters" landing page).

21.     The Industry Related Legal Matters page contains thirty postings purporting to list litigation matters relating to companies in the steel building market. Twenty-four of the thirty postings are about General Steel; six are about other companies in the "Industry."

22.     The Industry Related Legal Matters posts are not a complete or representative list of lawsuits and legal matters relating to companies in the steel building industry.

23.     Only one lawsuit identifying Armstrong Steel is reported, albeit deceptively.   That post falsely suggests that Armstrong Steel won its case against Plaintiff, or at a minimum, fails to disclose that Armstrong Steel and Chumley lost that case at the trial level, with serious findings of unlawful behavior against Armstrong Steel and Chumley.

24.     The Industry Related Legal Matters posts contain inaccurate, incomplete, false, unfair and misleading statements and omission concerning lawsuits filed against General Steel.

25.     The Industry Related Legal Matters landing page for Defendants' advertising campaign fails to disclose any of the losses and court orders/findings in Plaintiff's favor, including losses and orders against Plaintiff's direct competitor Armstrong Steel.

26.     The Industry Related Legal Matters landing page for Defendants' advertising campaign is an inaccurate, incomplete, false, unfair and misleading comparison with Plaintiff.

27.    The Industry Related Legal Matters landing page contains marketing language soliciting and marketing to customers and prospective customers to purchase from Armstrong rather than Plaintiff.

28.    The Industry Related Legal Matters landing page is intended by Defendants to discourage new, potential, and existing customers from contacting and/or doing business with Plaintiff and mislead people searching for information about General Steel that General Steel will defraud them on any new sales.

29.    Because customers and prospective customers who are specifically searching for Plaintiff's company name "General Steel" through a Google search or a Yahoo/Bing search are shown Defendants' advertisement and directed by hyperlink to the competitor Armstrong Steel's Industry Related Legal Matters landing page, the advertisement campaign is designed to create a comparison for customers and prospects between the two companies, and divert customers looking for Plaintiff to Defendants.

30.    Because customers and prospective customers who are specifically searching for Plaintiff's company through a Google search or a Yahoo/Bing search are shown Defendants' advertisement and directed by hyperlink to the competitor Armstrong Steel's Industry Related Legal Matters landing page, the advertisement campaign is designed to discourage and deter customers and potential customers from doing business with General Steel.

31.     Customers and prospective customers of Plaintiff are falsely led to believe that the subject web page is providing an impartial, fair and accurate summary of the legal proceedings relating to the steel building industry current in 2014.

32.     The Industry Related Legal Matters page is neither accurate, complete or a fair summary of legal proceedings against General Steel generally, the particulars of each case cited or industry legal proceedings in general.

33.     Defendants' Industry Related Legal Matters Posts intentionally, recklessly, and/or negligently mischaracterize allegations, pleadings and/or orders from litigation matters against General Steel for the sole purpose of causing harm to General Steel, its reputation, and for Defendants' collective and individual financial benefit.

34.     Defendants were not/are not part of the media industry, or acting as reporters in posting false in misleading statements about General Steel's litigation history, but instead are competitors/adversaries of General Steel acting with malice and seeking unfair competitive advantage.

35.     In addition to its Google AdWords® and Yahoo/Bing advertising campaigns, Defendants show a 'pop-up' window (the screen shot below is hereinafter referred to as "Pop-Up Advertisement"), web visitor to its own website <www.armstrongsteelbuildings.com> on certain comparative marketing pages which states:



36.     Defendants are identifying, and prospective customers would understand,

the "well-known steel building broker" is intended to, and in fact, refers to Plaintiff.

**Exhibit 7** hereto is a screenshot of the Pop-Up Advertisement dated July 10, 2014.

37.     Defendants' publications are inaccurate and misleading as set forth below

as of  July 10, 2014[1]:

38.     ***Publication 1****:*

Class Action Complaint - Heinbaugh et al v. General Steel Domestic
Sales, LLC

U.S. District Court of Colorado - General Steel Corp. and its CEO Jeffrey Knight,
"infamous" telemarketers of steel-buildings, systematically defrauded their
customers, in defiance of court orders, by, among other things, taking
nonrefundable deposits and then refusing to deliver buildings for the price
advertised, a class-action complaint claims in Federal Court.

---

[1] Note that it is unclear whether previous versions of the web page contain further
defamation, or variations in language, which Plaintiff's are unaware.  Because
Defendants have enabled 'norobots.txt files to preclude any version tracking of their
website and hide changes from public view, Plaintiff reserves the right to amend this
Complaint as discovery progresses.

> "Ron Heinbaugh's, Doug Kruger's and Sam Zambon's dealings with General
> Steel occurred after the issuance of Judge Jackson's opinion, a time when
> General Steel supposedly had cleaned up its deceptive business practices.
> Unfortunately for its innocent and trusting customers, while General Steel may
> have made a few small changes to its business practices, its basic business plan
> remained focused on two overriding goals - obtain a "non-refundable" deposit
> from customers and never actually deliver a steel building to any customer for the
> price set forth in the contract."

See, **Exhibit 8** hereto, Armstrong Steel website "Industry Related Legal Matters"

Printout dated June 12, 2014.

### *Publication 1 is Inaccurate and Intentionally Misleading*

39.     The subject post falsely states and/or implies that General Steel is an

infamous telemarketer of steel-buildings which is a statement that is factually untrue and

intentionally misleading.

40.     This first post is intended to set up context for all subsequent posts,

portraying Plaintiff as being infamous for unlawful, fraudulent and business practices

against its customers and that all prior complaints, some dating back 15 years,

represent operations at Plaintiff's company current in 2014.

41.     False and misleading statements in the subject post include, but are not

limited to, statements that General Steel "systemically defrauds" its customers (not

proven) and that General Steel's "basic business plan" is to obtain a non-refundable

deposit and never actually deliver a steel building to any customer for the price set forth

in the contract (not proven).  None of these false and misleading statements are true

statements about General Steel in 2014 when Defendants posted them.

42.     The "*Heinbaugh*" class action referenced in the subject post was filed by

Defendants' attorney Grant.

43.     The subject posts failed to state or disclose that the allegations were contested and were never proven.

44.     The inflammatory and false allegations selectively published by Defendants on the Industry Related Legal Matters page were posted in a way where an average reader would, on balance, read them as fact, as though proven in court before a judge and jury.

45.     The subject post failed to state at the outset that the statements contained therein were unproven 'allegations' in a court document.  Instead, the words "a class-action complaint claims in Federal Court" appear at the end of the first sentence in a grammatically incorrect and intentionally confusing way designed to create an impression that Plaintiff is an infamous "telemarketers of steel-buildings, systematically defrauded their customers, in defiance of court orders."

46.     Defendants knew that the allegations in the "*Heinbaugh*" class action complaint were misleading and incomplete when they published the subject post, or posted the statements in reckless disregard for the truth or at least with negligence. Defendants further acted with malice in publishing the subject post.

47.     Attorney Paul M. Grant abandoned his class action as to all other potential class action plaintiffs and dismissed the class action without proving the allegations contained therein or fulfilling his duties to the absent putative class members.

48.     Upon information and belief, attorney Grant's knowledge and conduct should be imputed to his clients Chumley and Armstrong.

49.     The settlement agreement between General Steel and the three named parties specifically stated that General Steel made no admissions of any kind in resolving the matter.

50.     The snippets published on the Industry Related Legal Matters page are incomplete and inaccurate and intentionally published to discourage new and existing customers from doing business with and/or contacting Plaintiff, and mislead people searching for information about General Steel that General Steel will defraud them on any new sales in 2014 and thereafter.

51.     Upon information and belief, Defendants' attorney Grant provided Defendants with the Heinbaugh and the other "lawsuits" to post on Defendants' website and/or otherwise use on the internet to harm General Steel, promote his own law practice and disparage a company, Plaintiff, he regularly brings lawsuits against.

52.     Upon information and belief, attorney Grant and/or other attorneys for Defendants reviewed, participated and/or approved the false and misleading information concerning cases reported on the "Industry Related Legal Matters" page.

53.     Subsequent changes to the "Industry Related Legal Matters" seek to add disclaimers fail to cure the false, misleading and incomplete nature of the post.

54.     ***Publication 2***

### Attorney General Madrid Warns New Mexico Churches About Colorado Metal Building Company

New Mexico Attorney General — Attorney General Patricia Madrid issued a consumer alert, directing her warning at churches or other organizations that might be considering the construction of prefabricated steel buildings through General Steel, a Lakewood, Colorado-based company saying:

13

> "The Colorado Attorney General's Office has filed a lawsuit against General Steel after receiving hundreds of complaints, including a number from New Mexico consumers. In recent months, General Steel's advertising in New Mexico has been targeting church congregations who may be looking at adding on to their churches. The Colorado Attorney General's office informed my office that during their investigation, they discovered approximately one-fourth of consumers from around the nation who were defrauded by this company were churches, each of which lost almost $10,000."

***Publication 2 is Inaccurate and Intentionally Misleading***

55.     The statements published are unproven allegations and were/are contested.

56.     Defendants publish this nine year old 2005 story falsely stating or implying that the 'consumer alert' and lawsuit are current in 2014 and pertain to customers and potential customers seeking to purchase buildings now.

57.     Defendants intentionally fail to disclose the date of the press release, knowing that this omission will suggest that the 'consumer alert' and lawsuit are current in 2014.

58.     Defendants present the press release in the current tense, without advising readers that the press release was issued nine years ago and the entire matter was fully resolved in 2007.To the extent Defendants are relying on allegations made against Plaintiff in prior Attorney General proceedings from 2004, Defendants recklessly, intentionally and knowingly are falsely portraying that that those allegations are true and accurate in 2014.

59.     The Attorney General proceedings and alleged practices at issue were never proven and were resolved to the Attorney General's satisfaction long ago and are not at issue in 2014.

60.     The snippets published on the Industry Related Legal Matters page are incomplete and inaccurate and intentionally published to discourage new and existing customers from doing business with or contacting Plaintiff, and mislead people searching for information about General Steel that General Steel will defraud them on any new sales in 2014 and thereafter.

61.     The subject Post is not full, complete and fair reporting of the subject matter.

62.     Defendants have selectively published inflammatory materials out of context.

63.     Subsequent changes to the "Industry Related Legal Matters" seeking to add disclaimers fail to cure the false, misleading and incomplete nature of the post.

64.     ***Publication 3***

### General Steel Domestic Sales, LLC v. Chumley

U.S. District Court of Colorado — For several years, defendant Ethan Daniel Chumley worked for General Steel Domestic Sales, LLC, doing business as General Steel Corporation ("General Steel"). Upon leaving, Chumley worked for Olympia Steel, a competitor of General Steel. He then formed Atlantic Building Systems, LLC, doing business as Armstrong Steel Corporation ("Armstrong"), which sells pre-engineered steel metal buildings throughout the world in competition with General Steel and Olympia. General Steel initiated this trademark and unfair competition action on June 16, 2010.

Armstrong has filed counterclaims, alleging that General Steel has made disparaging comments about Armstrong to customers and potential customers of

15

Armstrong, including that "Armstrong does not have proper facilities; that it consists of one or two individuals; that those individuals were fired from General Steel for committing fraud against customers; that Armstrong would take the customers [sic] money and not deliver the building ordered; and that Armstrong Steel would soon be out of business." Docket No. 23 at 19-20, ¶ 18. Armstrong further alleges that, during a May 4, 2010 meeting, General Steel wrongfully received confidential information about Armstrong from Jon Abbotts, an Armstrong employee, and used that information to aid in its efforts to disparage Armstrong. Armstrong contends that the disparagement has resulted in lost profits and goodwill.

### *Publication 3 is Inaccurate and Intentionally Misleading*

65.     Defendants misrepresent by omission and seek to deceive readers by failing to disclose that that this is a lawsuit involving Defendants, and not any third party action.

66.     Defendants are intimately aware of the actual facts involved in this lawsuit since they were parties in the lawsuit.

67.     The statements published are unproven allegations and were/are contested.

68.     Defendants' repeat unsubstantiated allegations as facts in the counterclaims they filed in *General Steel v. Chumley and Armstrong Steel,* 2010 cv 01398, when the attached U.S. District Court Order *dismissed* their counterclaims. (**Exhibit 9**, Order dated June 10, 2011).

69.     Defendants fail to disclose that their counterclaims and allegations they represent as facts were dismissed by court order.  *Id.*

70.     Defendants further failed to disclose that General Steel significantly won the lawsuit after trial as set forth in the 39 page Order from United States District Judge Philip Brimmer of the U.S. District Court for the District of Colorado.  (**Exhibit 1**).

71.     The Court found that Defendants Chumley and Armstrong willfully violated the federal Lanham Act's false advertising prohibitions, entering a large disgorgement of profits award in favor of General Steel, and enjoining Armstrong's false advertising. (**Exhibit 1**).

72.     Defendants seek to portray the subject lawsuit in a way that falsely and misleadingly suggests that Plaintiff's lawsuit was unfounded or that Armstrong succeeded on its claims.

73.     The snippets published on the Industry Related Legal Matters page are incomplete and inaccurate and intentionally published to discourage new and existing customers from doing business with or contacting Plaintiff, and mislead people searching for information about General Steel that General Steel will defraud them on any new sales in 2014 and thereafter..

74.     The subject Post is not full, complete and fair reporting of that case.

75.     Defendants have selectively published inflammatory materials out of context.

76.     Subsequent changes to the "Industry Related Legal Matters" seeking to add disclaimers fail to cure the false, misleading and incomplete nature of the post.

77.     ***Publication 4***

### Findings, Conclusions & Order of Judgment in STATE OF COLORADO vs. GENERAL STEEL DOMESTIC SALES, LLC, dba GENERAL STEEL

U.S. District Court of Colorado – The salespersons talked about the "clearance buildings" as if they were sitting on the ground somewhere just waiting to be purchased at bargain prices, sometimes providing their locations such as in Texas or Arizona or some such. At times this was further refined to claim that such buildings had been returned by such major corporations as Boeing and K-Mart. These claims were patently false. General Steel does not even argue now that Boeing or K-Mart ever purchased or returned a building.

Given the extent of the violations over a several-year period, the Court concludes that, except as provided below, General Steel and Jeffrey Knight deserve the maximum civil penalty allowed by law. The gist of the complaint was that the defendants engaged in deceptive practices in the marketing of the buildings and dealerships. This is broken down into six claims: (1) false representations as to the characteristics of goods, services or property, (2) material omissions concerning goods, services or property, (3) knowing misrepresentations as to the source of goods, (4) false or misleading statements regarding price, (5) failure to set forth terms and conditions of sale in a contract, and (6) bait and switch advertising.

***Publication 4 is Inaccurate and Intentionally Misleading***

78.     This posting is not from the U.S. District Court but from a 2004 non-final ruling by the state court in the aforementioned case brought against General Steel in 2004 by the Colorado Office of Attorney General.

79.     Defendants have incompletely and inaccurate published inflammatory portions of the ruling without disclosing that it is from 2004 and non-final.

80.     Defendants portray the lawsuit in present tense as though it is ongoing.

81.     Further, the ruling relates to alleged sales practices of General Steel's that are from approximately fourteen years ago.

82.     Defendants fail to disclose the outcome of the proceeding with the Attorney General or the terms of the settlement of which they are fully aware.

83.     The snippets published on the Industry Related Legal Matters page are incomplete and inaccurate and intentionally published to discourage new and existing customers from doing business with or contacting Plaintiff, and mislead people searching for information about General Steel that General Steel will defraud them on any new sales in 2014 and thereafter.

84.     The subject Post is not full, complete and fair reporting of that case.

85.     Defendants have selectively published inflammatory materials out of context.

86.     Subsequent changes to the "Industry Related Legal Matters" seeking to add disclaimers fail to cure the false, misleading and incomplete nature of the post.

87.     ***Publication 5***

### General Steel and Bernard Madoff: Business Ethics in Reverse

General Steel gave the church the impression all along that they manufactured metal buildings. General Steel is listed on the website of the industrial directory called MacRAE's Blue Book, with the following misleading information: "Steel building construction; manufactures prefabricated metal buildings & components; travel agency Travel agents, Tour arrangement services, Travel agencies, Chartering services, Structures and Building and Construction and Manufacturing Components and Supplies. "Here is the truth: General Steel is a sales company that does not manufacture the metal shell and the components it sells. This is deceptive to say the least.

**Publication 5 is Inaccurate and Intentionally Misleading**

88.     Defendants misrepresent this as this is not from a lawsuit, but rather is a republication of an unsubstantiated defamatory internet posting apparently by a disgruntled General Steel customer from five years ago.

89.     The statements published are unproven allegations and are contested.

90.     The snippets published on the Industry Related Legal Matters page are incomplete and inaccurate and intentionally published to discourage new and existing customers from doing business with or contacting Plaintiff, and mislead people searching for information about General Steel that General Steel will defraud them on any new sales..

91.     The subject Post is not full, complete and fair reporting of that matter.

92.     Defendants have selectively published inflammatory materials out of context.

93.     Subsequent changes to the "Industry Related Legal Matters" seeking to add disclaimers fail to cure the false, misleading and incomplete nature of the post.

94.     ***Publication 6***

### College Park Pentecostal v. General Steel Corp

U.S. District Court of Maryland - Kahn signed and initialed the Agreement on January 11, 2007, the same day he received it, and immediately faxed it back to General Steel. On January 12, Kahn sent General Steel a check for $45,000 as a deposit under the contract. Approximately one year later, in January 2008, Kahn signed a "Building Change Order," which added a mezzanine level to the planned building, and sent General Steel another check for $50,000. Due to the increased price of the mezzanine, however, the parties later executed a second Change Order that restored the original design of the building. Notably, Defendants never returned the $50,000 following the execution of the second Change Order.

The Church submits that following payment of the deposits, Defendants informed it that they would in fact provide no assistance with site planning, zoning, or construction and would only supply materials for the building. The Church thereupon demanded that Defendants return the deposits, claiming it had no intention of entering into a "materials only" contract, but Defendants refused. The instant lawsuit was filed on August 6, 2009.

### Publication 6 is Inaccurate and Intentionally Misleading

95.     This portion of a ruling published by Defendants on their Industry Related Legal Matters page is from an order compelling arbitration.

96.     The statements published are unproven allegations and are contested.

97.     Defendants fail to disclose that the publication is not a final resolution of the dispute.

98.     The snippets published on the Industry Legal Matters page are incomplete and inaccurate and intentionally published to discourage new and existing customers from doing business with or contacting Plaintiff, and mislead people searching for information about General Steel that General Steel will defraud them on any new sales in 2014 and thereafter.

99.     The subject Post is not full, complete and fair reporting of that case.

100.     Defendants have selectively published inflammatory materials out of context.

101.     Subsequent changes to the "Industry Related Legal Matters" seeking to add disclaimers fail to cure the false, misleading and incomplete nature of the post.

102.     **Publication 7**

## Rock Limo Service v. General Steel Domestic Sales

21

U.S. District Court of Illinois - Arbitrator Kral made the following findings: On December 9, 2005, Akrap signed a purchase agreement with General Steel, under which it would pay General Steel $395,000 for the fabrication of steel components for construction of a building. (Id. ¶ 10; Award of Arbitrator, Ex. B to Amended Petition [14-2], (hereinafter "Award") at 2-3.) The erection itself, and the concrete and finishing work, were to be performed by third parties. (Id.) Akrap made a $100,000 deposit payment upon signing the purchase agreement, but later revoked that wire transfer, and General Steel was unable to access the funds. (Id. at 2-3.) The Arbitrator determined that this first agreement was never consummated and was not binding. (Id. at 3.)

The parties continued negotiations, however: Akrap's attorney made handwritten modifications to the December 9, 2005 purchase agreement and sent the marked-up document back to General Steel on December 16, 2005. (Id.) General Steel returned the modified purchase agreement three days later, with two additional modifications. (Id.) No modifications or amendments were made to the purchase agreement after December 19, 2005, and the Arbitrator concluded that the document General Steel sent to Akrap on December 19, 2005 was a binding contract. (Id. at 4.) Indeed, Akrap sent General Steel an automated deposit transfer dated December 21, 2005 for the $100,000 deposit called for under the contract, and General Steel successfully deposited the funds. (Id.) When the deal stalled, Petitioners demanded return of their deposit, but General Steel refused to pay it.

### *Publication 7 is Inaccurate and Intentionally Misleading*

103.    The statements published are unproven allegations and are contested.

104.    The statements published do not reveal that General Steel's customer lost its claims in arbitration and its appeal in federal court.

105.    The statements published do not reveal that General Steel's customer was found to have breached its contract with General Steel.

106.    Defendants fail to disclose the status of the proceeding.

107.    The subject Post is not full, complete and fair reporting of that case.

108.    Defendants have selectively published inflammatory materials out of context.

109.    The snippets published on the Industry Related Legal Matters page are incomplete and inaccurate and intentionally published to discourage new and existing customers from doing business with or contacting Plaintiff, and mislead people searching for information about General Steel that General Steel will defraud them on any new sales in 2014 and thereafter.

110.    Subsequent changes to the "Industry Related Legal Matters" seeking to add disclaimers fail to cure the false, misleading and incomplete nature of the post.

111.    *Publication 8*

### Texas Echo Land & Cattle LLP v. General Steel Domestic Sales LLP

Texas Court of Appeals - Texas Echo sued General Steel in July 2011 for breach of contract, misrepresentation, and violation of the Texas Deceptive Trade Practices Act. According to one of the trial court's unchallenged fact findings, Texas Echo terminated the agreement and demanded that General Steel return the $14,000 deposit.

*Publication 8 is Inaccurate and Intentionally Misleading*

112.    The statements published are unproven allegations and were/are contested.

113.    The statements published do not reveal that General Steel's customer lost its claim in both the state court of Texas and the Texas Court of Appeals.

114.    Defendants fail to disclose the status of the proceeding.

115.    The subject Post is not full, complete and fair reporting of that case.

116.    Defendants have selectively published inflammatory materials out of context.

23

117. The snippets published on the Industry Related Legal Matters page are incomplete and inaccurate and intentionally published to discourage new and existing customers from doing business with or contacting Plaintiff, and mislead people searching for information about General Steel that General Steel will defraud them on any new sales in 2014 and thereafter.

118. Subsequent changes to the "Industry Related Legal Matters" seeking to add disclaimers fail to cure the false, misleading and incomplete nature of the post.

119. ***Publication 9***

## General Steel Domestic Sales v. Hogan & Hartson, LLP

Colorado Court of Appeals – These facts are not disputed: plaintiffs retained Ty Cobb and his firm, Hogan & Hartson, to defend General Steel against an action brought by the Colorado Attorney General (the Colorado AG action). According to plaintiffs, they sought Cobb's services because they were aware, based on a Denver Post article and other references, that Cobb was experienced in representing white collar defendants in complex, high-stakes cases like the Colorado AG action. The parties' representation agreement provided, as relevant here, that Cobb would "have primary responsibility for the matter, with assistance as required from ... other attorneys in the litigation group," and that the parties would submit any dispute over legal fees to binding arbitration.

Cobb was actively engaged in the Colorado AG action for approximately two months, but then moved his practice to Hogan & Hartson's Washington, D.C. office, effectively terminating his involvement in General Steel's defense. Although other Hogan & Hartson attorneys remained active in the case, plaintiffs retained another law firm. Thus, for the remainder of the Colorado AG action, plaintiffs were represented by, and paid legal fees to, both Hogan & Hartson and the other firm. Ultimately, plaintiffs settled the action with the Colorado AG.

Plaintiffs subsequently initiated this action against Cobb and Hogan & Hartson, alleging fraud, breach of fiduciary duty, breach of contract, and violation of the CCPA. As relevant here, the CCPA claim included allegations that defendants had engaged in the "deceptive trade practice" of "`bait-and-switch' advertising" as defined in section 6-1-105(1)(n)(I), C.R.S.2009. In response, defendants filed a

motion to dismiss the CCPA claim and a motion to compel arbitration of the contract claim pursuant to the terms of the parties' representation agreement.

The trial court granted both of defendants' motions.

**Publication 9 is Inaccurate and Intentionally Misleading**

120.    The statements published are unproven allegations and were/are contested.

121.    This publication is inaccurate and misleading since it does not disclose that Plaintiff won on its counterclaim in the arbitration case, which resulted in an arbitrator's award finding that Hogan & Hartson had breached its contract with Plaintiff.

122.    This litigation has no relevance to Plaintiff's customers or potential customers.

123.    Defendants fail to disclose the status of the proceeding.

124.    The subject Post is not full, complete and fair reporting of that case.

125.    Defendants have selectively published inflammatory materials out of context.

126.    The snippets published on the Industry Related Legal Matters page are incomplete and inaccurate and intentionally published to discourage new and existing customers from doing business with or contacting Plaintiff, and mislead people searching for information about General Steel that General Steel will defraud them on any new sales in 2014 and thereafter.

127.    Subsequent changes to the "Industry Related Legal Matters" seeking to add disclaimers fail to cure the false, misleading and incomplete nature of the post.

128.   *Publication 10*

### Skillman v. General Steel Settlement Fund

U.S. District Court of Massachusetts - This action involves a claim for damages in the amount of $15,971.18 excluding interest, and seeks to repay the Bank of America money loaned to her which she used toward her contract with General Steel Corporation for building materials. Skillman again states that there was a class action settlement with General Steel Corporation, handled by the General Steel Settlement Fund, and she concedes that, in fact, she received distributions of settlement funds. While not entirely clear, it appears that Skillman claims that these distributions were not enough to compensate her.

#### *Publication 10 is Inaccurate and Intentionally Misleading*

129.   The statements published are unproven allegations and were/are contested.

130.   This posting does not disclose that Skillman's claim was dismissed from the federal court and is unproven.

131.   Defendants fail to disclose the status of the proceeding.

132.   The subject Post is not full, complete and fair reporting of that case.

133.   Defendants have selectively published inflammatory materials out of context.

134.   The snippets published on the Industry Related Legal Matters page are incomplete and inaccurate and intentionally published to discourage new and existing customers from doing business with or contacting Plaintiff, and mislead people searching for information about General Steel that General Steel will defraud them on any new sales in 2014 and thereafter.

135.   Subsequent changes to the "Industry Related Legal Matters" seeking to add disclaimers fail to cure the false, misleading and incomplete nature of the post.

136.   ***Publication 11***

## General Steel Corporation v. Donna Collins

Kentucky Court of Appeals - On December 15, 2004, Donna Collins, d/b/a Collins Game Room & Restaurant (referred to collectively as "Collins"), filed a complaint against General Steel. Collins sought to recover the $24,000.00 deposit made in May toward the purchase of the steel building. General Steel answered and denied that Collins was entitled to a refund of the deposit. It also demanded that the complaint be dismissed and that the matter be referred to arbitration "as set forth within the contract and pursuant to motion filed herein." Following a hearing, the trial court denied the motion. This appeal followed.

***Publication 11 is Inaccurate and Intentionally Misleading***

137.   This posting does not disclose that the statements published are unproven allegations and were/are contested.

138.   Defendants fail to disclose the status of the proceeding.

139.   The subject Post is not full, complete and fair reporting of that case.

140.   Defendants have selectively published inflammatory materials out of context.

141.   The snippets published on the Industry Related Legal Matters page are incomplete and inaccurate and intentionally published to discourage new and existing customers from doing business with or contacting Plaintiff, and mislead people searching for information about General Steel that General Steel will defraud them on any new sales in 2014 and thereafter.

142.   Subsequent changes to the "Industry Related Legal Matters" seeking to add disclaimers fail to cure the false, misleading and incomplete nature of the post.

143.   ***Publication 12***

## AT&T Corp v. General Steel Domestic Sales, LLC

27

U.S. District Court of Colorado — This is a breach of contract case. Plaintiff AT&T Corporation alleges that Defendant General Steel, Inc.: (1) breached the contract between them; and (2) was unjustly enriched by Plaintiff's services.

***Publication 12 is Inaccurate and Intentionally Misleading***

144.    This posting does not disclose that the statements published are unproven allegations and were/are contested.

145.    This posting about an 8-year-old dispute over phone bills having nothing to do with the steel building industry, potential customers of Plaintiff or service issues between Plaintiff and its customers.

146.    Defendants fail to disclose the status of the proceeding.

147.    The subject Post is not full, complete and fair reporting of that case.

148.    Defendants have selectively published inflammatory materials out of context.

149.    The snippets published on the Industry Related Legal Matters page are incomplete and inaccurate and intentionally published to discourage new and existing customers from doing business with or contacting Plaintiff, and mislead people searching for information about General Steel that General Steel will defraud them on any new sales in 2014 and thereafter.

150.    Subsequent changes to the "Industry Related Legal Matters" seeking to add disclaimers fail to cure the false, misleading and incomplete nature of the post.

151.    ***Publication 13***

### Elete Enterprises LLC v. General Steel Corporation

Michigan Court of Appeals - Plaintiff's complaint alleged that it entered into a purchase agreement with defendant on September 6, 2005, pursuant to which

defendant agreed to provide plaintiff with a prefabricated building and plaintiff agreed to pay defendant $116,553 for the building. Plaintiff further alleged that it paid defendant $30,004 as a deposit on the building as provided for in the purchase agreement and that it performed all of its obligations under the contract.

Plaintiff additionally asserted that it had yet to receive the building or building materials as required by the purchase agreement and that defendant had refused to refund the deposit. Plaintiff alleged that the failure to deliver the building or refund the deposit constituted a material breach of contract, proximately resulting in damages in the amount of $30,004.

### *Publication 13 is Inaccurate and Intentionally Misleading*

152.    This posting does not disclose that the statements published are unproven allegations and were/are contested.

153.    Defendants fail to disclose that this matter was ordered to arbitration and that the plaintiff Elete never pursued the claim.

154.    Defendants fail to disclose that these allegations were never proven.

155.    Defendants fail to disclose that General Steel did not breach the contract.

156.     Defendants fail to disclose the status of the proceeding.

157.    The subject Post is not full, complete and fair reporting of that case.

158.    Defendants have selectively published inflammatory materials out of context.

159.    The snippets published on the Industry Related Legal Matters page are incomplete and inaccurate and intentionally published to discourage new and existing customers from doing business with or contacting Plaintiff, and mislead people searching for information about General Steel that General Steel will defraud them on any new sales in 2014 and thereafter.

29

160.    Subsequent changes to the "Industry Related Legal Matters" seeking to

add disclaimers fail to cure the false, misleading and incomplete nature of the post.

161.    ***Publication 14***

### Evangelistic Outreach Center v. General Steel Corporation

North Carolina Court of Appeals - Defendant, General Steel Corporation, is a
Colorado company that sells prefabricated steel buildings. Plaintiff, Evangelistic
Outreach Center, is a religious institution organized as a North Carolina non-
profit corporation. In June 2004, plaintiff signed an agreement to buy a building
from defendant. Thereafter, a dispute arose regarding the amount that plaintiff
owed for the steel building. On 25 May 2005 plaintiff filed a complaint against
defendant alleging fraud, unfair and deceptive trade practices, and breach of
contract.

***Publication 14 is Inaccurate and Intentionally Misleading***

162.    Defendants fail to disclose that this matter related to an arbitration

proceeding.

163.    This posting does not disclose that the statements published are unproven

allegations and were/are contested.

164.    Defendants fail to disclose that the contract in dispute was from 2001,

some 13 years ago.

165.    Defendants fail to disclose the status of the proceeding.

166.    The subject Post is not full, complete and fair reporting of that case.

167.    Defendants have selectively published inflammatory materials out of

context.

168.    The snippets published on the Industry Related Legal Matters page are

incomplete and inaccurate and intentionally published to discourage new and existing

customers from doing business with or contacting Plaintiff, and mislead people

searching for information about General Steel that General Steel will defraud them on

any new sales in 2014 and thereafter.

169.    Subsequent changes to the "Industry Related Legal Matters" seeking to

add disclaimers fail to cure the false, misleading and incomplete nature of the post.

170.    ***Publication 15***

### David B. Fisher; Bison Constructors Inc; & Mark Yakowec v. General Steel Domestic Sales, LLC

U.S. District Court of Colorado - Plaintiffs are former customers of Defendant
General Steel Domestic Sales, LLC. The individual Defendants are present and
former General Steel officers and managers. In 2007, Plaintiffs entered into
contracts with General Steel to purchase pre-engineered steel structures. These
contracts all include identical arbitration clauses providing that any controversy or
claim arising out of or relating to [the] contract, or the breach thereof shall be
resolved by arbitration...On June 28, 2010, Plaintiffs filed this action in this Court.
Shortly thereafter, Defendants filed a motion to compel arbitration.

***Publication 15 is Inaccurate and Intentionally Misleading***

171.    This posting does not disclose that the statements published are unproven

allegations and were/are contested.

172.    This posting relates to another putative class action lawsuit filed by

attorney Grant.

173.    The putative class action was ordered to arbitration by the federal court

but Defendant Grant subsequently refused to comply with the arbitrator's orders.

174.    The allegations were never proven and arbitrator Joseph Bellipanni of the

Judicial Arbiter Group, Inc., awarded attorney's fees to General Steel.

175.    Defendants fail to disclose the status of the proceeding or Plaintiff's allegations or defenses.  The knowledge and conduct of Defendants' attorney Grant should be imputed to Defendants.

176.    The subject Post is not full, complete and fair reporting of that case.

177.    Defendants have selectively published inflammatory materials out of context.

178.    The snippets published on the Industry Related Legal Matters page are incomplete and inaccurate and intentionally published to discourage new and existing customers from doing business with or contacting Plaintiff, and mislead people searching for information about General Steel that General Steel will defraud them on any new sales in 2014 and thereafter.

179.    Subsequent changes to the "Industry Related Legal Matters" seeking to add disclaimers fail to cure the false, misleading and incomplete nature of the post.

180.    ***Publication 16***

### Polyrock Technologies, LLC v. General Steel Domestic Sales, LLC

U.S. District Court of Colorado - When General Steel and Genstone began marketing their own products, they deceptively used advertising and marketing materials received from and depicting the products of PolyRock's predecessors to advertise the products that General Steel and Genstone were now manufacturing on their own. General Steel's actions in this regard, as well as its use of misappropriated technology to manufacture products without permission, are not the first time it has engaged in deceptive trade practices.  In December of 2004, a judge of the Jefferson County, Colorado, District Court found that in connection with the sale of steel buildings General Steel "for years engaged in sales practices that were riddled with misrepresentations and omissions" and imposed civil penalties against Jeff Knight of $200,000 and against Defendant Kevin Kissire of $20,000 and permanently enjoined defendants General Steel,

Knight, and Kissire from engaging in deceptive sales practices or actions
contrary to the Colorado Consumer Protection Act. Genstone and General Steel
acted in bad faith, willfully violated the injunction entered by the Jefferson County
District Court, and willfully and wantonly disregarded the rights of plaintiff.

### Publication 16 is Inaccurate and Intentionally Misleading

181.   This posting does not disclose that the statements published are unproven
allegations and were/are contested.

182.    In this matter, General Steel moved in federal court to strike the irrelevant
allegations relating to the 2004 case brought by the Colorado Office of Attorney
General.

183.   The lawsuit brought by Polyrock in 2004 against General Steel and an
affiliated company related to claims over technology for a siding product.  The lawsuit
was settled and dismissed.  No monetary payments were made by any party.

184.   Defendants fail to disclose the status of the proceeding.

185.   The subject Post is not full, complete and fair reporting of that case.

186.   Defendants have selectively published inflammatory materials out of
context.

187.   The snippets published on the Industry Related Legal Matters page are
incomplete and inaccurate and intentionally published to discourage new and existing
customers from doing business with or contacting Plaintiff, and mislead people
searching for information about General Steel that General Steel will defraud them on
any new sales in 2014 and thereafter.

188.    Subsequent changes to the "Industry Related Legal Matters" seeking to add disclaimers fail to cure the false, misleading and incomplete nature of the post.

189.    ***Publication 17***

## Angermann v. General Steel Domestic Sales

U.S. District Court of Colorado - Plaintiffs executed purchase orders for three buildings to be supplied by defendant General Steel Domestic Sales, LLC ("General Steel"), in May, 2005. The individual defendants were various officers and employees of General Steel at the time the purchase orders were signed. Plaintiffs claim on behalf of a putative class of similar purchasers that these purchase orders were deceptive and misleading, and, indeed, had been found to be so by a Colorado state district court at the time plaintiffs and the other members of the putative class executed their purchase orders.

They assert claims under the Colorado Consumer Protection Act as well as for civil theft and fraud in the inducement, and seek declaratory and monetary relief on behalf of themselves and the putative class.

***Publication 17 is Inaccurate and Intentionally Misleading***

190.    This posting does not disclose that the statements published are unproven allegations and were/are contested.

191.    This is a misleading and inaccurate publication from yet another putative class action lawsuit filed by Defendants' attorney Paul M. Grant.

192.    Approximately two years after dismissing the *Heinbaugh* case referenced in Publication 1 above, Defendants' attorney Grant filed a virtually identical putative class action in 2010 in *Angermann et. al. v. General Steel*, U.S. District Court for the District of Colorado, case no. 10-cv-00711 REB-MJW.

193.    In both cases, the claim brought by attorney Grant was that the General Steel contract was allegedly illegal during 2005 due to alleged non-compliance with a

court order. The only difference in the class allegations in these two suits is that Defendants' attorney Grant changed the date from "December 31, 2005" to "approximately November 30, 2005."

194.    Defendants' attorney Grant's cut and paste Complaint even had the same significant typo where he alleges in paragraphs 15 and 14 respectively that the "contact" [rather than "contract"] was misleading and unenforceable.

195.    As in *Heinbaugh*, the federal court compelled the matter to arbitration. Attorney Grant never pursued the matter on behalf of a class in arbitration.

196.    Defendants misleadingly publish these contrived and unproven allegations as facts without context.

197.    Defendants fail to disclose the status of the proceeding.

198.    The subject Post is not full, complete and fair reporting of that case.

199.    Defendants have selectively published inflammatory materials out of context.

200.    The snippets published on the Industry Related Legal Matters page are incomplete and inaccurate and intentionally published to discourage new and existing customers from doing business with or contacting Plaintiff ,and mislead people searching for information about General Steel that General Steel will defraud them on any new sales in 2014 and thereafter.

201.    Subsequent changes to the "Industry Related Legal Matters" seeking to add disclaimers fail to cure the false, misleading and incomplete nature of the post.

202.    ***Publication 18***

### Olympia Steel Building Systems Corp v. General Steel Domestic Sales

Olympia and Universal contend that the Defendants have engaged in defamatory sales techniques, which disparaged Olympia during sales calls. They commenced this action in the Court of Common Pleas of Allegheny County, Pennsylvania. They request and / or have asserted claims of: defamation; commercial disparagement; interference with prospective contractual relations; a permanent injunction; a preliminary injunction; "enterprise liability / piercing the corporate veil"; and unfair competition and false advertising under the Lanham Act.

***Publication 18 is Inaccurate and Intentionally Misleading***

203.    This posting does not disclose that the statements published are unproven allegations and were/are contested.

204.    Defendants misleadingly publish these contrived and unproven allegations as facts without context.

205.    The published statements were never proven and vigorously disputed.

206.    The litigation was settled many years ago, yet no dates or context are provided.

207.    Defendants fail to disclose the status of the proceeding.

208.    The subject Post is not full, complete and fair reporting of that case.

209.    Defendants have selectively published inflammatory materials out of context.

210.    The snippets published on the Industry Related Legal Matters page are incomplete and inaccurate and intentionally published to discourage new and existing customers from doing business with or contacting Plaintiff, and mislead people

searching for information about General Steel that General Steel will defraud them on any new sales in 2014 and thereafter.

211.    Subsequent changes to the "Industry Related Legal Matters" seeking to add disclaimers fail to cure the false, misleading and incomplete nature of the post.

212.    ***Publication 19***

### Michael & Jessamine Guerzon v. General Steel Domestic Sales, LLC

U.S. District Court of Colorado - I will note that counsel for these parties are skating on thin ice. The multitude of cases with these same counsel have not gone unnoticed. And while the present matter cannot remain in this Court, it does not appear that it should be refiled anywhere. The Final Arbitration Award at issue here is clear and does not appear to require any judicial interpretation. It is strongly suggested that counsel put aside their obvious personal animosity and behave like the professionals they are.

***Publication 19 is Inaccurate and Intentionally Misleading***

213.    The *Guerzon* case referenced in this publication is yet another case brought by Defendants' attorney Paul M. Grant against General Steel.

214.    After an arbitration hearing, Defendants' attorney Grant's clients lost on all of their claims for relief, and the arbitrator awarded General Steel $40,304 in attorney's fees.

215.    Defendants again inaccurately and incompletely and misleadingly quote from irrelevant litigation matters in order to perpetuate their campaign of false advertising aned defamation.  Defendants' attorney Grant's knowledge and conduct should be imputed to Defendants.

216.    Defendants fail to disclose the status of the proceeding.

217.    The subject Post is not full, complete and fair reporting of that case.

218.    Defendants have selectively published inflammatory materials out of context.

219.    The snippets published on the Industry Related Legal Matters page are incomplete and inaccurate and intentionally published to discourage new and existing customers from doing business with or contacting Plaintiff, and mislead people searching for information about General Steel that General Steel will defraud them on any new sales in 2014 and thereafter.

220.    Subsequent changes to the "Industry Related Legal Matters" seeking to add disclaimers fail to cure the false, misleading and incomplete nature of the post.

221.    *Publication 20*

## James Conner v. General Steel Domestic Sales, LLC

U.S. District Court of Colorado - This action involves the purchase and sale of a custom, pre-engineered steel building. A dispute arose between the parties concerning the building.

### Publication 20 is Inaccurate and Intentionally Misleading

222.    This posting does not disclose that the statements published are unproven allegations and were/are contested.

223.    The *Conner* case referenced in this publication is yet another case brought by Defendants' attorney Paul Grant against General Steel.

224.    The claim was compelled to arbitration. Attorney Grant filed it as part of a putative consolidated arbitration case along with *Fisher* (Publication 15 above), but his consolidation efforts were rejected by arbitrator Joseph Bellipanni and General Steel was awarded attorney's fees.

225.   Defendants again inaccurately and incompletely and misleadingly quote from irrelevant litigation matters in order to perpetuate their campaign of defamation. Defendants' attorney Grant's knowledge and conduct should be imputed to Defendants.

226.   Defendants fail to disclose the status of the proceeding.

227.   The subject Post is not full, complete and fair reporting of that case.

228.   Defendants have selectively published inflammatory materials out of context.

229.   The snippets published on the Industry Related Legal Matters page are incomplete and inaccurate and intentionally published to discourage new and existing customers from doing business with or contacting Plaintiff, and mislead people searching for information about General Steel that General Steel will defraud them on any new sales in 2014 and thereafter.

230.   Subsequent changes to the "Industry Related Legal Matters" seeking to add disclaimers fail to cure the false, misleading and incomplete nature of the post.

231.   Defendants' Pop-Up Advertisement is false, inaccurate, incomplete and misleading in at least the following ways:

    a.   Defendants' suggestion that they "hear from their customers" falsely suggests that their customers are the source of information about the complaints, and the websites to which people are being directed.  In fact, Defendants created and are the primary and overwhelming source of negative information and websites about Plaintiff to which people are being directed.

b. In 2014, Plaintiff is not a 'once well-known' steel building broker, but continues to be a market leader and established steel building company.

c. In 2014, Plaintiff does not have an 'atrocious reputation' independent of Defendants' activities, or unsatisfactory delivery rates compared to the industry as a whole, or in comparison with Armstrong Steel.

d. In 2014, Plaintiff is not "back to its old tricks, targeting unsuspecting consumers." a reference to Attorney General issues long resolved but re-published by Defendants for their own nefarious purposes.

Defendants' Pop-Up Advertisement states explicitly, or implicitly, that Defendants Armstrong and Chumley have impeccable reputations in the industry and with consumers, which is untrue and false comparative advertising.

**FIRST CLAIM FOR RELIEF**
**(Unfair Competition and Unfair Trade Practices Under the Lanham Act)**

232.   Plaintiff incorporates the preceding paragraphs as if set forth herein.

233.   Defendants' activities and statements as identified above, including the Pop-Up Advertising, AdWords[®]  and Yahoo/Bing advertisement placements, organic search results and the landing page for that advertisement, and banner ads including but not limited to the December 3 and 22, 2014 ads described in ¶ 16 above, were designed for commercial advertising purposes and promotion between competitors for the purpose of influencing consumers to buy Defendants' goods and services and to discourage and deter customers and potential customers from not buying Plaintiff's goods and services.

234.    Defendants' dissemination and publication is available through Google AdWords®, Yahoo/Bing and organic search to any consumer searching for information about Plaintiff or steel building manufacturers in general.

235.    Defendants Armstrong and Chumley intend consumers to believe their steel buildings are better and that their company is trustworthy in comparison to Plaintiff in engaging in the above advertisements, activities and statements.

236.    Defendants Armstrong and Chumley fail to disclose their own history of litigation, court losses, consumer complaints, conflicts of interest, involvement, biases and business practices and by implication convey that their reputations are exemplary.

237.    Defendant's own history of business practices and court rulings against them, which are not disclosed but known to Defendants, establish Defendants' propensity towards fraud, deceit, unlawful practices and ethics they attempt to push onto Plaintiff's reputation.

238.    Defendants have determined that the best defense is offense, attempting to distract customers from their own sordid history of fraud, deceit, unlawful practices and ethics.

239.    Defendants intend to have consumers not do business with Plaintiff, and/or to bring litigation or sue Plaintiff, or otherwise bring claims against Plaintiff.

240.    Defendants' advertisements, comparisons, activities and statements are false, and/or misleading in violation of 15 U.S.C. § 1125(a)(1)(A).

241.    Defendants' advertisements, activities and statements were designed to, and are likely to, deceive consumers.

242.   Defendants engaged in any unfair, deceptive, untrue or misleading advertising as defined under the Lanham Act.

243.   Defendants' advertisements, activities and statements as identified above had and have a material effect on consumer purchasing decisions.

244.   Plaintiff suffered damages as a result of Defendants activities including but not limited to actual damages, special damages, incidental and consequential damages.

245.   Plaintiff is entitled to any and all damages available under law, including disgorgement of profits, statutory damages, costs and attorney fees.

## SECOND CLAIM FOR RELIEF
### (Defamation – Libel & Libel Per Se)

246.   Plaintiff incorporates the preceding paragraphs as if set forth herein.

247.   Defendants' paid advertising scheme postings as identified above on the Industry Related Legal Matters about Plaintiff and their Pop-Up Advertising ("Defamatory Postings") above are defamatory.

248.   Defendants' Defamatory Postings are false statements under their ordinary and popular meaning.

249.   Defendants' Defamatory Postings are defamatory on their face or, alternatively, by innuendo or implication.

250.   Defendants' Defamatory Postings would generally be understood by customers, prospective customers and others to state facts that are false and misleading.

251.   Defendants' Defamatory Postings are neither accurate, complete nor a fair summary of legal proceedings within the steel building industry or as against Plaintiff.

252.    Defendants' Defamatory Postings were made negligently, with reckless disregard for the truth or were intentionally false.

253.    Defendants' Defamatory Postings were made with actual malice.

254.    Defendants' Defamatory Postings created a greater sting than the actual resolution of those cases would establish.

255.    Defendants' Defamatory Postings were made for the sole purpose of causing harm to Plaintiff.

256.    Defendants' Defendants' Defamatory Postings above constitute libel because they are a negative characterization of Plaintiff General Steel coupled with a clear but false implication that the author is privy to facts about the person that are unknown to the general reader.

257.    Defendants' Defendants' Defamatory Postings relate to General Steel's business, trade, and profession, and therefore constitute libel per se.

258.    As a result of Defendants' defamation and libel of Plaintiff, Plaintiff has been injured and sustained actual, special, presumed and other damage as identified herein in an amount to be proven at trial.

259.    Plaintiff's damages include harm to General Steel's business reputation, humiliation, and good will.

260.    In addition, Defendants' conduct was attended by circumstances of fraud, malice and willful and wanton behavior.

261.    Plaintiff seeks recovery of punitive damages pursuant to Colorado law for Defendants' conduct and actions as alleged herein and will be proven at trial.

## THIRD CLAIM FOR RELIEF
### (Intentional Interference with Prospective Business Advantage)

262.    Plaintiff incorporates the preceding paragraphs as if set forth herein.

263.    Defendants' Defamatory Postings are intended to cause potential customers of General Steel to not business with General Steel and instead do business with Armstrong Steel and drive clients to Defendants' attorney Paul M. Grant.

264.    It is believed that many prospective customers have not contacted and/or failed to do business with General Steel after viewing the advertising scheme and Publications.

265.    Defendants' interference with General Steel's prospective business advantage is improper.

266.    Defendants' intentional interference with the prospective business advantage of General Steel has caused General Steel to sustain actual, consequential, lost profits, and unjust enrichment/restitutionary damages.  Said amounts will be proven at trial.

267.    In addition, Defendants' conduct was attended by circumstances of fraud, malice and willful and wanton behavior.  Plaintiff seeks recovery of punitive damages pursuant to Colorado law for Defendants' conduct and actions as alleged herein and will be proven at trial.

## FOURTH CLAIM FOR RELIEF
### (Civil Conspiracy)

268.    Plaintiff incorporates the preceding paragraphs as if set forth herein.

269.    Upon information and belief, Defendants' attorney Paul M. Grant is and

has been a co-conspirator in the acts alleged herein.  Defendants, acting as a malicious combination of two or more persons, agreed upon an unlawful common objective to be accomplished involving unlawful acts and unlawful purposes. Discovery may reveal other co-conspirators, including other attorneys for Defendants.

270.    Each Defendant committed one or more overt acts in furtherance of the common objective.

271.    As a proximate result of the conspiracy, Plaintiff has been injured and sustained damage as identified above in an amount to be proven at trial.

272.    In addition, Defendants' conduct was attended by circumstances of fraud, malice and willful and wanton behavior.  Plaintiff seeks recovery of punitive damages pursuant to Colorado law for Defendants' conduct and actions as alleged herein and will be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, General Steel prays for judgment against Defendants, and each of them, as follows:

1.    For actual, compensatory, special, general, consequential, incidental, exemplary, punitive, treble damages under the Lanham Act, costs, and attorney's fees, and all other damages provided under law in an amount to be determined at trial.

2.    For a injunction requiring Defendants to:

   a.  cease and desist its AdWords$^{®}$  and Yahoo/Bing advertising campaigns triggered by search keywords for Plaintiff's company name, brand or owner and officer names.

   b.  cease and desist directing any people using the Internet to the Industry Legal Matters page on its website.

   c.  cease and desist from advertising designed to create misleading comparisons between Plaintiff and Armstrong Steel.

      d.  remove all defamatory posts from any advertising or landing page.

    3.     For such other and further appropriate relief as the Court deems just and proper.

DATED: February 3, 2015.

                        Respectfully Submitted,

                        /s/ David S. Fein
                        David S. Fein, Reg. No. 18788
                        Patrick D. Frye, Reg. No. 30369
                        Building Services Group, LLC Legal Dept.
                        10639 Bradford Road
                        Littleton, CO 80127

                        Attorneys for Plaintiff General Steel Domestic
                        Sales, LLC, d/b/a General Steel Corporation

Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-01932-REB-CBS

GENERAL STEEL DOMESTIC SALES, LLC
d/b/a GENERAL STEEL CORPORATION,

       Plaintiff,

v.

ETHAN DANIEL CHUMLEY AND ATLANTIC
BUILDING SYSTEMS, LLC,

       Defendants.

---

## DEFENDANTS' ANSWER TO AMENDED COMPLAINT

---

Defendants Ethan Daniel Chumley and Atlantic Building Systems, LLC d/b/a Armstrong Steel ("Armstrong") (collectively "Defendants"), through their counsel, submit their Answer to Plaintiff General Steel's ("Plaintiff") Amended Complaint (ECF No. 49) filed in this matter.

### JURISDICTION AND VENUE

1.      Paragraph 1 of the Amended Complaint contains legal conclusions to which no response is required. To the extent that the allegations require a response, Defendants admit that the Court has jurisdiction, under 28 U.S.C. § 1338(a) and (b), 1331, and 15 U.S.C. § 1121(a), and that Plaintiff bring the claims it alleges.

2.      Paragraph 2 of the Amended Complaint contains legal conclusions to which no response is required. To the extent that the allegations require a response,

Defendants admit that, under 28 U.S.C. § 1367(a), the Court has jurisdiction over Plaintiff's state-law claims pursuant to supplemental jurisdiction.

3.      Paragraph 3 of the Amended Complaint contains legal conclusions to which no response is required. To the extent that the allegations require a response, Defendants admit that, under 28 U.S.C. § 1391(b) and (c), this Court is the proper venue.

## THE PARTIES

4.      Defendants admit the allegations in Paragraph 4.

5.      Defendants admit the allegations in Paragraph 5.

6.      Defendants admit the allegations in Paragraph 6, except that Atlantic Building Systems is a Delaware Limited Liability Company, not a corporation.

## FACTS

7.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7, and therefore deny them.

8.      Defendants admit the allegations in Paragraph 8.

9.      Defendants admit that Judge Brimmer issued an order in May 2013 that is currently on appeal to the Tenth Circuit.

10.     Defendants deny the allegations in Paragraph 10.

11.     Defendants admit that they have been represented in the past by attorney Paul Grant. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 11, and therefore deny them.

12. Defendants admit that Google AdWords and Bing Ads are advertising services that provide capabilities for advertising online on Google and Bing/Yahoo. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 12, and therefore deny them.

13. Defendants admit that in February 2014, Armstrong started pay-per-click advertisements on Google directing customers to the "Industry Related Legal Matters" (IRLM) page of the Armstrong website. Defendants deny the characterization of the ads and deny the remaining allegations in Paragraph 13.

14. Defendants admit that in February 2014, Armstrong started pay-per-click advertisements on Yahoo/Bing directing customers to the "Industry Related Legal Matters" page of the Armstrong website. Defendants deny the characterization of the ads and deny the remaining allegations in Paragraph 14.

15. Defendants admit they run advertisements on Bing triggered by the keyword General Steel and that they run advertisements on Google triggered by the keyword [General Steel]. Defendants deny the remaining allegations in Paragraph 15.

16. Defendants admit they run advertisements on Bing triggered by the keyword General Steel and that they run advertisements on Google triggered by the keyword [General Steel], and that these advertisements link to the IRLM page. Defendants deny the remaining allegations in Paragraph 16.

17. Defendants are unsure what advertisements are referenced in Paragraph 17 and thus lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17, and therefore deny them.

18.     Defendants are unsure what advertising campaign is referenced in Paragraph 18 and thus lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18, and therefore deny them.

19.     Defendants are unsure what webpage is referenced in Paragraph 19 and therefore lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore deny them.

20.     Defendants are unsure what hyperlinks are referenced in paragraph 20 and thus lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20, and therefore deny them.

21.     Defendants admit that the 24 of the 30 postings on the IRLM page concern General Steel, and that six other postings involve other steel-building companies. Defendants deny the remaining allegations in Paragraph 21.

22.     Defendants deny that the Industry Related Legal Matters page purports to be a complete list of lawsuits and legal matters relating to companies in the steel building industry and therefore denies the allegations in Paragraph 22.

23.     Defendants deny the allegations in Paragraph 23.

24.     Defendants deny the allegations in Paragraph 24.

25.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25, and therefore deny them.

26.     Defendants deny the allegations in Paragraph 26.

27.     Defendants admit that the IRLM page contains information about Armstrong Steel. Defendants deny the remaining allegations in Paragraph 27.

28.     Defendants deny the allegations in Paragraph 28.

29.     Defendants deny the allegations in Paragraph 29.

30.     Defendants deny the allegations in Paragraph 30.

31.     Defendants deny the allegations in Paragraph 31.

32.     Defendants deny the allegations in Paragraph 32.

33.     Defendants deny the allegations in Paragraph 33.

34.     Defendants deny the allegations in Paragraph 34.

35.     Defendants admit that a window displays with the content alleged in Paragraph 35 when a user moves her mouse over selected text on Armstrong's Things to Remember webpage. Defendants deny the remaining allegations in Paragraph 35.

36.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36, and therefore deny them.

37.     Defendants deny the allegations in Paragraph 37.

38.     Defendants deny the allegations in Paragraph 38.

39.     Defendants deny the allegations in Paragraph 39.

40.     Defendants deny the allegations in Paragraph 40.

41.     Defendants deny the allegations in Paragraph 41.

42.     Upon information and belief, Defendants admit that Paul Grant is listed as an attorney for plaintiffs on the *Heinbaugh* case. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 42, and therefore deny them.

43.     Defendants deny the allegations in Paragraph 43.

44.     Defendants deny the allegations in Paragraph 44.

45.     Defendants deny the allegations in Paragraph 45.

46.     Defendants deny the allegations in Paragraph 46.

47.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47, and therefore deny them.

48.     Defendants deny the allegations in Paragraph 48.

49.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49, and therefore deny them.

50.     Defendants deny the allegations in Paragraph 50.

51.     Defendants deny the allegations in Paragraph 51.

52.     Defendants deny the allegations in Paragraph 52.

53.     Defendants deny the allegations in Paragraph 53.

54.     Defendants deny the allegations in Paragraph 54.

55.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55, and therefore deny them.

56.     Defendants deny the allegations in Paragraph 56

57.     Defendants deny the allegations in Paragraph 57.

58.     Defendants deny the allegations in Paragraph 58.

59.     Defendants deny the allegations in Paragraph 59.

60.     Defendants deny the allegations in Paragraph 60.

61.     Defendants deny the allegations in Paragraph 61.

62.     Defendants deny the allegations in Paragraph 62.

63.     Defendants deny the allegations in Paragraph 63.

64.     Defendants deny the allegations in Paragraph 64.

65.     Defendants deny the allegations in Paragraph 65.

66.     Defendants admit that they were parties to the reference lawsuit in Paragraph 66. Defendants deny the remaining allegations in Paragraph 66.

67.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 67, and therefore deny them.

68.     Defendants deny the allegations in Paragraph 68.

69.     Defendants admit that the IRLM page does not mention the outcome of the referenced case in Paragraph 69. Defendants deny that they had any duty to make such a disclosure. Defendants deny the remaining allegations in Paragraph 69.

70.     Defendants admit that the Order referenced in Paragraph 70 ruled in General Steel's favor on some issues. Defendants deny the remaining allegations in Paragraph 70.

71.     Defendants admit that the Order referenced in Paragraph 71 ruled in General Steel's favor on some issues. Defendants deny the remaining allegations in Paragraph 71.

72.     Defendants deny the allegations in Paragraph 72.

73.     Defendants deny the allegations in Paragraph 73.

74.     Defendants deny the allegations in Paragraph 74.

75.     Defendants deny the allegations in Paragraph 75.

76.     Defendants deny the allegations in Paragraph 76.

77.     Defendants deny the allegations in Paragraph 77.

78.     Defendants admit that the posting is not from the U.S. District Court for the District of Colorado, and that it is from the 2004 state court proceedings brought against Plaintiff by the Colorado Attorney General's office. Defendants deny the remaining allegations in Paragraph 78.

79.     Defendants deny the allegations in Paragraph 79.

80.     Defendants deny the allegations in Paragraph 80.

81.     Defendants admit that the ruling refers to General Steel sales practices that occurred in the 2000s. Defendants deny the remaining allegations in Paragraph 81.

82.     Defendants admit that the IRLM page does not mention the settlement terms or the outcome of the referenced case in Paragraph 82. Defendants deny that they had any duty to make such a disclosure. Defendants deny the remaining allegations in Paragraph 82.

83.     Defendants deny the allegations in Paragraph 83.

84.     Defendants deny the allegations in Paragraph 84.

85.     Defendants deny the allegations in Paragraph 85.

86.     Defendants deny the allegations in Paragraph 86.

87.     Defendants deny the allegations in Paragraph 87.

88.     Defendants deny the allegations in Paragraph 88.

89.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 89, and therefore deny them.

90.     Defendants deny the allegations in Paragraph 90.

91.     Defendants deny the allegations in Paragraph 91.

92.     Defendants deny the allegations in Paragraph 92.

93.     Defendants deny the allegations in Paragraph 93.

94.     Defendants deny the allegations in Paragraph 94.

95.     Defendants admit the ruling involves an order compelling arbitration, but that it also includes further rulings.

96.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96, and therefore deny them.

97.     Defendants deny the allegations in Paragraph 97.

98.     Defendants deny the allegations in Paragraph 98.

99.     Defendants deny the allegations in Paragraph 99.

100.    Defendants deny the allegations in Paragraph 100.

101.    Defendants deny the allegations in Paragraph 101.

102.    Defendants deny the allegations in Paragraph 102.

103.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103, and therefore deny them.

104.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104, and therefore deny them.

105.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 105, and therefore deny them.

106.    Defendants admit that the IRLM page does not mention the status of the proceeding referenced in Paragraph 106. Defendants deny that they had any duty to make such a disclosure. Defendants deny the remaining allegations in Paragraph 106.

107.    Defendants deny the allegations in Paragraph 107.

108.    Defendants deny the allegations in Paragraph 108.

109.    Defendants deny the allegations in Paragraph 109.

110.    Defendants deny the allegations in Paragraph 110.

111.    Defendants deny the allegations in Paragraph 111.

112.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 112, and therefore deny them.

113.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 113, and therefore deny them.

114.    Defendants admit that the IRLM page does not mention the status of the proceeding referenced in Paragraph 114. Defendants deny that they had any duty to make such a disclosure. Defendants deny the remaining allegations in Paragraph 114.

115.    Defendants deny the allegations in Paragraph 115.

116.    Defendants deny the allegations in Paragraph 116.

117.    Defendants deny the allegations in Paragraph 117.

118.    Defendants deny the allegations in Paragraph 118.

119.    Defendants deny the allegations in Paragraph 119.

120.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 120, and therefore deny them.

121.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 121, and therefore deny them.

122.   Defendants deny the allegations in paragraph 122.

123.   Defendants admit that the IRLM page does not mention the status of the proceeding referenced in Paragraph 123. Defendants deny that they had any duty to make such a disclosure. Defendants deny the remaining allegations in Paragraph 123.

124.   Defendants deny the allegations in Paragraph 124.

125.   Defendants deny the allegations in Paragraph 125.

126.   Defendants deny the allegations in Paragraph 126.

127.   Defendants deny the allegations in Paragraph 127.

128.   Defendants deny the allegations in Paragraph 128.

129.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 129, and therefore deny them.

130.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 130, and therefore deny them.

131.   Defendants admit that the IRLM page does not mention the status of the proceeding referenced in Paragraph 131. Defendants deny that they had any duty to make such a disclosure. Defendants deny the remaining allegations in Paragraph 131.

132.   Defendants deny the allegations in Paragraph 132.

133.   Defendants deny the allegations in Paragraph 133.

134.   Defendants deny the allegations in Paragraph 134.

135.   Defendants deny the allegations in Paragraph 135.

136.    Defendants deny the allegations in Paragraph 136.

137.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 137, and therefore deny them.

138.    Defendants admit that the IRLM page does not mention the status of the proceeding referenced in Paragraph 138. Defendants deny that they had any duty to make such a disclosure. Defendants deny the remaining allegations in Paragraph 138.

139.    Defendants deny the allegations in Paragraph 139.

140.    Defendants deny the allegations in Paragraph 140.

141.    Defendants deny the allegations in Paragraph 141.

142.    Defendants deny the allegations in Paragraph 142.

143.    Defendants deny the allegations in Paragraph 143.

144.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 144, and therefore deny them.

145.    Defendants admit the posting purports to be about a dispute over a contract for services. Defendants deny the remaining allegations in Paragraph 145.

146.    Defendants admit that the IRLM page does not mention the status of the proceeding referenced in Paragraph 146. Defendants deny that they had any duty to make such a disclosure. Defendants deny the remaining allegations in Paragraph 146.

147.    Defendants deny the allegations in Paragraph 147.

148.    Defendants deny the allegations in Paragraph 148.

149.    Defendants deny the allegations in Paragraph 149.

150.    Defendants deny the allegations in Paragraph 150.

151.    Defendants deny the allegations in Paragraph 151.

152.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 152, and therefore deny them.

153.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 153, and therefore deny them.

154.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 154, and therefore deny them.

155.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 155, and therefore deny them.

156.    Defendants admit that the IRLM page does not mention the status of the proceeding referenced in Paragraph 156. Defendants deny that they had any duty to make such a disclosure. Defendants deny the remaining allegations in Paragraph 156.

157.    Defendants deny the allegations in Paragraph 157.

158.    Defendants deny the allegations in Paragraph 158.

159.    Defendants deny the allegations in Paragraph 159.

160.    Defendants deny the allegations in Paragraph 160.

161.    Defendants deny the allegations in Paragraph 161.

162.    Defendants admit that the IRLM page does not mention whether the proceeding referenced in Paragraph 162 related to an arbitration, if it did at all. Defendants deny that the linked-to content references an arbitration proceeding. Defendants deny that they had any duty to make such a disclosure. Defendants deny the remaining allegations in Paragraph 162.

163.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 163, and therefore deny them.

164.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 164, and therefore deny them.

165.   Defendants admit that the IRLM page does not mention the status of the proceeding referenced in Paragraph 165. Defendants deny that they had any duty to make such a disclosure. Defendants deny the remaining allegations in Paragraph 165.

166.   Defendants deny the allegations in Paragraph 166.

167.   Defendants deny the allegations in Paragraph 167.

168.   Defendants deny the allegations in Paragraph 168

169.   Defendants deny the allegations in Paragraph 169.

170.   Defendants deny the allegations in Paragraph 170.

171.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 171, and therefore deny them.

172.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 172, and therefore deny them.

173.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 173, and therefore deny them.

174.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 174, and therefore deny them.

175.   Defendants admit that the IRLM page does not mention the status of the proceeding referenced in Paragraph 175. Defendants deny that they had any duty to

make such a disclosure. Defendants deny the remaining allegations in Paragraph 175, including but not limited to, the allegation about imputation of knowledge and conduct.

176.    Defendants deny the allegations in Paragraph 176.

177.    Defendants deny the allegations in Paragraph 177

178.    Defendants deny the allegations in Paragraph 178

179.    Defendants deny the allegations in Paragraph 179.

180.    Defendants deny the allegations in Paragraph 180.

181.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 181, and therefore deny them.

182.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 182, and therefore deny them.

183.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 183, and therefore deny them.

184.    Defendants admit that the IRLM page does not mention the status of the proceeding referenced in Paragraph 184. Defendants deny that they had any duty to make such a disclosure. Defendants deny the remaining allegations in Paragraph 184.

185.    Defendants deny the allegations in Paragraph 185.

186.    Defendants deny the allegations in Paragraph 186.

187.    Defendants deny the allegations in Paragraph 187.

188.    Defendants deny the allegations in Paragraph 188.

189.    Defendants deny the allegations in Paragraph 189.

190.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 190, and therefore deny them.

191.    Defendants deny the allegations that the publication is misleading and inaccurate. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 191 regarding who filed the lawsuit, and therefore deny them. Defendants deny the remaining allegations in Paragraph 191.

192.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 192, and therefore deny them.

193.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 193, and therefore deny them.

194.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 194, and therefore deny them.

195.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 195, and therefore deny them.

196.    Defendants deny the allegations in Paragraph 196.

197.    Defendants admit that the IRLM page does not mention the status of the proceeding referenced in Paragraph 197. Defendants deny that they had any duty to make such a disclosure. Defendants deny the remaining allegations in Paragraph 197.

198.    Defendants deny the allegations in Paragraph 198.

199.    Defendants deny the allegations in Paragraph 199.

200.    Defendants deny the allegations in Paragraph 200.

201.    Defendants deny the allegations in Paragraph 201.

202.    Defendants deny the allegations in Paragraph 202.

203.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 203, and therefore deny them.

204.    Defendants deny the allegations in Paragraph 204.

205.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 205, and therefore deny them.

206.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 206, and therefore deny them.

207.    Defendants admit that the IRLM page does not mention the status of the proceeding referenced in Paragraph 207. Defendants deny that they had any duty to make such a disclosure. Defendants deny the remaining allegations in Paragraph 207.

208.    Defendants deny the allegations in Paragraph 208.

209.    Defendants deny the allegations in Paragraph 209.

210.    Defendants deny the allegations in Paragraph 210.

211.    Defendants deny the allegations in Paragraph 211.

212.    Defendants deny the allegations in Paragraph 212.

213.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 213, and therefore deny them.

214.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 214, and therefore deny them.

215.    Defendants deny the allegations in Paragraph 215.

216.    Defendants admit that the IRLM page does not mention the status of the proceeding referenced in Paragraph 216. Defendants deny that they had any duty to make such a disclosure. Defendants deny the remaining allegations in Paragraph 216.

217.    Defendants deny the allegations in Paragraph 217.

218.    Defendants deny the allegations in Paragraph 218.

219.    Defendants deny the allegations in Paragraph 219.

220.    Defendants deny the allegations in Paragraph 220.

221.    Defendants deny the allegations in Paragraph 221.

222.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 222, and therefore deny them.

223.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 223, and therefore deny them.

224.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 224, and therefore deny them.

225.    Defendants deny the allegations in Paragraph 225.

226.    Defendants admit that the IRLM page does not mention the status of the proceeding referenced in Paragraph 226. Defendants deny that they had any duty to make such a disclosure. Defendants deny the remaining allegations in Paragraph 226.

227.    Defendants deny the allegations in Paragraph 227.

228.    Defendants deny the allegations in Paragraph 228.

229.    Defendants deny the allegations in Paragraph 229.

230.    Defendants deny the allegations in Paragraph 230.

231.   Defendants deny the allegations in Paragraph 231, including subparts a-d.

## FIRST CLAIM FOR RELIEF

### (Unfair Competition and Unfair Trade Practices under the Lanham Act)

232.   Defendants incorporate and restate the responses and averments contained in the preceding paragraphs 1-231 as if stated here in full.

233.   Defendants deny the allegations in Paragraph 233.

234.   Defendants deny the allegations in Paragraph 234.

235.   Defendants deny the allegations in Paragraph 235.

236.   Defendants deny the allegations in Paragraph 236.

237.   Defendants deny the allegations in Paragraph 237.

238.   Defendants deny the allegations in Paragraph 238.

239.   Defendants deny the allegations in Paragraph 239.

240.   Defendants deny the allegations in Paragraph 240.

241.   Defendants deny the allegations in Paragraph 241.

242.   Defendants deny the allegations in Paragraph 242.

243.   Defendants deny the allegations in Paragraph 243.

244.   Defendants deny the allegations in Paragraph 244.

245.   Defendants deny the allegations in Paragraph 245.

## SECOND CLAIM FOR RELIEF

### (Defamation – Libel and Libel Per Se)

246.   Defendants incorporate and restate the responses and averments contained in the preceding paragraphs 1-245 as if stated here in full.

247.   Defendants deny the allegations in Paragraph 247.

248.   Defendants deny the allegations in Paragraph 248.

249.   Defendants deny the allegations in Paragraph 249.

250.   Defendants deny the allegations in Paragraph 250.

251.   Defendants deny the allegations in Paragraph 251.

252.   Defendants deny the allegations in Paragraph 252.

253.   Defendants deny the allegations in Paragraph 253.

254.   Defendants deny the allegations in Paragraph 254.

255.   Defendants deny the allegations in Paragraph 255.

256.   Defendants deny the allegations in Paragraph 256.

257.   Defendants deny the allegations in Paragraph 257.

258.   Defendants deny the allegations in Paragraph 258.

259.   Defendants deny the allegations in Paragraph 259.

260.   Defendants deny the allegations in Paragraph 260.

261.   Defendants admit that Plaintiff purports to seek punitive damages as alleged in Paragraph 261, but Defendants deny that Plaintiff is entitled to Punitive damages.

### THIRD CLAIM FOR RELIEF

### (Intentional Interference with Prospective Business Advantage)

262.   Defendants incorporate and restate the responses and averments contained in the preceding paragraphs 1-261 as if stated here in full.

263.   Defendants deny the allegations in Paragraph 263.

264.   Defendants deny the allegations in Paragraph 264.

265.   Defendants deny the allegations in Paragraph 265.

266.   Defendants deny the allegations in Paragraph 266.

267.   Defendants deny the allegations in Paragraph 267.

## FOURTH CLAIM FOR RELIEF

### (Civil Conspiracy)

268.   Defendants incorporate and restate the responses and averments contained in the preceding paragraphs 1-267 as if stated here in full.

269.   Defendants deny the allegations in Paragraph 269.

270.   Defendants deny the allegations in Paragraph 270.

271.   Defendants deny the allegations in Paragraph 271.

272.   Defendants deny the allegations in Paragraph 272.

## DEFENSES AND AFFIRMATIVE DEFENSES

Defendants assert the following defenses. By listing these, Defendants do not concede that they bear the burden of proof on them.

1.   Defendants designate all of their denials of material allegations as defenses to the extent necessary to provide a complete defense.

2.   Plaintiff's Complaint, in whole or in part, fails to state a claim on which relief can be granted.

3.   Without acknowledging that such is an affirmative defense as opposed to an affirmative element of Plaintiff's case, to the extent Plaintiff's claims arise from third

party content which Defendants have not created or developed, Plaintiff's claims are barred by the Communications Decency Act, 47 U.S.C. § 230(c)(1).

4.      Plaintiff's claims are barred to the extent that the statements which form the basis for such claims are, in fact, either completely true or substantially true. *See Gordon v. Boyles*, 99 P.3d 75 (Colo. App. 2004); *Gomba v. McLaughlin,* 504 P.2d 337, 339 (Colo. 1972).

5.      To the extent they relate to or quote from documents filed as part of judicial proceedings, Defendants' statements are absolutely privileged under the fair report doctrine as set forth in *Tonnessen v. Denver Pub. Co.*, 5 P.3d 959 (Colo. App. 2000) (explaining, "under the common law doctrine of fair report, reports of in-court proceedings containing defamatory material are privileged if they are fair and substantially correct, or are substantially accurate accounts of what took place[]" and noting, "The privilege exists even if the reporter of the defamatory statements believes or knows them to be false[]", and agreeing, "The fair report privilege is not limited to media defendants, but extends to protect reports of judicial proceedings made by all other persons as well.")

6.      Defendants' statements, even if false, are non-actionable under the incremental harm doctrine as set forth in *Tonnessen v. Denver Pub. Co.*, 5 P.3d 959 (Colo. App. 2000).

7.      Plaintiff has failed to mitigate its damages, if any.

8.      Plaintiff's damages, if any, are the result of its own acts and omissions for which Defendants are not responsible.

9.     Plaintiff has not suffered injury in fact as a result of any alleged act or omission of Defendants.

10.     Plaintiff's equitable claim(s), if any, are barred, in whole or in part, by the doctrine of unclean hands, on account of Plaintiff's conduct.

11.     Plaintiff's claims are barred, in whole or in part, by the doctrines of estoppel and equitable estoppel.

12.     Plaintiff's claims are barred or limited by res judicata or collateral estoppel.

13.     Plaintiffs' claims are barred or limited because they seek unconstitutional penalties, rather than damages.

14.     Plaintiff's request for punitive damages fails to state a claim for this remedy under federal and state pleading standards.

15.     Plaintiff's request for punitive damages cannot be maintained unless the trial is bifurcated. Any award of punitive damages without bifurcating the trial and trying all punitive damages issues only if and after liability on the merits has been found, would violate Defendants' due process rights guaranteed by the Fourteenth Amendment to the United States Constitution and by the constitutions, common law, and public policies of the state of Colorado.

16.     Plaintiff's claims seeking punitive damages and the remedy of punitive damages itself are limited to the amount of actual damage awarded to Plaintiff. Colo. Rev. Stat. § 13-21-102(1)(a).

17.     Plaintiff is unable to prove its entitlement to punitive damages beyond a reasonable doubt. Colo. Rev. Stat. § 13-25-127(2).

18.     None of Defendants' actionable conduct, if any, was attended by circumstances of fraud, malice, or willful-and-wanton conduct.

19.     Plaintiffs' claims seeking punitive damages and the remedy of punitive damages itself cannot be sustained, because an award of punitive damages by a jury that (a) is not provided standards of sufficient clarity for determining the appropriateness, and the appropriate size, of a punitive damages award; (b) is not adequately instructed on the limits on punitive damages imposed by the applicable principles of deterrence and punishment; (c) is not expressly prohibited from awarding punitive damages, or determining the amount of an award of punitive damages, in whole or in part, on the basis of invidiously discriminatory characteristics, including the residence, wealth, corporate status, and irrelevant past acts of Defendants; (d) is permitted to award punitive damages under a standard for determining liability for punitive damages that is vague and arbitrary and does not define with sufficient clarity the conduct or mental state that makes punitive damages permissible; and (e) is not subject to trial court and appellate judicial review for reasonableness and furtherance of legitimate purposes on the basis of objective standards, would violate due process and equal protection rights belonging to Defendants and guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution, the Colorado constitution, and would be improper under the common law and public policies of the state of Colorado.

20.     Any award of punitive damages based on anything other than the conduct of Defendants in connection with the allegations that are the subject of Plaintiff's claims would violate the due process clauses of the Fifth and Fourteenth Amendments to the

U.S. Constitution, the Colorado Constitution, and would be improper under the common law and public policies of the state of Colorado, because any judgment for punitive damages in this case cannot protect Defendants against impermissible multiple punishment for the same wrong.

21.     Defendants reserve the right to assert any and all other affirmative defenses, as set forth in the Federal Rules of Civil Procedure, that investigation, discovery, or trial may reveal to be applicable.

## PRAYER FOR RELIEF

Defendants deny that Plaintiff is entitled to any of the relief it seeks in paragraphs 1-3, including any subparts, of its prayer for relief.

Defendants request that the Court enter judgment in their favor and against Plaintiff on all of its claims; that Plaintiff take nothing by its Complaint; that Plaintiff's Complaint, and all claims alleged therein, and each of them, be dismissed with prejudice; that Defendant be awarded its costs and reasonable attorneys' fees incurred herein pursuant to applicable law; and that Defendant be awarded such other and further relief as the Court may deem proper.

Dated:  February 17, 2015.            Respectfully submitted,


                                     *s/ Kenneth E. Stalzer*
                                     ─────────────────────────────
                                     Hugh Q. Gottschalk (#8525)
                                     Craig R. May (#32267)
                                     Kenneth E. Stalzer  (#42896)
                                     Wheeler Trigg O'Donnell LLP
                                     370 Seventeenth Street, Suite 4500
                                     Denver, CO 80202-5647
                                     Telephone:  303.244.1800
                                     Facsimile:  303.244.1879
                                     Email:  gottschalk@wtotrial.com
                                             may@wtotrial.com
                                             stalzer@wtotrial.com

                                     Jeffrey M. Rosenfeld
                                     Kronenberger Rosenfeld, LLP
                                     150 Post Street, Suite 520
                                     San Francisco, CA 94108
                                     Telephone:  415.955.1155
                                     Facsimile:  415.955.1158
                                     Email:  jeff@KRInternetLaw.com

                                     David S. Gingras
                                     Gingras Law Office, PLLC
                                     4802 E. Ray Road, #23-271
                                     Phoenix, AZ 85044
                                     Telephone:  480.264.1400
                                     Facsimile:  480.248.3196
                                     Email:  david@gingraslaw.com

                                     Attorneys for Defendants, Ethan Daniel
                                     Chumley and Atlantic Building Systems, LLC

Exhibit C

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Colorado

| | |
|---|---|
| General Steel Domestic Sales, LLC | ) |
| *Plaintiff* | ) |
| v. | ) |
| Ethan Daniel Chumley and Atlantic Building Systems, LLC | ) |
| *Defendant* | ) |

Civil Action No.   1:14-cv-01932-REB-CBS

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          Xcentric Ventures, LLC and affiliates
c/o Maria Crimi Speth, Esq.; Jaburg & Wilk, P.C., 3200 N. Central Avenue, Suite 2000, Phoenix, AZ 85012

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Exhibit A

| Place: Gingras Law Office, PLLC; 4802 E. Ray Road, #23-271 Phoenix, AZ 85044 | Date and Time: 02/06/2015 10:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:          01/20/2015

CLERK OF COURT

OR

_____                    _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Ethan Daniel Chumley and Atlantic Building Systems, LLC _____ , who issues or requests this subpoena, are:

Craig May; Wheeler, Trigg, O'Donnell, LLP, 370 17th St., Ste 4500, Denver, CO; may@wtotrial.com; 303-244-1862

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

## INSTRUCTIONS FOR USE IN RESPONDING

A.     All information is to be divulged which is in the possession, custody or control of each individual or corporate party, their attorneys, insurance claim representatives, investigators, agents, employees or other representatives, including all information reasonably available to them.

B.     Where an individual interrogatory calls for an answer, which involves more than one part or sub-part, each part of the answer should be set forth separately so that it is clearly understandable and responsive to the respective sub-part.

C.     The terms "writing" or "written" are intended to include but not necessarily be limited to the following:  other means of recording upon any tangible thing any form of communications, including letters, words, pictures, sounds or symbols or combinations thereof; and it further includes any oral communication later reduced to a writing or confirmed by a letter.

D.     The terms "document" or "documents" are intended to include but not necessarily be limited to the following:   files, notes, memoranda, correspondence or letters of any kind, intra-departmental or office communications, written statements or reports, either signed or unsigned, records or taped interviews or statements, maps, plats, photographs, moving or still pictures, diagrams, plans, drawings, specifications, measurements, or other descriptions, agreements, contracts, records, and computer files in any format and printouts thereof.  The term "document" shall include both originals and all copies which are not identical with the original or which contain any commentary or notation that does not appear on the original.

E.     The term "investigation" means any investigation whether conducted by an employee of any governmental entity or any private person, including representatives of any insurance company or an attorney.  It is intended to include any inquiry into the facts underlying the basis of the claims and defenses presented herein, and any communication with any person thought to have knowledge about the facts.  However, it is not intended to include any communication to which a privilege is claimed between the answering party and its attorney.

F.     If you contend that the answer to any interrogatory is privileged, in whole or in part, or if you object to any interrogatory, in whole or in part, state the reasons for such objection and identify each person having knowledge of the factual basis, if any, on which the privilege is asserted.

G.     When an interrogatory requests that you "identify," or state the "identity" of a person, you are requested to provide his or her:

1. Full name;
2. Present or last known address or, if unknown, the last known whereabouts;
3. Phone number;
4. Present employer's name and address;
5. Occupational position or classification.

H.     Unless otherwise directed, when an interrogatory asks that you "identify" a document or writing, please state:

1. Its nature (e.g., letter, memorandum, report, etc.);
2. Its title, if any;
3. The date it was prepared;
4. The date it was sent;
5. The date it was received;
6. The identity, as defined above, or person(s) who:
   a. Prepared it;
   b. Participated in any way in its preparation; or
   c. Signed it;
7. A statement of its subject matter; and
8. The identity, as defined above, of the person who has custody of it.

I.     In the event that your answer to an interrogatory is "not applicable" or any similar phrase or answer, explain in detail why that interrogatory is not applicable.

J.     In the event that your answer to any interrogatory is "don't know" or "unknown," or any similar phrase or answer, explain in detail all efforts made by the named party or its attorneys or representatives to obtain the answer to that interrogatory.

K.     These interrogatories should be deemed continuing in nature.  It is requested that you update your answers to interrogatories as soon as possible after new information is obtained to reflect any information obtained after the interrogatories are initially answered to include all information up to and including the date of the trial.

L.     Where an interrogatory requests that you provide information concerning Explain a witness may testify about, that interrogatory is intended to elicit a summary of the information that any witness may have provided to you of whether they may testify at trial.

M.      References to "YOU" mean XCENTRIC VENTURES, LLC and its directors, offices, investigators, agents, employees or other representatives, where applicable.

N.      References to "GENERAL STEEL" mean GENERAL STEEL DOMESTIC SALES, LLC, d/b/a GENERAL STEEL CORPORATION and its directors, offices, investigators, agents, employees or other representatives, where applicable.

Exhibit A

## DOCUMENT REQUESTS

1.)   Produce any and all correspondence YOU have relating to complaints, reviews, or comments received from any third party regarding GENERAL STEEL.

2.)   Produce copies of any and all documents YOU have relating to complaints, reviews, or comments received from any third party regarding GENERAL STEEL which were received by YOU from any source but which are not publicly visible on www.ripoffreport.com.

3.)   Produce copies of any and all documents YOU have, including but not limited to Google Analytics reports and/or any similar reports, reflecting the total number of hits/views, and any other available visitor data such as date/time viewed, referral source, viewer IP, viewer location, etc., for each of the following pages:

http://www.ripoffreport.com/r/general-steel/lakewood-colorado-80226/general-steel-lakewood-Colorado-188787-188787

http://www.ripoffreport.com/r/General-Steel-Ripoff-Report-Verified-businesses-you-can-trust-Commitment-to-customer-satisfaction-positive-rating-for-its-customer-support-from-Ripoff-Report-General-Steel-brand-buildings-widely-recognized-brand-of-steel-buildings-in-America-because-of-the-Generals-superior-building-quality-unmatched-commitment-to-customer-satisfaction-and-project-success/Littleton-Colorado-80127/General-Steel-REVIEW-General-Steel-unlimited-commitment-to-customer-satisfaction-General-1037284

http://www.ripoffreport.com/r/General-Steel-Corporation/Denver-Colorado-80226/General-Steel-Corporation-Liars-and-Thieves-that-say-anything-to-get-you-money-Denver-Colo-374014

http://www.ripoffreport.com/r/General-Steel/Lakewood-Colorado-80226/General-Steel-Rip-off-Scam-Miss-represented-Lied-decieved-Lakewood-Colorado-197157

http://www.ripoffreport.com/r/General-Steel/Lakewood-Colorado-80266/General-Steel-In-the-STEAL-business-not-the-STEEL-business-fraud-high-pressure-tactics-241933

http://www.ripoffreport.com/r/General-Steel-Corporation/Lakewood-Colorado-80226/General-Steel-General-Thief-Steels-Again-Lakewood-Colorado-319744

http://www.ripoffreport.com/r/general-steel-ripoff-report-verified-businesses-you-can-trust-commitment-to-customer-satisfact/lakewood-colorado-/general-steel-review-general-steel-unlimited-commitment-to-customer-satisfaction-general-1047014

http://www.ripoffreport.com/r/General-Steel/Littleton-Colorado-80127/General-Steel-Anthem-Steel-Deceptive-Marketing-NOT-A-MANUFACTURER-Overcharging-for-NON-E-1024449

http://www.ripoffreport.com/r/General-Steel-Corporation/Littleton-Colorado-80127/General-Steel-Corporation-misrepasented-what-was-offered-Littleton-Colorado-1020583

http://www.ripoffreport.com/r/General-Steel-Corporation/Littleton-Colorado-80127/General-Steel-Corporation-Anthem-SteelDiscount-Steel-or-Capital-Steel-Industries-Misrepre-1018918

http://www.ripoffreport.com/r/General-Steel/Littleton-Colorado-80127/General-Steel-added-misc-charges-to-our-building-purchase-with-no-change-orders-Littlet-1016153

http://www.ripoffreport.com/r/General-Steel/Littleton-Colorado-80127/General-Steel-Comepletely-deceptive-sales-of-steel-building-Paid-a-lot-more-than-the-or-1013911

http://www.ripoffreport.com/r/General-Steel-Corp/Littleton-Colorado-80127/General-Steel-Corp-The-sales-person-misrepresented-the-time-frame-for-engineering-fabric-981091

http://www.ripoffreport.com/r/General-Steel-Corporation/Lakewood-Colorado-80226/General-Steel-Corporation-Ripoff-steals-112000-from-church-Lakewood-Colorado-199869

http://www.ripoffreport.com/r/General-Steel-Corporation/Lakewood-Colorado-80226/General-Steel-Corporation-Trying-to-make-me-take-delivery-of-steel-and-payment-in-full-on-449440

http://www.ripoffreport.com/r/General-Steel-Anthem-Steel/Lakewood-Colorado-80226/General-Steel-Anthem-Steel-Misrepresentation-Fraud-Breach-of-Contract-Liar-Crooks-S-437422

http://www.ripoffreport.com/r/Anthem-Steel-A-Division-Of-General-Steel/Littleton-Colorado-80127/Anthem-Steel-A-Division-Of-General-Steel-Bait-and-Switch-Littleton-Colorado-402060

http://www.ripoffreport.com/r/General-Steel/Lakewood-Colorado-80226/General-Steel-Verbal-Promises-about-Financing-Kept-Deposit-Deceptive-sale-acts-lies-stalli-396922

http://www.ripoffreport.com/r/General-Steel-Corporation/Lakewood-Colorado-80226/General-Steel-Corporation-Ripoff-Breached-contract-lied-took-my-money-misrepresented-the-180744

http://www.ripoffreport.com/r/General-Steel/Lakewood-Colorado-80266/General-Steel-Corporation-General-Steel-Domestic-Sales-Anthem-Steel-Capital-SteelFraud-188089

http://www.ripoffreport.com/r/General-Steel/Lakewood-Colorado-80266/General-Steel-has-deceptive-sales-practices-misleading-contracts-deposit-RIPOFF-Lakewood-353125

http://www.ripoffreport.com/r/General-Steel-Corporation/Littleton-Colorado-80127/General-Steel-Corporation-Rip-Off-Scam-Miss-represented-contract-Down-right-lied-Littl-352799

http://www.ripoffreport.com/r/General-Steel/Lakewood-Colorado-80266/General-Steel-Corrupt-Company-Lakewood-Colorado-291442

http://www.ripoffreport.com/r/Capital-General-Anthem-And-Discount-Steel-Also-Genstone/nationwide/Captial-General-Anthem-Discount-Steel-Also-Genstone-They-are-thieves-who-mislead-you-228367

Exhibit D

## David Gingras

| | |
|---|---|
| **From:** | Maria Crimi Speth [mcs@jaburgwilk.com] |
| **Sent:** | Wednesday, January 21, 2015 5:35 PM |
| **To:** | 'david@gingraslaw.com'; Debra A. Gower |
| **Subject:** | RE: Subpoena for Xcentric |
| **Attachments:** | image001.png; image003.jpg |

David:

I accept service by email without waiving objections to the subpoena.

**MARIA CRIMI SPETH** | Shareholder | 602.248.1089

JABURG | WILK
Attorneys at Law

**From:** David Gingras [mailto:david@gingraslaw.com]
**Sent:** Tuesday, January 20, 2015 5:56 PM
**To:** Maria Crimi Speth; Debra A. Gower
**Subject:** RE: Subpoena for Xcentric

Of course; thanks for the quick response.

David Gingras, Esq.
Gingras Law Office, PLLC
David@GingrasLaw.com
https://twitter.com/DavidSGingras
http://gingraslaw.com
Tel.: (480) 264-1400
Fax: (480) 248-3196



**From:** Maria Crimi Speth [mailto:mcs@jaburgwilk.com]
**Sent:** Tuesday, January 20, 2015 5:54 PM
**To:** 'david@gingraslaw.com'; Debra A. Gower
**Subject:** RE: Subpoena for Xcentric

David:

Exhibit E

**Jaburg & Wilk, P.C.**
3200 N. Central Avenue, 20th Floor
Phoenix, AZ 85012
602.248.1000

Maria Crimi Speth (012574)
mcs@jaburgwilk.com
Maria Crimi Speth (012574)
mcs@jaburgwilk.com

Attorneys for Xcentric Ventures, LLC

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COURT

| | |
|---|---|
| GENERAL STEEL DOMESTIC SALES, LLC d/b/a GENERAL STEEL CORPORATION, | Case No. 1:14-cv-01932-REB-CBS |
| Plaintiff, | |
| v. | |
| ETHAN DANIEL CHUMLEY AND ATLANTIC BUILDING SYSTEMS. LLC, | |
| Defendants. | |

## NON PARTY XCENTRIC VENTURES, LLC

## RESPONSE TO SUBPOENA

1.) Produce any and all correspondence YOU have relating to complaints, reviews, or comments received from any third party regarding GENERAL STEEL.

Xcentric Ventures, LLC objects on the grounds that the request is overbroad and unduly burdensome, and compliance would require Xcentric Ventures, a non-party in this case, to devote many hours of manpower to search for documents that may not exist. Notwithstanding the objection, Xcentric does not object to making a reasonable search for and production of complaints, reviews, and comments received from third parties regarding General Steel, so long as the results are covered by a protective order limiting the disclosure of the information to the purposes of the litigation.

2.) Produce copies of any and all documents YOU have relating to complaints, reviews, or comments received from any third party regarding GENERAL STEEL which were received by YOU from any source but which are not publicly visible on www.ripoffreport.com.

Xcentric Ventures, LLC objects on the grounds that the request is overbroad and unduly burdensome, and compliance would require Xcentric Ventures, a non-party in this case, to devote many hours of manpower to search for documents that may not exist.  Notwithstanding the objection, Xcentric does not object to making a reasonable search for and production of complaints, reviews, and comments received from third parties regarding General Steel, so long as the results are covered by a protective order limiting the disclosure of the information to the purposes of the litigation.

3.) Produce copies of any and all documents YOU have, including but not limited to Google Analytics reports and/or any similar reports, reflecting the total number of hits/views, and any other available visitor data such as date/time viewed, referral source, viewer IP, viewer location, etc., for each of the following pages:

Xcentric Ventures, LLC objects on the grounds that the request is overbroad and unduly burdensome, and compliance would require Xcentric Ventures, a non-party in this case, to devote many hours of manpower to search for documents that are not in Xcentric's possession.  In explanation, Xcentric does not "have" Google Analytics reports and/or similar reports" because Google Analytics is a database kept by Google, and to access the database requires Xcentric to task a researcher to obtain information.

Without waiving the foregoing objections, Xcentric provides the following responsive information:

http://www.ripoffreport.com/r/general-steel/lakewood-colorado-80226/general-steel-lakewood-Colorado-188787-188787

**Google**: June 2014 – January 23rd, 2015
**Woopra**: June 2014 – January 23rd, 2015

| PageViews | Unique PageViews | People |
|---|---|---|
| 551 | 498 | 539 |

http://www.ripoffreport.com/r/General-Steel-Ripoff-Report-Verified-businesses-you-can-trust-Commitment-to-customer-satisfaction-positive-rating-for-its-customer-support-from-Ripoff-Report-General-Steel-brand-buildings-widely-recognized-brand-of-steel-buildings-in-America-because-of-the-Generals-superior-building-quality-unmatched-commitment-to-customer-satisfaction-and-project-success/Littleton-Colorado-80127/General-Steel-REVIEW-General-Steel-unlimited-commitment-to-customer-satisfaction-General-1037284

**Google**: April 2013 – January 23rd, 2015
**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
|---|---|---|
| 535 | 428 | 502 |

http://www.ripoffreport.com/r/General-Steel-Corporation/Denver-Colorado-80226/General-Steel-Corporation-Liars-and-Thieves-that-say-anything-to-get-you-money-Denver-Colo-374014

**Google**: April 2013 – January 23rd, 2015

**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
| --- | --- | --- |
| 986 | 986 | 164 |

http://www.ripoffreport.com/r/General-Steel/Lakewood-Colorado-80226/General-Steel-Rip-off-Scam-Miss-represented-Lied-decieved-Lakewood-Colorado-197157

**Google**: April 2013 – January 23rd, 2015

**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
| --- | --- | --- |
| 15 | 12 | 43 |

http://www.ripoffreport.com/r/General-Steel/Lakewood-Colorado-80266/General-Steel-In-the-STEAL-business-not-the-STEEL-business-fraud-high-pressure-tactics-241933

**Google**: April 2013 – January 23rd, 2015

**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
| --- | --- | --- |
| 33 | 28 | 52 |

http://www.ripoffreport.com/r/General-Steel-Corporation/Lakewood-Colorado-80226/General-Steel-General-Thief-Steels-Again-Lakewood-Colorado-319744

**Google**: April 2013 – January 23rd, 2015
**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
|---|---|---|
| 49 | 34 | 64 |

http://www.ripoffreport.com/r/General-Steel-Ripoff-Report-Verified-businesses-you-can-trust-Commitment-to-customer-satisfact/Lakewood-Colorado-/General-Steel-REVIEW-General-Steel-unlimited-commitment-to-customer-satisfaction-General-1047014

**Google**: April 2013 – January 23rd, 2015
**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
|---|---|---|
| 38 | 29 | 58 |

http://www.ripoffreport.com/r/General-Steel/Littleton-Colorado-80127/General-Steel-Anthem-Steel-Deceptive-Marketing-NOT-A-MANUFACTURER-Overcharging-for-NON-E-1024449

**Google**: April 2013 – January 23rd, 2015

**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
|---|---|---|
| 13 | 8 | 29 |

http://www.ripoffreport.com/r/General-Steel-Corporation/Littleton-Colorado-80127/General-Steel-Corporation-misrepasented-what-was-offered-Littleton-Colorado-1020583

**Google**: April 2013 – January 23rd, 2015

**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
|---|---|---|
| 13 | 13 | 42 |

http://www.ripoffreport.com/r/General-Steel-Corporation/Littleton-Colorado-80127/General-Steel-Corporation-Anthem-SteelDiscount-Steel-or-Capital-Steel-Industries-Misrepre-1018918

**Google**: April 2013 – January 23rd, 2015
**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
|-----------|------------------|--------|
| 11 | 7 | 35 |

http://www.ripoffreport.com/r/General-Steel/Littleton-Colorado-80127/General-Steel-added-misc-charges-to-our-building-purchase-with-no-change-orders-Littlet-1016153

**Google**: April 2013 – January 23rd, 2015
**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
|-----------|------------------|--------|
| 2 | 1 | 15 |

http://www.ripoffreport.com/r/General-Steel/Littleton-Colorado-80127/General-Steel-Comepletely-deceptive-sales-of-steel-building-Paid-a-lot-more-than-the-or-1013911

**Google**: April 2013 – January 23rd, 2015
**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
|-----------|------------------|--------|
| 5 | 5 | 22 |

http://www.ripoffreport.com/r/General-Steel-Corp/Littleton-Colorado-80127/General-Steel-Corp-The-sales-person-misrepresented-the-time-frame-for-engineering-fabric-981091

**Google**: April 2013 – January 23rd, 2015
**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
|-----------|------------------|--------|
| 6 | 4 | 21 |

http://www.ripoffreport.com/r/General-Steel-Corporation/Lakewood-Colorado-80226/General-Steel-Corporation-Ripoff-steals-112000-from-church-Lakewood-Colorado-199869

**Google**: April 2013 – January 23rd, 2015
**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
| --- | --- | --- |
| 2 | 2 | 17 |

http://www.ripoffreport.com/r/General-Steel-Corporation/Lakewood-Colorado-80226/General-Steel-Corporation-Trying-to-make-me-take-delivery-of-steel-and-payment-in-full-on-449440

**Google**: April 2013 – January 23rd, 2015
**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
| --- | --- | --- |
| 5 | 3 | 25 |

http://www.ripoffreport.com/r/General-Steel-Anthem-Steel/Lakewood-Colorado-80226/General-Steel-Anthem-Steel-Misrepresentation-Fraud-Breach-of-Contract-Liar-Crooks-S-437422

**Google**: April 2013 – January 23rd, 2015
**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
|-----------|------------------|--------|
| 45        | 38               | 97     |

http://www.ripoffreport.com/r/Anthem-Steel-A-Division-Of-General-Steel/Littleton-Colorado-80127/Anthem-Steel-A-Division-Of-General-Steel-Bait-and-Switch-Littleton-Colorado-402060

**Google**: April 2013 – January 23rd, 2015
**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
|-----------|------------------|--------|
| 10        | 6                | 39     |

http://www.ripoffreport.com/r/General-Steel/Lakewood-Colorado-80226/General-Steel-Verbal-Promises-about-Financing-Kept-Deposit-Deceptive-sale-acts-lies-stalli-396922

**Google**: April 2013 – January 23rd, 2015

**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
| --- | --- | --- |
| 14 | 11 | 28 |

http://www.ripoffreport.com/r/General-Steel-Corporation/Lakewood-Colorado-80226/General-Steel-Corporation-Ripoff-Breached-contract-lied-took-my-money-misrepresented-the-180744

**Google**: April 2013 – January 23rd, 2015

**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
| --- | --- | --- |
| 2 | 1 | 21 |

http://www.ripoffreport.com/r/General-Steel/Lakewood-Colorado-80266/General-Steel-Corporation-General-Steel-Domestic-Sales-Anthem-Steel-Capital-SteelFraud-188089

**Google**: April 2013 – January 23rd, 2015
**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
|-----------|------------------|--------|
| 37 | 29 | 72 |

http://www.ripoffreport.com/r/General-Steel/Lakewood-Colorado-80266/General-Steel-has-deceptive-sales-practices-misleading-contracts-deposit-RIPOFF-Lakewood-353125

**Google**: April 2013 – January 23rd, 2015
**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
|-----------|------------------|--------|
| 6 | 3 | 11 |

http://www.ripoffreport.com/r/General-Steel-Corporation/Littleton-Colorado-80127/General-Steel-Corporation-Rip-Off-Scam-Miss-represented-contract-Down-right-lied-Littl-352799

**Google**: April 2013 – January 23rd, 2015

**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
|---|---|---|
| 9 | 8 | 15 |

http://www.ripoffreport.com/r/General-Steel/Lakewood-Colorado-80266/General-Steel-Corrupt-Company-Lakewood-Colorado-291442

**Google**: April 2013 – January 23rd, 2015

**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
|---|---|---|
| 22 | 19 | 57 |

http://www.ripoffreport.com/r/Capital-General-Anthem-And-Discount-Steel-Also-Genstone/nationwide/Captial-General-Anthem-Discount-Steel-Also-Genstone-They-are-thieves-who-mislead-you-228367

**Google**: April 2013 – January 23rd, 2015

**Woopra**: April 2013 – January 23rd, 2015

| PageViews | Unique PageViews | People |
|-----------|------------------|--------|
| 408       | 355              | 439    |

DATED this 4th day of February, 2015.

**Jaburg & Wilk, P.C.**

/s/ Maria Crimi Speth

Maria Crimi Speth
3200 N. Central Avenue, 20th Floor
Phoenix, AZ 85012
Attorneys for Xcentric Ventures, LLC

**COPY** of the foregoing mailed
this 4th day of February, 2015, to:

Hugh Q. Gottschalk (#8525)
Craig R. May (#32267)
Kenneth E. Stalzer (#42896)
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202-5647
Telephone: 303.244.1800
Facsimile: 303.244.1879
Email: gottschalk@wtotrial.com
may@wtotrial.com
stalzer@wtotrial.com

*Attorneys for Defendants Ethan Daniel
Chumley and Atlantic Building Systems, LLC*

Exhibit F

**David Gingras**

| | |
|---|---|
| **From:** | David Gingras [david@gingraslaw.com] |
| **Sent:** | Wednesday, February 4, 2015 5:30 PM |
| **To:** | 'Maria Crimi Speth'; 'gottschalk@wtotrial.com'; 'may@wtotrial.com'; 'stalzer@wtotrial.com' |
| **Cc:** | 'Adam'; 'Debra A. Gower' |
| **Subject:** | RE: General Steel v. Ethan Daniel Chumley - Xcentric response to subpoena |
| **Attachments:** | [41] Protective Order (2).PDF |

Maria,

Thanks for sending this.  In addition to the information you already sent, I understand that Xcentric is willing to produce some additional information subject to a protective order.

The Colorado court has issued a protective order in the case; a copy is attached.  If this is acceptable to you, please go ahead and produce any additional responsive documents which you can designate as confidential under this order and they will be treated as subject to the order.

Regarding the cost of compliance, we will of course compensate Xcentric for the reasonable costs of compliance with the subpoena.

If you have any other questions, please let me know.  Thanks.

David Gingras, Esq.
Gingras Law Office, PLLC
David@GingrasLaw.com
https://twitter.com/DavidSGingras
http://gingraslaw.com
Tel.: (480) 264-1400
Fax: (480) 248-3196



---

**From:** Maria Crimi Speth [mailto:mcs@jaburgwilk.com]
**Sent:** Wednesday, February 4, 2015 5:16 PM
**To:** 'gottschalk@wtotrial.com'; 'may@wtotrial.com'; 'stalzer@wtotrial.com'
**Cc:** 'david@gingraslaw.com'; 'Adam'
**Subject:** General Steel v. Ethan Daniel Chumley - Xcentric response to subpoena

Please see attached response to subpoena.  Because Xcentric is a non-party and incurred substantial time in gathering this information, Xcentric requests reimbursement at the rate of $20 per hour for the actual expenses it has incurred.  Thus far, four hours have been expended.  The check should be made payable to Xcentric

Exhibit G

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:14-cv-01932-REB-CBS

GENERAL STEEL DOMESTIC SALES, LLC, d/b/a
GENERAL STEEL CORPORATION, a Colorado limited liability company,

Plaintiff,

v.

ETHAN DANIEL CHUMLEY, individually; and ATLANTIC BUILDING SYSTEMS, LLC, a
Delaware corporation, doing business as ARMSTRONG STEEL CORPORATION.

Defendants.

---

## PROTECTIVE ORDER

---

Upon a showing of good cause in support of the entry of a protective order to protect the discovery and dissemination of confidential information or information which will improperly annoy, embarrass, or oppress any party, witness, or person providing discovery in this case, under Federal Rule of Civil Procedure 26(c), IT IS HEREBY ORDERED:

1.     This Order governs any information designated by a party as containing "confidential information" or "confidential – attorneys' eyes only."  The form of information protected includes, but is not limited to, documents and things, discovery responses, deposition testimony and exhibits, and all copies, extracts, summaries, compilations, designations and portions thereof.

2.     Any information produced that a party or subpoenaed party reasonably and in good faith believes contains confidential information relating to trade secrets,

research and development, marketing or training, financial data, technical information,

or other confidential proprietary or sensitive information may be so designated by

labeling the first page of the document "confidential."  Any information produced that a

party or subpoenaed party reasonably and in good faith believes contains proprietary

confidential information that would provide a competitive advantage to another party

may be so designated by labeling the first page of the document "confidential –

attorneys' eyes only."  If a subpoenaed party does not designate any document or thing

that a Party reasonably believes should be entitled to Confidential or Confidential-

Attorney's Eyes only protections, such Party may make any such designation within 10

days of the production of any such document or thing by the subpoenaed party.   For all

other documents and things, the designation of confidentiality shall be made at the time

of the production of the documents or things if they were produced after the entry of this

Order.  The designation may be made within 30 days of the entry of this Order for any

other documents.  For deposition testimony, the designation of confidentiality for either

exhibits or testimony shall either be made on the record of the deposition, or within 30

days after receipt of the finished (i.e., not rough) deposition transcript.  For interrogatory

answers, the designation of confidentiality shall be made at the time of the answer to

the interrogatory is submitted.  However each party retains the right to subsequently re-

designate documents and to require such documents to be treated in accordance with

such designations thereafter.  Such disclosures shall not result in the waiver of any

associated privilege or protection.

    3.    **<u>Resolution of disputes regarding designation.</u>**  If a Party takes issue with

the designation of Confidential or Attorneys' Eyes Only, that party shall inform the other

in writing, specifically identifying the documents or information and reason for disputing

the designation, andthe parties shall make a good faith effort to resolve the dispute in a

timely fashion.  If the parties cannot resolve the dispute regarding the designation(s),

the disputing party may request relief from the court after providing the disclosing party

written notice confirming its belief that the good faith efforts to resolve the disagreement

have failed.  The burden of establishing that the document is entitled to protection is on

the party claiming the protection.  The challenged designation shall remain in effect until

changed by order of the court or agreement of the parties.

4.   **A.  <u>Access to Confidential Information.</u>**  Access to information marked

Confidential shall be limited to the following "Qualified Persons":

     i.    The Parties, including the officers, partners, in-house counsel and management employees of the parties or related entities which share common control or employees with the parties, unless the information is designated "Confidential Attorney's eyes only".

    ii.    The parties' independent third party attorneys, including any litigation assistant or paralegal employed by and assisting such counsel, and stenographic, secretarial or clerical personnel employed by and assisting such legal counsel in this action; Before any such person is permitted access to any of the confidential information, such person shall be informed of the existence and contents of this Protective Order;

   iii.    Persons who are directly and actively assisting trial counsel in the

preparation of this action, including parties assisting in electronic

discovery and mediators.  Before any such person is permitted access

to any of the confidential information, such person shall be informed of

the existence and content of this Protective Order and execute such

acknowledgement in the form of Exhibit A attached hereto;

iv.    The Court, Court personnel, and any court reporter or typist recording

or transcribing testimony given in this action;

v.    Experts and consultants retained in this matter by the attorneys in so far

as the attorneys may deem it necessary for the preparation or trial of

this matter.  Prior to any expert or consultant being permitted access to

any of the confidential information, each such expert or consultant shall

first execute a declaration agreeing to be bound by the terms of this

Protective Order in the form of Exhibit A attached hereto.

B.    **Access to Confidential – Attorneys' Eyes Only Information.**

Information or documents designated as "confidential – attorneys eyes' only" may be

disclosed only to litigation counsel for the parties (including any litigation assistant or

paralegal employed by and assisting such counsel), experts employed by the Parties in

this matter (who are not Party employees), the Court, Court personnel, and any court

reporter or typist recording or transcribing testimony given in this action, and not to any

other person otherwise designated as a "Qualified Person" under Section 4(A).

5.    **Use of Designated Information.**  Confidential and Confidential –

Attorneys' Eyes Only information disclosed pursuant to this protective Order shall be

used only for purposes of the above captioned matter and shall be protected from any unauthorized or unrelated use, or any use which results or attempts to result in a competitive advantage in the marketplace.  Any deposition, upon any inquiry with regard to the content of a document marked "confidential" or "confidential-attorneys' eyes only", or when counsel for a party deems that the answer to a question shall result in the disclosure of confidential information, counsel for that party may request that all persons other than the reporter, counsel and individuals herein authorized leave the deposition room during the confidential portion of the deposition.  All information designated as "confidential" or "confidential-attorneys' eyes only" information which is filed or lodged with the court shall be filed in accordance with D.C.COLO.LCivR. 7.1 and 7.2.  The parties agree not to oppose any Motion to Seal filed in accordance with this section unless the opposing party already has filed or agrees to file contemporaneously a motion disputing any confidential or attorneys' eyes only designation.  Any objections in opposition to such Motion may be made in accordance with D.C.COLO.LCivR. 7.2(c).

6.  **No Waiver.**  Other than specified herein, the taking of or the failure to take any action to enforce the provisions of this Protective Order, or the failure to object to any designation or any such action or omission, shall not constitute a waiver of any right to seek and obtain protection or relief.

7.  **Termination of Litigation.**  Within thirty days of the final disposition of this matter, whether by judgment and exhaustion of all appeals, or by settlement, the attorneys of record shall destroy or return to the disclosing party or its attorney the confidential information in their possession, custody or control or in the possession,

custody or control of their staff, experts and constituents, and shall destroy all notes,

memoranda or other documents which contain excerpts from any of the confidential

information, except that counsel may retain one copy of such notes, memoranda or

other documents for their files, and shall deliver to the disclosing party or its attorney

written confirmation that there has been compliance with the terms of this paragraph or

that there has not been compliance and the reason for such noncompliance, upon

receipt of which the disclosing party may make application to the court for such further

order as may be appropriate.

8.      **Acceptance and Inadvertent Disclosure.**  Acceptance by a party or its

attorney of information disclosed under designation as protected shall not constitute an

admission that the information is, in fact, entitled to protection. Inadvertent disclosure of

information which the disclosing party intended to designate as protected shall not

constitute waiver of any right to claim the information as protected upon discovery of the

error. If a party inadvertently produces protected information without the required

"Confidential" or "Confidential – Attorneys' Eyes Only" legend, the producing party shall,

within five business days of discovering the inadvertent omission, inform the receiving

party in writing of the inadvertent omission and the specific material at issue. Upon

receipt of such notice, the receiving party shall treat the material identified in the notice

as Confidential or Confidential – Attorneys Eyes Only as designated until (a) the parties

agree to non-confidential treatment of the subject material, or (b) this Court enters an

order stating that the document shall not be treated as protected information. A party

shall not be deemed to have waived any right to designate material as "Confidential" or

"Confidential – Attorneys' Eyes Only" by allowing inspection of such material prior to a designation of such material or by inadvertently failing to mark a document as "Confidential" or or "Confidential – Attorneys' Eyes Only" prior to its disclosure.

9.     **No Waiver of Privilege or Protection.** Inadvertent production of any document or information subject to the attorney-client privilege, the attorney work-product protection, or any other applicable privilege, protection, or immunity provided by law shall not constitute a waiver of the privilege, protection, or immunity, provided that the producing party promptly notifies the receiving party in writing of such inadvertent production after the producing party discovers such inadvertent production. Fed. R. Civ. P. 26(b)(5)(B) & Fed. R. Evid. 502. If prompt notification is made and the producing party establishes the circumstances surrounding the document's inadvertent production and the grounds for an applicable privilege, protection, or immunity, such inadvertently produced document and all copies thereof shall be returned to the producing party or destroyed, upon request, within five days of the receiving party's receipt of the written request to return or destroy. The receiving party shall not make any use of such document in the case, including but not limited to, motions, briefs, discovery, depositions, hearings, or trial, nor shall the receiving party show the document to anyone who was not already given access to it prior to the producing party's request to return or destroy. If, after conferring, the parties cannot agree as to whether a document should be protected from disclosure by a privilege, protection, or immunity, the receiving party shall have 14 days to file a motion with the Court seeking an order that the document is not privileged, protected, or immune from disclosures. While such a motion

is pending, the receiving party shall not make any use of such document in the case and such document shall not be shown by the receiving party to anyone who was not already given access to such document prior to the producing party's request to return or destroy.

10.     In the event that any party hereto claims that any provision of the Protective Order has been violated, such party may move this Court, upon proper notice, for appropriate sanctions and/or other relief.

11.     Nothing in this Protective Order shall be construed as limiting or negating the right of any party hereto to bring a motion to compel discovery in this action or as limiting or negating the right of any party to object to any discovery such party otherwise believes in good faith to be improper.

12.     This Protective Order shall not preclude any party from using or disclosing any documents or materials created or maintained by that party for any lawful purpose.

13.     In the event any Confidential information is used in any court proceeding prior to trial and not disclosed to the public, it shall not lose confidential status because of such use. The use and treatment of Confidential material at trial will be addressed separately at or before the trial.

14.     **Enforcement of this Protective Order.**  The parties shall continue to comply with this Protective Order's provisions after the conclusion of this action.

DATED this __2nd__ day of __December__ 2014.

BY THE COURT:

_____
United States Magistrate Judge

**EXHIBIT A**

**AGREEMENT CONCERNING MATERIAL COVERED
BY PROTECTIVE ORDER**

The undersigned acknowledges that he/she has read the Protective Order with regard to this matter and that he/she understands the terms thereof, and he/she agrees to be bound by such terms.

DATED: _____          BY: _____

Exhibit H

**David Gingras**

| | |
|---|---|
| **From:** | Maria Crimi Speth [mcs@jaburgwilk.com] |
| **Sent:** | Wednesday, February 11, 2015 10:00 AM |
| **To:** | 'david@gingraslaw.com'; gottschalk@wtotrial.com; may@wtotrial.com; stalzer@wtotrial.com |
| **Cc:** | 'Adam' |
| **Subject:** | RE: General Steel v. Ethan Daniel Chumley - Xcentric response to subpoena |
| **Attachments:** | image001.png; image003.jpg |

David:

I will try to move it along.

**MARIA CRIMI SPETH** | Shareholder | 602.248.1089



**From:** David Gingras [mailto:david@gingraslaw.com]
**Sent:** Wednesday, February 11, 2015 9:55 AM
**To:** Maria Crimi Speth; gottschalk@wtotrial.com; may@wtotrial.com; stalzer@wtotrial.com
**Cc:** 'Adam'
**Subject:** RE: General Steel v. Ethan Daniel Chumley - Xcentric response to subpoena

Maria,

Can you please let me know the status of this?  We have a discovery cutoff coming up, so it's extremely important to get the remaining info ASAP.

David Gingras, Esq.
Gingras Law Office, PLLC
David@GingrasLaw.com
https://twitter.com/DavidSGingras
http://gingraslaw.com
Tel.: (480) 264-1400
Fax: (480) 248-3196



**From:** Maria Crimi Speth [mailto:mcs@jaburgwilk.com]

**Sent:** Wednesday, February 4, 2015 5:16 PM
**To:** 'gottschalk@wtotrial.com'; 'may@wtotrial.com'; 'stalzer@wtotrial.com'
**Cc:** 'david@gingraslaw.com'; 'Adam'
**Subject:** General Steel v. Ethan Daniel Chumley - Xcentric response to subpoena

Please see attached response to subpoena.  Because Xcentric is a non-party and incurred substantial time in gathering this information, Xcentric requests reimbursement at the rate of $20 per hour for the actual expenses it has incurred.  Thus far, four hours have been expended.  The check should be made payable to Xcentric Ventures, LLC.



**MARIA CRIMI SPETH** | Shareholder

3200 North Central Avenue, 20th Floor, Phoenix Arizona 85012
Direct 602.248.1089 | Main 602.248.1000 | Fax 602.248.0522
Download vCard | jaburgwilk.com | mcs@jaburgwilk.com

This communication is intended only for the individual or entity to whom it is directed. It may contain information that is privileged, confidential, or otherwise exempt from disclosure under applicable law. Dissemination, distribution, or copying of this communication by anyone other than the intended recipient, or a duly designated employee or agent of such recipient, is prohibited. If you have received this communication in error, please notify us immediately by telephone at (602) 248-1000, or via e-mail, and delete this message and all attachments thereto.

Exhibit I

## David Gingras

**From:**   David Gingras [david@gingraslaw.com]
**Sent:**   Friday, February 13, 2015 3:52 PM
**To:**   'Maria Crimi Speth'; 'gottschalk@wtotrial.com'; 'may@wtotrial.com'; 'stalzer@wtotrial.com'
**Cc:**   'Adam'
**Subject:**   RE: General Steel v. Ethan Daniel Chumley - Xcentric response to subpoena

Maria,

I just tried to call you about this but I got your voicemail.

I don't mean to be pushy, but we have a discovery cutoff in the case of March 2.  Under Colorado Local Civil Rule 30.1, depositions require no less than 14 days' advance notice.  Due to the short timing, this means that if I don't receive Xcentric's response to the missing subpoenaed materials by this Monday, February 16, the only remaining option I have would be to notice Xcentric's deposition.  I do not want to do this, particularly because the material we've asked for could be gathered and produced very easily and the subpoena was sent more than 3 1/2 weeks ago, but if I have no other option, then that's what we'll have to do.

Please discuss this with Ed and get back to me ASAP.

David Gingras, Esq.
Gingras Law Office, PLLC
David@GingrasLaw.com
https://twitter.com/DavidSGingras
http://gingraslaw.com
Tel.: (480) 264-1400
Fax: (480) 248-3196



**From:** Maria Crimi Speth [mailto:mcs@jaburgwilk.com]
**Sent:** Wednesday, February 11, 2015 10:00 AM
**To:** 'david@gingraslaw.com'; gottschalk@wtotrial.com; may@wtotrial.com; stalzer@wtotrial.com
**Cc:** 'Adam'
**Subject:** RE: General Steel v. Ethan Daniel Chumley - Xcentric response to subpoena

David:

I will try to move it along.

Exhibit J

| | |
|---|---|
| DISTRICT COURT,<br>JEFFERSON COUNTY,  COLORADO<br><br>1st Judicial District Court<br>Jefferson County Court & Administrative Facility<br>100 Jefferson County Parkway<br>Golden, CO  80401-6002 | |
| | ▲COURT USE ONLY▲ |
| Plaintiff(s):  STATE OF COLORADO ex. rel. KEN SALAZAR, Attorney General<br><br>v.<br><br>Defendant(s):  GENERAL STEEL DOMESTIC SALES, LLC d/b/a GENERAL STEEL, et al. | Case No. 04 CV 143<br><br>Division 6, Courtroom 5-B |
| FINDINGS, CONCLUSIONS AND ORDER OF JUDGMENT | |

## FINDINGS

**Case History.**

The State of Colorado, acting through its Attorney General, filed this case in January 2004 under the Colorado Consumer Protection Act, C.R.S. 6-1-101 et seq. (hereafter the "CCPA" or "the Act").  The corporate defendants are General Steel Domestic Sales, LLC, a Colorado limited liability company engaged in the business of selling steel buildings, and Capital Steel Industries, LLC a Colorado limited liability company engaged in the business of selling General Steel dealerships.  The individual defendants are Jeffrey Knight, the founder, owner and chief executive officer of both companies; Kevin Kissire, a former employee; and current employees Bruce Graham, Jordan Blum and Jeffrey Donelson.

The gist of the complaint is that the defendants engaged in deceptive practices in the marketing of the buildings and dealerships.  This is broken down into six claims: (1) false representations as to the characteristics of goods, services or property, contrary to §6-1-105(1)(e); (2) material omissions concerning goods, services or property, contrary to §105(1)(u); (3) knowing misrepresentations as to the source of goods, contrary to §6-105(1)(b); (4) false or misleading statements regarding price, contrary to §6-1-105(1)(l); (5) failure to set forth terms and conditions of sale in a contract, contrary to §6-1-105(1)(m); and (6) bait and switch advertising, contrary to §6-1-105(1)(n)(VI).

The case, which has been the subject of numerous prior orders including a preliminary injunction, was tried to the Court October 25-29 and November 2-3.  Per an earlier order, this was a first phase of the trial of the case.  The Court received testimony from 37 witnesses and admitted 61 exhibits.  The State's witnesses included 11 customers, 7 former employees, 4 current employees (by deposition), 2 expert witnesses, and an investigator from a California district attorney's office.  The defendants called four customers, four current employees (one of whom, Knight, was also called by the State via his deposition), three expert witnesses and two suppliers.  The Court's findings of fact set forth below are based on a combination of all of this evidence.

For all the sound, fury and paper generated in the case, however, it is not that complex.  Beyond any legitimate question, General Steel for years engaged in sales practices that were riddled with misrepresentations and omissions.  While General Steel's management to this day denies misconduct, General Steel's own expert witnesses -- a trio of professors of marketing ethics – had to acknowledge that misrepresentations have occurred.  On the other hand, no one denies that the buildings sold by General Steel are of good quality.  The Court heard from four satisfied customers, and doubtless there are others.  The real questions in the case involve whether and to what extent the offensive conduct is actionable under the CCPA, and what remedy is necessary and appropriate to deal with the conduct at this time.

### General Steel

Jeffrey Knight founded General Steel in 1995, initially to sell Quonset Huts to agricultural consumers.  The agricultural market declined, and by late 1996 or early 1997 Knight had switched to the sale of steel buildings.  Rather than selling through dealers, which was the traditional approach in the industry, Knight decided that he could do better by selling directly to the consumer.  He was remarkably successful, increasing sales from approximately 15 buildings a month initially to some 40 a month by 1998 to as many as 200 to 250 buildings a month at height of the business in 2002.  Meanwhile, General Steel grew from two or three employees initially to as many as 170 employees in 2002.

General Steel's business and its workforce have declined.  According to Knight, sales are down 75% from the peak in 2002.  He says that this is due to complaints that began in California and ultimately resulted in the Colorado Attorney General's investigation and lawsuit, and competitors' using these matters to their advantage.

### Sales Practices

Knight and others working under him developed sales methods that were used by General Steel's salespersons with considerable success.  However, these included a number of practices that were not entirely truthful:

1.  General Steel claimed in advertisements that were widely distributed via mailings and radio ads by prominent radio personalities such as Paul Harvey and Rush Limbaugh that it had buildings for sale up to "50% off."  *E.g.* ex. RR, at depo. ex. 4.  The implication, of course, is that buildings were being sold at up to 50% off the normal price or, in the words of a couple of

the consumer witnesses, for half-price.  However, this was not the case at all.  The buildings were in fact being sold at their normal price.  Later General Steel changed its wording to "50% off the cost of conventional construction."  *E.g.*, ex. RR, at depo. ex. 1.  This claim was not shown to have been inaccurate.

2.  The advertisements indicated that General Steel had a limited number of "clearance" buildings available for purchase at significant savings.  As discussed below, this image was enhanced by the salespersons who fielded the calls that were received in response to the advertisements.  However, the reference to "clearance buildings" or whatever other term was used ("overstocked," "returned," "liquidation") was misleading.  Unbeknownst to the customer, they were not getting an existing building at all.  Rather, once General Steel received a purchase order, it would then order a building from its suppliers to fit the customer's specifications.  Because of that, there was no limit at all to the number of buildings available.

General Steel argues that there were in fact cancellations of orders that left General Steel with inventories of buildings in some stage of design or fabrication and that its suppliers wanted General Steel to move.  Therefore it was not misleading to advertise "clearance" or "overstocked" buildings.  The Court could agree with this argument if there were any evidence that the reference to "clearance buildings," etc. in the advertisements was actually a reference to something in inventory.  However, as amplified below, the evidence was that the advertisements and sales pitches were not linked to whatever General Steel might have had on its hands in the way of cancelled orders.

3.  When a prospective customer called the 800 number provided in General Steel's advertisements, the person who answered the call (the "first call") would frequently pretend to be someone in another department to whom the call had been accidentally routed.  For example, the employee might identify himself as "Joe in Shipping" or "Joe in Production" or some such and act surprised to have received the call.  He would seem at first not to know about any "clearance buildings" but then a "light bulb would go off," and he would acknowledge some faint knowledge of such buildings.  As former employee Leonard Armenta characterized it," we were trained to act stupid."

The employee would continue with the ruse, indicating among other things that it was unusual for someone to be able to purchase a building through the company's headquarters as opposed to a dealer, but that there might be a few clearance buildings left.  He would find out what size building the customer was looking for and then promise to try to find out whether anything like that might still be available.  Sometimes this would include an indication that the salesperson would check with "Al in the warehouse" or "Al in the plant."  The employee would promise to call the prospective customer back after he had done some checking.

In fact, the call was answered by one of the many salespersons employed by General Steel to field the flood of calls it was receiving, up to something like 10,000 calls a month, in response to its nationwide advertising campaign.  There was no "Al in the warehouse."  In fact, there was no warehouse, and there was no plant as such.  These individuals were all located in General Steel's offices in an office building in Lakewood, Colorado.  The salesperson was

3

following a script developed by Knight and polished over the years by others.  *See, e.g.,* Ex. 1 and Ex. 2 (written versions).

General Steel argues that salespeople did not follow the script exactly.  Each call is unique, and salespeople had to be able to react to questions.  Salespeople sometimes did identify themselves as salespeople.  Customers often understood them to be salespeople.  If they were misrepresentation, then per General Steel, they were immaterial and were simply designed to put the customer at ease.

I will return to the materiality point later.  The other points simply add up to, "we didn't misrepresent everything all the time in the first calls."  The fact is that Knight developed a sales pitch that he believed would work.  As confirmed by several former General Steel salespersons (Armenta, Spencer Meister, Patrick Lupton), new salespersons were intensely trained in its use and were expected to use it, at least as a framework, when fielding calls.  Knight and managers working under him monitored calls and encouraged salespersons to stick to the script as much as possible.  The company's best salesperson, defendant Donelson, was a master in the use of the sales pitch and was the inventor of the "Joe in Shipping" and "Al in the Warehouse" ruses.  Knight encouraged others to learn from Donelson, and he rewarded Donelson with salesmanship awards and almost legendary earnings.

4.  Not only was there no "Al in the warehouse," there was no checking with anyone between the first and second calls.  Rather, the salesperson waited a period of time, perhaps 20 to 30 minutes, to give the appearance that he had been checking out whether there might be any of the "clearance buildings" left.  During that interim period of time the salesperson might be fielding new calls.  He then called the customer back and, again following the prescribed line, advised the caller that there were only a few, usually three, buildings left.  As Meister testified, this was done to solidify the impression that these were clearance buildings.  Invariably, one of the three was too large, one too small, and one either precisely the customer's desired size or close to its size.  This was billed by the salesperson, excitedly, as a lucky break – great news, we happen to have one left in your size!

The salespersons talked about the "clearance buildings" as if they were sitting on the ground somewhere just waiting to be purchased at bargain prices, sometimes providing their locations such as in Texas or Arizona or some such.  At times this was further refined to claim that such buildings had been returned by such major corporations as Boeing and K-Mart.  These claims were patently false.  General Steel does not even argue now that Boeing or K-Mart ever purchased or returned a building.  Nor does it argue that buildings said to be at specific locations were actually there.  In fact, as indicated above, there always was a building "left" in the customer's size, because the building was yet to be built.

General Steel also acknowledges that the salespersons did not know whether there was an overstocked or previously ordered building somewhere in the system that might correspond to the building the salesperson supposedly had found to be still available.  Former salesman Meister, for example, who worked for General Steel for about three months in mid 2002, testified that although he was trained in the pitch regarding clearance buildings, he did not know about or try to sell any existing buildings.  Only once or twice while he was there did he ever

even hear about actual buildings located at some site somewhere.  Former salesman Lupton, who worked for General Steel from November 2003 to March 2004, agreed.  Occasionally, he testified, there was a real cancelled order, but the salespersons were not required to sell those.  And, if those were sold, the price would be the same as for a new building.

Former salesperson DeVloo testified that spreadsheets were provided with lists of clearance buildings.  She did not, however, indicate when that occurred, and her employment spanned February 2002 to February 2004.  Nor did she indicate that the "clearance" buildings so listed were the ones advertised or the ones referenced by salespersons as they made their sales pitches per the script.  Current salesperson Mackenzie Gutierrez, who has been at General Steel for 13 months, acknowledged that she sells only new buildings and has never sold a clearance or cancelled or previously purchased building.

General Steel suggests that the shipping department was where orders could be matched with previously ordered but not delivered buildings.  There was no evidence, however, that anyone in shipping actually did match a previously ordered building with a new customer.  It might have happened occasionally, but it was not the norm.  The point is that salespeople encouraged the prospective customer to believe that he could get an incredible deal because there happened to be a "clearance" building sitting in a warehouse somewhere that General Steel needed to unload, whereas what was generally being sold was a new building and not at a discounted price.

In 2002 or 2003 General Steel modified the Conditions page of its form contract to include the following language:

> Seller has factory clearance steel buildings which consist of component parts for steel buildings which have been previously ordered by Seller and not delivered.  Those component parts may require additional engineering and fabrication.  Factory clearance buildings may or may not be available at the time of order.  Seller reserves the right to have a building fabricated for Buyer if a factory clearance building is not available.

Knight testified that this clause defines what a clearance building is.  Apart from the burial of these sentences in the morass of verbiage in the Conditions page, it is ridiculous to assume that consumers would interpret these sentences as clearing up the impression that the advertisements and salespersons worked so hard to create.  The quoted language instead is nothing more than General Steel's effort to defend an indefensible practice by defining it away.

5.  The suggestion or implication that there was an "existing building" in stock that the customer could purchase at a discount also contributed to another, more subtle omission.  The salesperson did not volunteer that the building being sold was simply a shell – walls and a roof but without such things as doors or windows or even openings for the placement of doors and windows.

If asked, the salesperson might say "no."  However, he might say, "I don't know," and again, there was a sort of script available to assist him.  General Steel's "Sales Employment

Manual" included suggested answers to "Frequent Objections." Ex. 3 at 6-8. In response to a customer question, "What comes with these buildings?," the suggested answer was, "Well, from what I understand, those were complete buildings – commercial grade, uh . . . straight wall, gabled roof, fully painted . . . they're nice." If the customer was more specific and asked, "Do any doors or windows come with it?," the suggested answer for the first call was "Um . . . I don't know, . . . It really depends on whatever's left and how it was ordered." *Ibid.*

Such answers perpetuated the myth that they were actually talking about clearance buildings located somewhere. In the situations where the customer asked the question, the salesperson generally answered it in the second call, emphasizing that the customer would be able to customize it any way he wanted. True – because nothing had yet been ordered or constructed at all in most cases. If the customer did not ask about what was included, the "disclosure" came when the customer was faxed a purchase order.

The purchase order form included on its first page a checklist for various accessories, including doors and windows. *E.g.* Ex. 10 at 0016. Invariably doors and windows, among other things, were not checked off. A customer who read the contract carefully or who was experienced in the purchase of steel buildings might understand that openings and doors and windows cost extra. However, the customer may well not understand that, as indeed several of the customers who testified at the trial did not. The salesperson's references to clearance buildings, particularly when coupled with a story about how they had been built for or returned by another customer, misled some consumers into assuming that doors and windows or at least openings were included.

The first page of the purchase order was often stamped, "factory clearance only." This was consistent with the misleading impression that the customer was buying some type of clearance building.

6. General Steel created the impression that it was the manufacturer of the buildings it was selling. This impression was heightened by its brochure, which listed the locations of its production facilities. Ex. YY. Even former salesmen Meister and Lupton thought at first that General Steel was the manufacturer of the buildings it was selling.

At trial General Steel described itself as a "contract manufacturer," and pointed out that it is commonplace for prestigious corporations like Nike and Hewlett Packard and many others to outsource the actual manufacture of their products. This response misses the point. There is nothing wrong with being a "contract manufacturer," or a "private label" contract marketer, or an outsourcer, or whatever other label one puts on it. There is nothing wrong with General Steel's marketing, under its own name, buildings fabricated by its suppliers. What is wrong is giving the consumer the wrong impression through misrepresentations or omissions.

7. General Steel offered one year's free storage to its customers – an offer that was attractive to those who were prepared sign a contract but not yet ready to take delivery or to complete payment. There is nothing wrong with free storage, if there was a building earmarked for that consumer that had to be stored somewhere. In fact, with the possible exception of rare situations where there really was a building already in existence that was redirected to a new

consumer (an event not once documented in the evidence at trial), there was no storage, because there was no building yet.  It took an average of six to nine months from order to delivery even if customer wanted the building as soon as possible.  Free storage was a hollow offer in most cases.

8.  The backside of the contract contained "Conditions," and General Steel places considerable emphasis on the disclosures on that page.  Some of the consumers testified that the fax of the Conditions page was illegible, and there was some suggestion (by former employee Kissire, discussed below) that bad copies were intentionally used for such faxes.  However, the contract was always accompanied by a fax cover sheet that clearly advised the recipient to contact General Steel if he could not read or understand the contract.

The Conditions page was almost entirely filled with single-spaced, small-font words that would take a degree of effort and determination to read and understand.  Knight says that this was done simply to get everything on one page and save mailing costs.  Someone who is sufficiently "sophisticated" to be spending many thousands of dollars buying a building, generally for some type of business use, can perhaps be expected to read a contract before signing it, and to ask questions about things that he does not understand.  The problem here, however, is that the salesperson – again following the standard sales pitch – created a false sense of great urgency to make a decision that often overcame what might otherwise be the buyer's natural care and caution.

In the second call when the salesperson would provide the good news that there was a building left that fit the caller's requirements, he or she would warn the caller that if he wanted the building, he must act immediately.  The salesperson would say that calls are pouring in, or that others are looking at the building, or that they had X many buildings just a few days earlier and they are already all gone but the last three.  In whatever words, the message delivered was that the customer had better act right now or the building would be gone, a notion that the salespersons knew to be false.  The salesperson would insist on a deposit to hold the building and then fax the standard contract form to the caller with a request that it be signed and returned immediately with a copy of the deposit check.

Of course, not all callers did it.  In fact, there was evidence that only about 3% of all of the first calls received resulted in the sale of a building.  But, as discussed later, at least some and quite possibly many customers did yield to the pressure to sign quickly.  Some otherwise smart and sophisticated people found themselves later chastising themselves for signing a contract and sending in the deposit without either reading the contract carefully or discovering what was and was not included in the deal.

The Court distinguishes this General Steel practice from the "sale" program implemented in July 2004 after the review and approval of a marketing ethics expert from Colorado State University.  If, as might occur under the new program, 24 buildings were offered at a genuine promotional or sale price, and by the time of a particular call only three were left, and the salespersons accurately used these facts in a sales pitch, the Court sees no CCPA issue.  *See generally State ex rel. Woodard v. May Department Stores Co.*, 849 F2d 802 (Colo. App. 1992).

9.   With respect to the deposit, General Steel's salespersons did not mention that the deposit was not refundable.  If asked, they might say "no," but more likely would say they didn't know and would have to check.  That was the suggested answer in the sales manual.  Ex. 3 at 6.  The fact is that the sales staff knew that deposits were not refundable.  The disclosure that the deposit was not refundable came in the "Conditions" language on the back of the contract, which the customer may or may not have studied before tendering a deposit.

10.   Upon receipt of the deposit, the file would be referred to someone in General Steel's components or accessories department.  This person would contact the customer to discuss the various accessories that could be purchased, including cutting openings in the shell, doors, windows, insulation, weather stripping and the like.  That might well be the time when the customer first discovered that some of these items were not included.  These items added substantially to the price of the building, often well exceeding the cost of the building shell.

Eric Martinez worked very briefly for General Steel and Capital Steel in late 2001 and early 2002, a total of 23 business days with the former and 12 with the latter.  His time with General Steel was mostly in the components department.  He testified that the most frequent complaints he heard from customers were that they did not understand why they would have to buy openings, etc., and why blueprints were not immediately available, if they were purchasing a pre-existing, complete building.  Former employee Terry Wise, who spent about ten months in the components department between January and October 2003, seconded this.  Wise estimated that 10 to 20% of the customers voiced these complaints.  Martinez expressed concern to Jordan Blum about that, but Blum told him that salespersons were in fact telling customers that they would have to purchase components separately.

Martinez also tried to "upsell" customers.  He was supposed to tell the customer that a church had cancelled an order for a building because it couldn't cut down an historic oak tree, and ask if the customer would like to take advantage of the fact that, as a result, General Steel had some extra material available.  Martinez asked Blum why he couldn't just tell people that there was excess material available without the phony story about the church and the historic oak tree.  Blum told him that "it works . . . stick to it."  He explained that the additional 10 or 20 feet of material that the components salespeople were trying to sell using the tree story were called "bays."  They got paid for selling bays as well as components.  If they could sell bays, then the longer building would need more doors, windows, insulation, etc.

Wise testified that occasionally customers would want to come to the "warehouse" to see their building.  He was instructed by "Nathan," who was Knight's son-in-law and who worked under Blum, to tell them that the warehouse was too busy for that.

Martinez says that it was a "running joke" that components purchased through General Steel were overpriced.  Some of the components were marked up several times above what they could have been purchased for at, for example, Home Depot.  He talked to Blum about this, and Blum responded that he wanted to make a profit.  Blum told him that some items were marked up as much as 500%.  If a customer objected too strenuously to buying components he would set the file aside, not return calls as quickly, and make the customer wait.  About twice a week,

according to Wise, customers would tell him that they wanted to cancel their contract after learning the cost of the components.  He took those files to Bruce Graham.

General Steel points out that the customer was permitted to purchase the accessory items from others, including local sources such as Home Depot, and that some customers did so.  Martinez was told to tell them, however, that if they did not at least buy the framed openings from General Steel, the warranty on the building would be void.  This might be true in some instances.  For example, Ed Kohutek, a vice president of the company that manufactured most of General Steel's buildings for a number of years ending in 2002, said that a customer's cutting into the wall of the building could affect the warranty if it was a major enough cut to affect the wind bracing.  There was no evidence that merely purchasing the actual doors or windows or insulation or any other accessories ever voided a warranty.  The "void the warranty" statement appears to have been mostly a means of convincing the customer to buy openings and components through General Steel, whether the salesperson actually knew of some risk to the warranty or not.  The Court notes also that a former salesperson called by General Steel, Jeannette DeVloo, who worked for General Steel from February 2002 through February 2004, testified that she was never told that failure to purchase openings, doors or windows would void any warranty.

The salespersons did not receive a commission if they did not sell components.  If they did well with component sales, then they also received bigger files, i.e., larger buildings, where there would be more components.

It is only fair to note that there were customers who understood from an early time that openings, doors and windows were not included in the initial contract price.  There were customers who were perfectly happy to purchase their accessories from General Steel.  And, there was no evidence that General Steel's accessories were not of high quality.

On one occasion Martinez mentioned his concerns briefly to Jeff Knight and said that he was not comfortable with components sales.  Knight said he would look into a change for him.  That appears to be what precipitated his move to Capital Steel.

11.  Regardless of the customer's surprise or complaints about the components, he was committed.  If he wished to back out, he would lose his deposit, regardless whether General Steel had spent money or committed itself to an order from a fabricator.  That was not all.  The customer also faced liquidated damages or a "bail out" fee of 60% of the contract price.  The loss of the deposit and the "bail out" fee exposure were disclosed in the Conditions information on the reverse side of the Purchase Order form.

Robert Fennig did General Steel's collections from September 2000 through August 2003.  His responsibility was to collect bail-out fees and storage fees.  Knight set the amount of the bail-out fee or storage fee that he was to collect, and Fennig received 50% of any amount he collected above the target that Knight set.  During his time with the company he collected approximately $900,000 in bail-out and storage fees.  He acknowledges that only in a "very, very small minority of cases" was there any actual storage, and he notes that the terminology was later

changed to "delay fees."  He does, however, believe that it was appropriate to collect the bail out fees, because they were disclosed in the contract.

**Expert Witnesses**

In its defense General Steel called three expert witnesses.  Each has impressive credentials.  Dr. O.C. Ferrell is the Chairperson of the Department of Marketing at Colorado State University and a co-director of CSU's Center for Business Ethics.  He has taught marketing ethics for many years and has published approximately 35 articles and 4 books dealing with business ethics.  His wife, Dr. Linda Ferrell, is a Professor of Marketing at the University of Wyoming with an emphasis on ethics.  *See* Ex. Q.  The Ferrells have been consulting with General Steel since August 2003.  Dr. Charles Maronick is a Professor of Marketing at Towson University in Baltimore, Maryland.  He teaches marketing ethics, among other things, and has been recognized as an "outstanding teacher."  From 1980 through 1997 he worked either full time or part time as a marketing expert for the Federal Trade Commission.

What surprised the Court in the testimony of these three business ethics experts is that they expressed relatively little concern about the misrepresentations and omissions that have pervaded General Steel's sales practices.  I realize, of course, that they were retained by General Steel to do a job, and that their testimony was limited by the questions they were asked.  But, frankly, it is concerning to this Court that professors of ethics in business and marketing would not be repulsed by the General Steel sales pitch.  In the opinion of this Court, there is no place in our society for the dishonesty and deception characteristic of General Steel's approach to marketing.

Dr. Maronick summarized his opinions by stating that there "may have been some misrepresentations," but that they were not material.  He did not dwell on what those misrepresentations were.  Rather, he said that it did not matter, because the misrepresentations had no impact on any consumer decisions.  This conclusion was not based upon any knowledge of the actual consumers of General Steel buildings.  It was based on his view that people who make a major purchase such as a steel building are "sophisticated" consumers whose only concerns are (1) can you build me a building, and (2) how much will it cost.  Such people, he believes, either have or have ready access to advisors who can provide guidance, including advice regarding the contract documents.  In response to a question, "Is it okay to lie," he responded in substance that it is okay for misrepresentations to be made so long as they are cleared up in the written agreement.  This Court disagrees.  As a matter of law, it is not okay.

Dr. O.C. Ferrell had somewhat of a different role at trial, i.e., to convince the Court (which needed no convincing) that it was okay to be a "contract manufacturer" or a "private label contract manufacturer."  There was no indication that Mr. Knight or anyone else at General Steel had ever heard of those terms before they hired Dr. Ferrell.  The intimation if not outright representation to consumers that General Steel was a "manufacturer" was not based upon the belief that they were a "contract manufacturer."  It would be misleading in any event to imply that General Steel was a "manufacturer" in the plain and ordinary meaning of that word.

Dr. (O.C.) Ferrell did acknowledge under cross examination that such sales techniques as pretending to be in the shipping department, pretending that a building is available because it was returned from another customer, and dodging questions from consumers if the salesperson actually knows the answer, are not "best practices."  He testified that salespersons should be complete and accurate.  However, he equivocated somewhat on other questions.  For example, when asked whether it was okay for a salesperson to say that he was going to check with the plant to see if clearance buildings are still available but then not to do so, he responded by mincing words: "It would depend on what you mean by check at the plant."  The academic literature, he says, defines "plant" to mean where the company's operations occur, so General Steel's headquarters are part of the "plant."  One can define "plant" that way.  But, the statement, "I need to check with Al in the plant" was a lie.  There was no "Al," and there was no checking.  I do not believe that someone of Dr. Ferrell's credentials and reputation would condone that kind of nonsense if he were fully knowledgeable of all the facts,

The Court found Dr. Linda Ferrell to be the most persuasive of the three defense experts, not because of her credentials, though they were equally impressive to those of her colleagues.  Rather, for the most part she called a spade a spade.  For example, if a customer question called for a simple answer, "no," such as the question, "is my deposit refundable," Dr. Ferrell would have the salesperson say "no," rather than "I don't know" or some gobbledygook.  Her testimony gives the Court hope that, if she continues in her role as consultant and trainer, General Steel's future practices will be fair and ethical.

I will note my wonder at what Mr. Knight must have been thinking when his experts were testifying that the sales script, the sales pitch, and all of the practices on which the Court has commented had no impact on potential consumers of buildings.  Mr. Knight is a smart, energetic, successful entrepreneur who has achieved substantial success by figuring out what does work.  Unfortunately, some of the techniques that worked were deceptive.

The State called two experts.  George King, a consultant and former executive in the steel building manufacturing industry, expressed a number of opinions regarding General Steel's business and practices.  It is unusual in his experience that either a manufacturer or a private label company would obtain a contractual commitment and a deposit before defining all the requirements of the project, i.e., doors, windows, openings, gutters and other accessories that make up the total building.  He believes that the prices of General Steel's components and accessories are higher, sometimes two to three times higher, than those of other suppliers.  In the companies with which he was involved the cancellation rate on contracts for buildings was 5 to 7%, which is dramatically different than Knight's estimate of 25% and Graham's estimate of 30 to 35%.  Graham depo. at 101.  It is not unusual for a canceling customer to forfeit a deposit, but in his experience the amount retained by the seller would equate to the seller's costs in the project – not the whole deposit, and certainly not an additional liquidated damages penalty.  He notes that General Steel is not a manufacturer, and that there is no inventory of completed or partially completed buildings on its balance sheet.

Mr. King impressed the Court as someone who was quite knowledgeable of the steel building industry due to hands-on experience and his long involvement in the Metal Building Manufacturers' Association, including terms as its president and on its board.  He was the only

industry expert to testify. The Court does note, however, that some of his opinions were expressed in terms of his experience with his own companies, such that they may or may not have been entirely reflective of the whole industry.

In rebuttal the State called Dr. Donald Lichtenstein, a Professor at the Leeds School of Business at the University of Colorado. He teaches marketing and consumer response. He expressed the opinion that General Steel's "Joe in shipping" technique reduced the consumers' natural skepticism about salespersons ("persuasion knowledge") by suggesting that they were dealing with someone who was not a salesperson and who had nothing to gain by a sale. He believes that General Steel's use of urgency tended to influence the customer not to research further out of fear of losing out on a significant bargain. He was critical of the 50% off or "was X, now Y" practice and the use of the term "clearance buildings," where in his view these characterizations were false. In combination, he believes that these techniques worked to increase the probability of making a sale.

Dr. Lichtenstein disagrees with characterizing all General Steel customers as "sophisticated." Rather, there is a continuum or distribution of consumers ranging from more to less sophisticated. At one end the deceptive practices might not be expected to make a difference, but at the other end they would.

Dr. Lichtenstein's opinions were reasonable but were essentially matters of common sense. The degree of "sophistication" varies. Moreover, while persons on the more sophisticated end of the spectrum can be expected to have a better grasp of negotiation and contracts, and might have advisors available to them, it is not appropriate to misrepresent facts or to omit important facts in a sales presentation, regardless of the customer's level of sophistication. The more sophisticated consumers might better be able to avoid being taken, but that does not excuse the conduct.

**Capital Steel**

Capital Steel is a limited liability company formed by Knight and owned by him, either directly or indirectly as a subsidiary of General Steel. Its primary business is to sell General Steel dealerships. Apparently its salespersons contact contractors and offer dealerships for $3000 to $4000. Capital Steel promises that it will provide the dealers with "leads" on potential customers, and that they will receive discounts on buildings that they sell. Knight testified that General Steel was selling buildings to about 3% of the people who called, and he thought he might be able to increase the percentage somewhat if he also sold buildings through dealers. So, he created Capital Steel to promote and sell dealerships.

Capital Steel is a mystery party to this case. There was little mention of this company in the complaint. The State's counsel did not, to the best of my recollection and notes, mention Capital Steel in his opening statement, and there was scant mention in his closing arguments. There were only a couple of limited references to Capital Steel during the State's deposition of Mr. Knight, and not much during his testimony at trial. The State called two former Capital Steel employees. Leonard Armenta, mentioned above, worked for Capital Steel for two to three months in late 2002 and early 2003. Even then, however, the majority of Armenta's testimony

focused on the two to three weeks he had worked for General Steel before being transferred to Capital Steel.  Terry Wise, also mentioned above, worked for Capital Steel for three months in late 2002 before being moved over to the General Steel components department.

According to Wise, the sales pitch at Capital Steel was carefully scripted.  The salesperson would call a prospect and say that he wanted to have a General Steel dealership in that area, and that one would be awarded within the next 10 days.  The prospect would be invited to pay a $100 application fee.  If selected he could purchase a dealership and receive buildings at a discount.  In fact, no one was ever turned down for a dealership while Wise was there.  When Wise left General Steel's components department – because his performance was down, and Blum said he was not a good fit – he was given the option to return to Capital Steel.  He says he did not do that because he had a "pit in his stomach" all the time because he felt like he was not telling people the truth.

The State contends that Capital Steel engaged in deceptive practices because the leads provided were "stale," i.e., they were individuals who had first contacted General Steel but who had not agreed to buy a building.  The State also seems to feel that the pitches used to sell the dealerships were misleading in terms of the value or exclusivity of the dealership.  However, the State presented no evidence that Capital Steel's customers were misled.  No dealer appeared at trial, nor was there evidence that any dealer had complained about anything.  No one could mount any criticism of the dealer agreement. Ex. GGG.  Knight testified that there is a network of 450 dealers, and that through that network Capital Steel sells approximately 300 buildings per year.  That unrebutted evidence tends to contradict the notion that the dealerships were nothing but "blue sky."

It appears to the Court that the State is suspicious of Capital Steel because of its abiding conviction that Knight will use his companies to engage in deceptive practices, and that if Capital Steel does not face injunctive orders, it can be used as a vehicle to commit continuing frauds.  The short answer is that the State did not prove any violation of the CCPA with respect to this defendant.

**Jeffrey Knight**

Mr. Knight is the owner, chief executive and chief operating officer of General Steel. There is no question among the other management personnel that it is Knight's company, and that he can do what he wants with it.  *See, e.g.,* Blum depo. at 78, 87.  Knight oversees everything, from hiring to firing, from the sales pitch through the final delivery, from the resolution of individual customer complaints through the response to the present case.  During the trial Knight testified that he takes responsibility for everything General Steel does.  The Court commends him for this acknowledgement.  The point was, in any case, overwhelmingly established by the evidence.

Knight regularly made the statement at sales meetings that the salespersons should tell the truth.  Several witnesses corroborated this.  However, as indicated above, he both created and approved sales methods that were built upon misrepresentations and omissions of facts.  He does not admit that he approved misrepresentations, even to this day.  He testified, for example, that

when he learned of the California investigation, he decided to set up a compliance program to avoid any law violations, even though General Steel was not doing anything wrong.  It is possible that Knight truly does believe that General Steel has done nothing wrong.  If so, then this appears to be because he has rationalized the deceptive aspects of the sales program.

For example, when Donelson proposed the "Joe in Shipping" idea, Donelson suggested that it was really true because the salesperson has to do some shipping functions.  That, plus Knight's belief that it wouldn't do any harm because the customer would probably know that it was really a salesperson were good enough reasons for Knight to approve it.  Knight explains the "how would I know, why would I care" attitude that is created by this "Joe in Shipping" notion by explaining that it is just a means of not putting pressure on the customer.

He has no problem with the "Al in the Warehouse" gambit.  He sees that as simply a means to break up the first call.  He says "Al" is an acronym for "a list," i.e., that the salesperson can consult a list of available buildings.  Of course, the truth is that the salespersons ordinarily weren't even consulting a list during the interval between the first and second calls.

He says a "clearance building" is just something he wants to sell.  He admitted that "clearance" could have been used on every building General Steel sold under his definition.  He is comfortable with the "explanation" of the clearance buildings inserted in the Conditions language a couple of years ago and discussed earlier in this order.  He defends the "historic oak tree" fib used by components salespersons to try to sell bays by the fact that a lot of the excess material does come from churches.  He testified that he saw no deception in the "Kissire script," Ex. 1.  He rationalizes references to General Steel's "plant" with the explanation that he is a large shareholder in NCI, which was one of General Steel's suppliers.

Knight says that the eleven customers who testified were not typical.  They purchased small buildings of the type that more commonly go to local dealers.  He says that that type of consumer probably does not have access to advisors like the more typical customer.  The Court is not at this time in a position to say whether those eleven were typical or not.  The Court is, however, in a position to find that the sales techniques used on General Steel's customers, at least until the legal problems arose, were deceptive, regardless of the size of the customer.

If these examples reflect an attitude that Knight will bring to the future compliance of his companies, then I suspect that he and his companies are in for a very long and difficult time with compliance agencies in Colorado and perhaps elsewhere.  On the other hand, Dr. Linda Ferrell's perception is that Knight has been cooperative and receptive during her ethics and compliance review, and that he is committed to following her advice and improving the company's practices.  If Knight brings that attitude to the task, then the Court sees no reason why, with his ability and with a good product, he cannot be competitive and successful.

**Kevin Neal Kissire**

Mr. Kissire was hired as a salesman in February 1998 and rose to become a General Manager.  He left the company in February 2003.  Although he is a named defendant, the State is

not pursuing any monetary remedy against him, because he elected to cooperate with the investigation and to testify as a witness for the State in this case.

The other defendants aggressively attacked Kissire's credibility.  He was repeatedly impeached with deposition testimony given when he was still on the defense side that was contrary to trial testimony.  His friend and former colleague, Andrew Tsakalakis, contradicted him on whether he bragged that he would make it his life's mission to bring Knight down.  A Tijuana, Mexico framing contractor, Guillermo Anaya, contradicted him on a number of things, including whether Kissire in effect stole $5000 from General Steel and proposed a kickback arrangement.  The Court found Tsakalakis and Anaya to be credible.  Counsel for the State agreed that Kissire's credibility was questionable.

As courts repeatedly instruct juries, however, the finder of fact can believe all of the testimony of a witness, some of it, or none of it.  Some of what he said was credible because it was quite consistent with other evidence.

It is credible to this court that Kissire received his initial, if minimal, sales training from Knight and Graham.  He learned to use a sales pitch or script that did not change much during his five years of employment.  He later was instrumental in reducing the script to the written form that is found in Exhibit 1.  He emphasized that Knight approved the sales pitches and insisted that the sales force adhere to the program.  His critiques of salespersons, like Knight's, focused on their failure to follow the script, not on misrepresentations to the callers.

Kissire confirms that, while there may have been some "existing buildings" in inventory in the sense that a building had been ordered at some point for another customer and was at some stage of design or fabrication when the other customer backed out, the suggestion to the caller that there were special, temporary, great deals available because of that was a charade.  In fact Kissire and the salespersons under his supervision neither knew nor cared whether there were any existing buildings available.  They had no intention of trying to find some special price for the caller by matching him to something in inventory.

The Court also finds credible Kissire's testimony that salespersons intentionally omitted mention of such important facts as that openings, doors and windows did not come with the building, that the deposit once made was non-refundable, and that if the customer backed out of the deal he would also face a bail-out fee of 60% of the contract price.

Other parts of his testimony are more questionable.  For example, he said that General Steel intentionally sent fourth- to sixth-generation copies of the purchase order to the customer, implying that the intent was that the copies would be too illegible for the customer to wade through.  Certainly there was testimony from some of the consumers that the copies they received were quite poor.  However, none of the other former salespersons corroborated this story.  The fax cover sheet does, in plain bold language, invite the consumer to contact the sender if there is anything the consumer cannot read.

Kissire's testimony that there were very few satisfied customers was likewise not supported by other evidence.  It may be that the four customers who testified to their satisfaction

with General Steel were ginned up in an intensive manhunt.  However, given the huge number of buildings sold, and the undisputed statements that the buildings were of good quality, it is at least questionable that satisfied customers were so few and far between.  His statement that the customers who have so far been willing to express satisfaction were "coerced" was entirely unsupported.

Kissire's estimate that some 50% of all persons who signed a contract never got a building (impliedly because they were unhappy and refused to complete the transaction), ostensibly derived from some research he did, was not supported by other credible evidence.  I do note, however, that even Graham and Knight admit that the percentage was very high.

At bottom, Kissire employed and taught the Knight sales practices with full knowledge that they were intentionally deceptive.  He trained junior employees in how to use it effectively.  One has to wonder which is worse: Kissire, on the one hand, admitting that he knew he was misrepresenting facts but doing so anyway; or Knight and others doing the same thing but rationalizing that it was just "putting the customer at ease," or "puffing," or "what any salesman does."  Neither mindset reflects ethical business conduct.

**Bruce Graham**

Mr. Graham was hired by General Steel as a salesman in 1996 and was promoted at various times to sales manager, district manager, regional manager and general manager.  Jeffrey Knight both hired him and trained him.  The training included a verbal sales pitch before Mr. Knight prepared the first written sales script in about the year 2000.  Graham depo. at 8-9.  The written versions of the script have been essentially the same as the sales pitch that was in use since he joined the company.  This continued until the sales pitch was dropped in February 2003, about the same time that Graham left sales and became customer service manager.  Depo. at 11-15.

Graham insists that General Steel's policy was not to misrepresent to the consumer.  However, he admits that while he would identify himself as a manager, he would not indicate that he was a salesperson.  When a potential customer asked whether he would get a commission on the sale, he would answer "no," even though the correct answer of course was "yes."  He considered that to be "puffing," not a misrepresentation.  Depo. at 29.  This Court disagrees.  It is a misrepresentation, plain and simple; it is not the truth, and there is no ambiguity in the question.

Mr. Graham, like other salespersons, engaged in practices that the Court has found to be deceptive.  He told customers that there were "clearance buildings" because other customers had backed out of a deal, and that he would have to check with the plant to see whether any remained.  He did not check with the plant, because there was no plant as such.  He did not know whether there might be such buildings in existence.  He simply waited awhile and called back, announcing that there were three or more buildings remaining, one of which fit the customer's size requirement.  He doesn't consider this misrepresentation.  Again, in his view it is just "puffing."  Depo. at 38-40.  He admits that he has told customers that they are getting a discounted price because they are acquiring a "leftover" building without knowing whether they

will receive a leftover building or not, but he does not consider that to be a misrepresentation because he hasn't misrepresented the product as such.  Depo. at 62-65.  Graham is deceiving not only the customer but also himself if he really thinks this is anything other than misrepresentation of facts.

Graham also had no quarrel with the practice of responding to the question, "Do doors and windows come with the building," by indicating that he did not know but would check, even though he did know that the answer was "no."  He considered that delaying the correct answer to the next call was okay because it was part of the standard sales presentation as taught by Knight.

On the other hand, Graham testified that if a customer asked whether the deposit is refundable, the correct answer is "no," and that is the answer he gave.  He believes it would be a misrepresentation to answer otherwise, including "I don't know," despite the suggested answer in the company's Sales Manual.  Depo. at 44-50.

**Jordan Blum**

Mr. Blum joined the company in 1999 as a project coordinator.  Over the following years he was promoted to components manager, co-general manager, and in February 2003 to Vice President.  He generally was not involved in building sales, other than isolated instances when he might have helped out a little.  His role was essentially to pick up where the salesman left off and deal with the sales of components, the final design, the zoning and building department requirements, and the like.

Blum was aware, of course, that some customers signed their contracts on the assumption that they were purchasing an existing building.  As discussed above, and as Blum knew, while there might occasionally be a building in some stage of design or fabrication that could be matched to the customer, this was not common.  He acknowledges that where there was no such "existing building," some customers expressed surprise and concern when they learned that they would have to pay extra for openings, doors, windows and other components.  Blum viewed his job as including the responsibility to explain things and try to straighten the customer out.  This included referring the customer back to his contract which, typically, did not have the various components checked off.

The Court has no doubt that Blum was fully aware of the types of misrepresentations and omissions that were common to the initial sales pitches.  *See, e.g.,* Blum depo. at 49-50.  However, he did not himself make those pitches.  More troublesome was Blum's approval and, indeed, insistence on the use of deception in the sales of "bays," as indicated in the testimony of Martinez and Wise.

Blum, though not an engineer, advises customers that he works "in engineering," because he works with engineers at fabricators such as NCI or Star as well as a foundation engineer in Houston, Charlie Nangia, who is an independent contractor to General Steel.  So long as the customer is made aware of who and where the engineers are, and that Blum is not an engineer, then there is no misrepresentation.  *See* depo. at 53-60.  The Court is not convinced that Blum did make these points clear, but there was no proof to the contrary.  He also offered every

17

building purchaser a "dealer number" and represented that this would give him or her a price advantage on components.  He indicates that, in fact, it does provide an advantage in the sense that persons who buy only component parts but not buildings do not get the same prices.  Depo. at 70-72.  The State did not prove that this was not correct.

**Jeffrey Scott Donelson**

Mr. Donelson was hired as a salesman in 1999 and fairly shortly became the top salesman in the company.  He sold, on average, approximately 20 buildings per month.  He testified, and the Court does not doubt, that his success was achieved at least in part by hard work and natural sales ability.  Donelson used and created parts of the standard sales pitch, but for the most part he didn't need a script as such because he mastered his own techniques.

Among his techniques were (1) representing that he was in the shipping department or production – a practice that he invented; (2) representing the availability of "clearance buildings" without knowing whether such buildings actually existed or were available or trying to match them with the customer's order (he apparently used and perhaps invented the "K-Mart" story); (3) pretending to call General Steel's warehouse or plant to check on the availability of such buildings (he apparently invented "Al in the warehouse"); (4) representing that General Steel was a "manufacturer" and saying or implying that it had a "factory;" (5) representing that a building was 50% off because someone had made a down payment but then backed out; and (6) creating an impression that the customer had to act immediately or face the loss of the opportunity to purchase a building at a particular price, either knowing that this was not the case or not knowing whether it was the case.

Donelson testified that these practices have been abandoned.  The company made the changes, and he complied.  However, it is also apparent from his testimony that he believed, quite candidly, they were an important part of being an effective salesman.  Mr. Donelson testified that "the more you know, the less you sell."  Depo. at 102, 106.  He acknowledges that he does not go out of his way to inform potential customers, because "my job is not to educate people."  Depo. at 103, 108.

**Ethics and Compliance Program**

Mr. Knight testified that his first awareness of a potential legal problem with General Steel's sales methods came in 2002 when he heard a rumor that the Jefferson County, Colorado District Attorney's office had commenced an investigation.  The extent of that investigation, if any, was not clearly established, one way or the other, at trial.

Knight then learned that the Sacramento County, California District Attorney's office was pursuing an investigation.  This supposedly arose out of a complaint by one Lance McKenrie in that office about misrepresentations he believed were made to him when he purchased a General Steel building.  Knight tried to calm those waters by instructing his people to give McKenrie "whatever he wants," but that was unsuccessful.  To this day that office is continuing to pursue an investigation under California's consumer protection laws.

Next Knight learned that the Colorado Attorney General's office had opened an investigation.  At about the same time he learned that General Steel had been "kicked out" of the Better Business Bureau (BBB) in Colorado.  Knight testified that, before then, General Steel's relationship with the BBB was excellent.  He attempted, through counsel, to work something out with the BBB, to no avail.  He states that the impact of these events on General Steel's business has been "catastrophic."

In an effort to deal with these problems Knight hired the Ferrells to provide advice on compliance with the consumer protection laws.  One result of such advice is an "Ethics and Compliance Program" that has been adopted and implemented.  *See* Ex. A.

The version of that program in Exhibit A, dated February 2004, is apparently not the version in effect today.  The suggested answers to frequently answered questions, for one thing, was not something that Dr. (Linda) Ferrell had approved.  For example, in response to the question, "Do any doors and windows come with your building," the suggested answer talks around the question without giving a straightforward and honest answer to it:

> If we are talking about a canceled contract building, we need to check and see what stage of production the building is in and if any accessory (door, window, etc.) decisions have been made which cannot be reversed.  If there have been no window/doors structurally added to the building, you have the opportunity to select from a wide variety of doors, windows, and associated parts to fit our building.  We take great pride in our ability to customize buildings to meet specific customer needs.

Ex. A at GS00092.

In fact, neither the doors, nor the windows, nor the openings into which they are placed are included in the contract price for the buildings.  They must be purchased separately, either through General Steel's components personnel or from outside vendors.  In the rare case where the salesperson can match a new customer with a building that had previously been constructed for a different customer with doors and windows already installed, then the salesperson can certainly so indicate.  In the vast majority of cases, however, the truthful answer to the question is "no."

The response to the question, "What comes with your buildings?," is incomplete and misleading for the same reason.  The questions, "Does your building come with insulation?" and "Is my deposit refundable?" are also given vague suggested answers, whereas the truthful answer to both questions is a simple "no."  Insulation is a separately purchased accessory.  Knight can order deposits refunded on a case by case basis if he wants to, but the policy and contract provide that deposits are not refundable.

Changes have been made to the sales script, but it was unclear whether the script contained in Ex. A. bears Dr. Ferrell's approval or is in current use.

19

The key to any effective ethics or compliance program is the attitude of the affected party.  Some of the suggested answers to frequently asked questions – which the Court lists as examples, not intending to imply that everything not mentioned here is approved – could be interpreted as trying to retain as much of the discredited practices as the company can get away with rather than a commitment to making real changes.  If that were General Steel's attitude, then the compliance program will not succeed, regardless of what is written in any training manual.

However, the suggested answers are labeled a 10/2003 draft.  The Court does not understand why this Ethics and Compliance Program of February 2004 was marked by the defendants as their Exhibit A if it is not a complete or accurate version of whatever compliance program is in effect.  Perhaps the intent was to show that as of February 2004 General Steel was making progress in addressing the various complaints.

**Preliminary Injunction**

The Court held a hearing on the State's motion for a preliminary injunction on March 1-2, 2004.  Following the presentation of the State's evidence, and before defendants presented any evidence other than via cross-examination of the State's witnesses, the parties stipulated to the entry of a comprehensive preliminary injunction.  The injunction order is attached as Addendum A to this order.

The Preliminary Injunction prohibits 14 specified sales practices.  Addendum, ¶1.  It required modification of the standard form contract and General Steel's training methods.  ¶¶2, 3.  Finally, it required the implementation of a monitoring program to ensure compliance.  ¶4.  The parties could not agree on some aspects of the monitoring program, and the Court on June 4, 2004 adopted the State's proposed program.  Addendum B.

As discussed below, on or about March 19, 2004 a General Steel salesperson represented to prospective customer George Ewers that so-called "bosses in Chicago" had authorized a discounted price if he submitted a deposit that day, but that otherwise the price would not be available due to rising steel prices.  While this is an example of a misleading statement used to create a sense of urgency, contrary to the CCPA, it does not violate the preliminary injunction as such.

The State presented the transcript of a call placed by a California investigator under an assumed name to General Steel on April 14, 2004.  Ex. 36.  The investigator feigned interest in being referred to a local dealer for the purpose of purchasing one or more steel buildings.  The salesman, "Colby," made references to "promotional" buildings, sale buildings, only three left, and the urgency of contracting by Friday or they'll all be gone.  *Id.* at 5, 20.  If untrue, those statements would be in violation of ¶¶1(h) and (k)of the preliminary injunction.  These representations occurred before the "sale" program that General Steel implemented in July 2004 after consulting with Dr. Manning, a marketing ethics professor.  They follow the same pattern as the deceptive practices that had been common with General Steel before this case was filed.  The Court finds that the salesperson involved probably did act contrary to the terms of the preliminary injunction.

As discussed below, a prospective customer, Todd Dixon, responded to a flier that he characterized as offering savings up to 50% off.  A salesperson, "T," told him that there was a building available that someone ordered but did not take, and that he needed to put a deposit down immediately because buildings "are flying out of here."  Dixon was also very surprised to discover, after signing his contract, that the building was nothing more than a shell without openings, windows or doors.  The Court is troubled by the Dixon sale because it has earmarks of the same old misrepresentations about cancelled orders and creating a false sense of urgency.  However, the Court notes that this sale occurred at about the same time as the sale program approved by Dr. Manning.  The Court also notes that the State did not contend at trial that the representations to Dixon violated the preliminary injunction, i.e., that it violated either ¶1(h)(concerning false statements about cancelled or previously purchased buildings) or ¶1(n)(concerning false representations about a building's being complete and ready to use).  The court finds that whether the Dixon sale violated the preliminary injunction stands as unproven.

Finally, as discussed below, General Steel salesman Maz told prospective customer Rotimi Lawani on July 12, 2004 that prices he quoted on two buildings were only good that day because of impending increases in steel prices.  That was not accurate, because Lawani signed a contract for the same prices on July 16.  However, the misrepresentation is not contrary to the preliminary injunction as such.  Lawani was surprised to learn, after signing his contract, that the price of components would greatly increase the cost of the buildings.  There was no evidence, however, that Maz violated ¶1(n) of the preliminary injunction.

The Court finds that while the preliminary injunction unfortunately does not appear to have stopped all deceptive practices, there was no evidence that General Steel or the individual defendants intentionally violated its terms.  Moreover, the preliminary injunction and its accompanying monitoring program acknowledge the possibility of occasional violations.  There was evidence that managers have imposed a three-strike system of discipline and ultimate termination for a third offense, and that sales personnel, including Mr. Tsakalakis and Ms. Gutierrez, have been sanctioned under this program.  This does not excuse any violation, but it may be close to impossible to prevent all salespersons from ever violating the injunction in any way.  The key is the company's attitude and efforts, accompanied by an effective monitoring program and a system of sanctions that appropriately responds to any violations detected.

**Consumer Witnesses**

I will turn next to the actual consumers who testified.  These 15 people are only a small fraction of the persons who contracted to buy buildings from General Steel.  Moreover, even within this group there were sharp differences in terms of reactions to the sales pitch and in their degree of satisfaction with General Steel's product and services.  Therefore, despite the considerable uniformity in the approaches of the salespersons and the evidence from current and former General Steel employees, one must be cautious about the breadth of conclusions that are drawn from this small sampling.  Still, the testimony of actual consumers is interesting when compared to the assumptions and opinions of experts as to how consumers are supposed to have reacted.  They are discussed in the order in which they entered contracts with General Steel.

Called by the State:

1. Duane Reed.

Mr. Reed from Montrose, Colorado called General Steel in October 2000 because he needed a building in which to park equipment from his excavation business.  He had built and erected steel buildings before.  Jeff Donelson answered his call.  There was no indication that Donelson used the "Joe in Shipping" or "Al in the Warehouse" ploys, perhaps because he had not yet created those techniques.  Donelson did give Reed the impression that General Steel was the actual manufacturer, referring to its plants in Colorado and elsewhere.  He discussed "surplus buildings" (Reed's term) at discounted prices, and after checking indicated that there were three or four left, one of which fit Reed's size requirements.  Reed submitted a $3000 deposit with a signed purchase order, stamped "Factory Clearance Only."  Ex. 10.

Reed understood that components were not included.  Reed's main complaint is that after declining to purchase either an additional 20 feet of building or the components from General Steel, he was essentially ignored.  He complains that he didn't receive plans, despite promises, and that his many calls were not returned.  Even as close as two weeks to the delivery date he felt he was being given the dodge, including being told by someone in the shipping department that he had cancelled the contract.  Finally, he did try to cancel the contract and obtain a refund of his deposit.  Jordan Blum declined this request.  Reed aired his complaint on the "Tom Martino" radio call-in show, and Martino got Knight on the line with Reed.  Knight offered to proceed with the delivery of the building, but Reed declined.  He never received a building or the return of his deposit.

2. Don Hansen.

Mr. Hanson met Jeff Donelson in August 2001 when Donelson was manning a General Steel booth at the Colorado State Fair.  Hanson is in the storage business in Rocky Ford, Colorado.  He needed an additional mini-storage unit.  Donelson, who presented himself as a "freight coordinator" for General Steel, told him that he had two unclaimed mini-storage buildings sitting in Texas that Hanson could "pick up today" if he were willing to go and get them.  Otherwise, according to Donelson, delivery would take four weeks.  After one follow-up call and the receipt of what he understood to be a photograph of the buildings, he submitted a $4000 deposit and signed a contract.

There are two interesting facts in the Hanson story.  In the initial meeting Donelson told Hanson that he could still choose the color he wanted for his building.  Hanson acknowledges that he didn't know how that could be possible if the buildings were already completed, but he "didn't push it."  Also, at some point (but it was not clear whether this was before or after he signed the contract) he noticed that the door column in the contract was not checked.  He asked Donelson about that, since he thought he was purchasing a building that was "complete and ready to go."  Donelson told him that the doors were not included.  Donelson persuaded Hanson to buy his doors through General Steel because they were "half price" and were the "best in the industry" quality.  Tom Johnson of General Steel told him that if he didn't use those doors, there would be no warranty on the building.  Hanson agreed to purchase his doors from General Steel.

22

He later bought an identical door from a local source for $187, whereas General Steel's price had been $387 per door (for 20 doors).

After signing the contract Hanson experienced delays and unreturned phone calls.  He felt that he was getting the "run-around" when he asked for blue prints.  He offered to go pick up the building and was told that he could not.  Eventually he requested a refund of his deposit.  This was refused with the explanation that General Steel would lose $4000 to $6000 for work it had already invested in the building.  Hanson questioned how that could be in the building was constructed by August 2001 as Donelson had indicated, but he could not obtain a refund.  Hanson finally received his building in February 2002, and he is using the building today.  He paid a total of $25,200, whereas he initially thought he would get the building for $13,800.

3. <u>Randy and Pam Hood.</u>

Mr. Hood is a mechanic in Ignacio, Colorado.  In approximately December 2001 he called General Steel in response to an advertisement on the Paul Harvey show.  Jeff Donelson answered the call.  According to Mr. Hood, he said he worked in the sales department.  Hanson said he was looking for a 30 by 40 foot building in which to do automobile repairs, with a door "all the way through" and one walk-in door.  Donelson told him he would have to check and get back with him.

Mr. Hood testified that when Donelson called him back he said that he had a building at General Steel's location in Phoenix, Arizona that was 30 by 40 with two 12 by 14 shop doors and one walk-through door.  It was complete with insulation and "everything," and would cost a little over $11,000.  Donelson told him that he could hold the building for up to one year upon the receipt of a $2000 deposit.  At that point Mr. Hood turned the transaction over to his wife, stating that he was working such long hours that he did not have time to continue with it.

Mrs. Hood spoke with Donelson, whom she said identified himself as "J.D. in Shipping."  Her understanding from her husband was that Donelson had offered a complete building, located in Arizona, and that they could save the shipping costs if they picked it up themselves.  She understood it to be "a full complete building that someone decided not to take delivery of."

Donelson told Mrs. Hood that some other people were looking at the building, but that he would hold it if she sent in a deposit.  Both Hoods testified that when they received the purchase order form they couldn't read the Conditions page.  They asked the person who had sent it to them, "Eric," to send another copy, but he did not do it.  Eric told them to read it as best they could, but that it was a "standard" (Mr.) or "basic" (Mrs.) contract, and that the important thing was to get the deposit in.  The Hoods signed a contract for their building, marked "Factory Clearance Only," and submitted a $2000 deposit.  The price was $11,266.  Ex. CC at DE00307.

Mrs. Hood testified that they received a components list sometime between July and October 2002.  They were surprised, because they thought everything was included.  The components were quite expensive, some $10,458 above the originally agreed price for the building.  They were also scared, because they did not have enough money to do this.  Mrs. Hood told a Chris Hawthorne of General Steel that they wanted to cancel their contract.  He said

23

that he would try to reduce the price of insulation and to give them a "church discount," but that if they canceled, their credit would be ruined, and they would still owe General Steel 60% of the contract price.  Bruce Graham later agreed that they were bound to the contract and, even later, refused to take the Hoods' calls.  Mrs. Hood testified that they went ahead with the contract to keep their credit in good standing.

When Mrs. Hood threatened to go to the Attorney General, Mr. Knight offered to throw in a free door "out of my own pocket."  Whether the Hoods received a free door was not clear.  In any event, the Hoods ultimately received a building which came either from Oklahoma or Iowa, not Arizona, and which was manufactured by Star, not by General Steel as the Hoods had thought.  It appears that they paid a total of $16,486.

Defendants argued that the Hoods' primary problem was lack of funds.  It is true, according to Mrs. Hood, that they had to refinance vehicles and borrow against life insurance policies, in order to complete their payments to General Steel.  There was no evidence, however, that they were so financially strapped that they could not have made the original contract price of $11,266 within the agreed period of one year without difficulty.

Knight attempted to negotiate a settlement with the Hoods by cutting their insulation price in half and giving them what Knight characterizes as a $2000 door.  The job summary on the Hood account, Ex. 62, does not confirm the "free door" testimony.

4.  Greg Rodriguez.

Mr. Rodriguez is a real estate broker and appraiser (and former debt collector) in Colorado Springs, Colorado.  In March 2002 he responded to an advertisement on the Limbaugh show for clearance buildings, seeking a steel building for a garage.  A Brian Page answered his call and told him he was in production and was not the usual person to take such calls.  However, Page offered to try to help him.  After contacting "Al in the Warehouse," Page told him that he was "very lucky," because there was a clearance building that met his requirements that someone else had ordered but had not taken.  However, it was "one of the last ones" and "wouldn't last long."  Page said he could make Rodriguez a "good deal," and quoted a price of $6700 with a $2000 deposit.  Rodriguez signed the purchase order and submitted the deposit.

A couple of weeks later Page called and apologetically explained that the building was not available, but that he could find him a somewhat larger building.  Rodriguez couldn't use a larger building.  Apparently Page offered another similar building and promised to throw in the "premium package."  At some point Page transferred Rodriguez to a manager, Michael Donagen, who requested another $1300 deposit.  Rodriguez demanded his $2000 deposit back, which Donagen refused.  Donagen transferred Rodriguez to "Tom," who explained that the deposit was non-refundable as provided on the second page of the contract.

Rodriguez testified that he never received the second page.  Rodriguez says that Robert Fennig of General Steel called his home early one morning and spoke with his wife.  Fennig told her that "you'll pay no matter what," and "we'll keep you in court until we break you."

Rodriguez hired a lawyer and filed a suit against General Steel.  The suit was settled for a full refund of his deposit in exchange for a release, though he says he is out $800 in attorney's fees.

  5.  Brian Krizek.

  Mr. Krizek is a vice president of "Christian Relief Services," a charitable organization in Alexandria, Virginia.  In November 2002 he responded to a radio advertisement regarding returned General Steel buildings that were being offered at half price.  He was looking for buildings in which to store food, clothing and other items on Indian Reservations in rural areas.

  The person who answered his call, either Randy Cone or a Mr. "Cloko" (phonetic) told him that he has having trouble dealing with all the calls on the returned buildings.  He said he didn't know how many were left.  This salesperson stated that General Steel is the largest manufacturer of steel buildings, and that it was getting as many as 100 back per month.  He said that the buildings currently available were returns from K-Mart that General Steel wanted to get rid of, and that because K-Mart had already paid half the price, General Steel would offer them at exactly half the original price.  This salesman said that there were five buildings that might still be available, but he'd have to check because that could have changed.

  Krizek was so excited by the prospect of obtaining the buildings for what he thought were bargain prices that he immediately assembled his management to discuss it.  They couldn't decide which buildings they wanted, so they authorized Krizek to put a hold on as many of the five as were still available.  Krizek called the General Steel salesperson and learned that all five were still available.  He said he would take all five, and he quickly signed a contract and submitted a deposit of $91,000.  The contract showed the original price and the discounted price, which was half the original.

  It appears that Krizek was not misled into thinking that doors and windows came with the buildings.  While he was convinced that these were buildings that K-Mart had ordered, when he was later told that he could buy doors and windows at dealer's cost, he thought that seemed like a good deal.  He also testified that the plan was for his organization to donate the buildings to local communities, but that the locals would raise the money for "extras."  Nevertheless, when he received a purchase order for components (doors, windows, insulation, eves, etc.) it came as quite a shock to him.  The cost was "way over what we could have imagined."

  One of the buildings was to be sent to New Mexico, and Krizek was in touch with a volunteer there who was a contractor.  That individual told him that the prices for components were way out of line.  For example, General Steel's price for downspouts was three times what another company was charging.  A Mr. Miles of General Steel told him there was a quality difference.  When Krizek tried to negotiate on the price of the components, Miles told him that he couldn't negotiate, because Krizek was already receiving a church discount.

  Krizek ultimately told Miles that he couldn't afford the five buildings.  Instead, he proposed that General Steel apply the $91,000 deposit to two buildings.  Krizek told Miles that, that way, General Steel could make its "exorbitant" profit on components on those two buildings.

25

General Steel accepted this proposal, and Krizek received two buildings instead of the five he originally thought he was getting.

Krizek has a college degree and a background with financial services in the insurance industry.  Despite that he did not, by his own admission, give the contract the attention he should have before agreeing to buy the five buildings.  He describes this as a "tremendous learning experience," and states that he won't make the same mistake in the future.

6.  Cuong Doan.

Dr. Doan is a physician, but he helps his parents at their small market because of their language barrier (Vietnamese).  In April 2003 he contacted General Steel about their "clearance buildings," because he wanted a storage building in the back of his parents' store and thought "clearance" meant that they would be a good deal.  The salesperson told him that lots of people were buying the clearance buildings, and that there were three left.  On the next day the salesperson called again and reported that he had found a building in the right size but needed a deposit of $2500 within 24 hours to hold it.  Dr. Doan left work early in order to obtain the funds and comply with the deadline.

Dr. Doan testified that he received the contract form and tried to read it, but the salesperson had told him that it was standard and everything was okay, so he signed it.  He did read the first few paragraphs on the backside, including the language regarding forfeiture of deposits, but he did not read the part concerning zoning.  He says that General Steel told him that the building would meeting building and zoning requirements, and that General Steel would take care of the zoning.  The contract price was $9279 including freight.  Two weeks later Michael Donagen contacted him and told him that he could extend the building an additional 10 feet for $2000.  Dr. Doan sent in $685 in additional deposit to accept that proposal.

Dr. Doan thought he was purchasing an existing building.  However, he learned that with components the price would be more than $17,000.  Meanwhile, the Denver Zoning Board denied his building permit.  He told someone at General Steel, "Luke," that he couldn't take the building, and he was encouraged to look for some way around the permit problem.  He contacted "Denver Renovation," but he still couldn't get a permit.  He told Mr. Montoya of General Steel that he couldn't use the building.  He testified that he hasn't heard from General Steel since that time, and that he intends to absorb the $3185 that he lost in his deposits.

7.  Dan Cafetz.

Mr. Cafetz is a trucker who delivers gasoline and diesel fuel.  He is the only employee of his business, which is located in St. David, Arizona.  In August 2003 he contacted General Steel in response to advertisements he had heard by Paul Harvey and Rush Limbaugh, because he was in the market for a building in which to put a maintenance shop.

A person whose name Cafetz does not recall took his call.  This person seemed surprised that Cafetz had his number (which was, of course, the advertised 800 number).  He said he was in the production department and was not involved in sales.  Nevertheless, he obtained

information about the size of building in which Cafetz was interested.  A couple of hours later this person called back and said that he had "miraculously" found a building in California that was close to the size Cafetz wanted.

Although the chronology is not entirely clear, at some point shortly thereafter Don Stenke of General Steel called him.  Cafetz knew that Stenke was a salesman.  He said that a previous order for the building had been cancelled, and that he could get it for a very reasonable cost.  However, he might lose the opportunity if he didn't act quickly.  If Cafetz would send in a deposit, he would hold the building, and on top of that, would get him a number that would permit him to buy components more cheaply.  This seemed like a good deal, and Cafetz sent in a deposit of $4200 (against a purchase price just under $17,000) and the signed purchase order.

Cafetz says that he spent a total of about 45 minutes on the phone with General Steel representatives before sending in the deposit.  The Conditions page of the contract was hard to read, but he read it, including the part on forfeiture of deposits.  He also read the part about one year's free storage, which was important because he was short on money and wanted to wait as long as possible.

He then received a components price list and realized that the total cost would be way over his budget.  He asked Stenke for his deposit back.  Stenke turned it over to Bruce Graham, who said "no way."

Sometime later a project coordinator called him and offered to sell 25 feet of "excess material" to him for $5000 more.  Remarkably, Cafetz agreed and submitted an additional deposit of $1600.  He testified that he did this "to try to make the best of a bad situation."

He says that in August 2004 he signed off on the completion of the order.  He did this because, according to him, he felt that General Steel could just raise the price more if it wanted to.  His total obligation is about $22,000 (the original price plus the $5000 extra).  This, he believes, will just buy him four walls and a roof, but the building won't be usable because he can't get into it.  He has paid $5870.63 so far.

8. <u>Jim Mages</u>.

Mr. Mages who lives in Minnesota is a graduate of the Air Force Academy and a retired Northwest Airlines pilot.  In September 2003 he responded to a General Steel radio advertisement, because he was looking for a hanger in which to park an airplane.  He spoke to "Marty," who said that he just happened to pick up the phone and did not know about the clearance buildings.  However, Marty said that sometimes General Steel does have buildings that were overages and that were really good deals.  He asked Mages for the size he was looking for (65 by 60 feet) and said he would have someone call.

Mages next received a call from "Lee."  Lee told him that there were three available buildings in Iowa, one of which was a hanger, 65 by 60 feet.  When asked if the hanger would accommodate a 12-foot door, Lee told him that it would.  Lee quoted a price.  Mages wanted more information and asked whether he could "wait until Monday" to get that information.  Lee

told him that the building wouldn't still be there, and that if he wanted to hold it, he would have to put down a deposit.  Mages received the purchase order, signed it and sent in a deposit of $5700, even though the second page was illegible.  He later obtained a legible copy of the second page from Lee.  Ex. 17.

Someone from General Steel's transportation department contacted him and told him that if he could wait three or four weeks, the hanger could be shipped with another order, saving him money.  He agreed.  Mages' complaint arises primarily from what happened next.  He didn't hear anything, so he contacted General Steel and talked to "Nathan."  Nathan told him he would assign "Terry" as project director, and that Terry would contact him, but Mages didn't hear from Terry.  He then received a message from Nathan saying that Terry had said that Mages cancelled the contract and asking him why.  Mages told Nathan that this was nonsense.  Nathan then promised to assign a different person, Matt Green, as project director.

By this time Mages was beginning to suspect that there might not really be a hanger in Iowa.  After some research, he went to Monticello, Iowa where Star had a plant.  Star's employee, Larry Cornell, acknowledged that Star did business with General Steel.  Cornell spent some seven hours making calls and trying to find out what he could about the hanger.  In the end, it turned out that there was no such hanger.  While Mages was there, Cornell received a call from Jordan Blum, who had learned of Mages' mission.  Blum told Mages that he had no right to be there, that he did not have to know about every screw in his building, and that he was in breach of his contract.  The call got so heated that Mages ultimately hung up on Blum.

Mages cancelled his order.  He acknowledges that he did notice in his purchase order that the delivery date was not filled in, but he says that he was promised delivery in the last two weeks of October, 2003.  He has heard nothing further from General Steel.  He is out his $5700 deposit.

9.  George Ewers.

Mr. Ewers, a Special Agent in the Inspector General's office of the Department of Health and Human Services, stationed in Des Moines, Iowa, heard Paul Harvey advertising for General Steel.  Needing an out building for storage and a woodworking shop, he initially contacted General Steel on March 13, 2004 by email.  Thereafter he talked with several salespeople on the telephone.  He was initially quoted a price of $16,100 for a 30 by 50-foot building but later told that he could get it for $14,200 if he made a deposit that day.  The explanation was that the "bosses in Chicago" had authorized a special one-day-only price because General Steel was discounting its present inventory.  If he waited, the price would increase because of increases in steel prices.

Ewers testified that he felt a little suspicious.  His suspicions were heightened by his inability to get answers to questions regarding doors, windows, roof pitch and insulation.  He says that the salespersons all said that another department took care of those things.  Nevertheless, on March 19, 2004 he sent in the $4200, figuring that it was a national company that advertised on Paul Harvey, so it couldn't be a scam.  He admits that he read the fax cover sheet that accompanied his contract, and that he understood, as indicated on the front page of the

contract, that he was not getting doors, windows or other components as part of the base contract price.  *See* Ex. 18 at 0167-68.  He did not read the Conditions page, which by then had been modified per the Preliminary Injunction.  *Id.* at 0170.  When he read the latter page later he wished that he had read it earlier.  He acknowledged that had he done so he would have realized that the deposit was not refundable.

When he eventually received prices for the components, they were much higher than he expected.  He told General Steel that he wanted to buy the components separately, and he was told that this would void the warranty on his building.  He asked for his deposit back two weeks after signing the purchase order, but that was refused.  Jonah Goldman and Casey Daker of General Steel contacted him about a revised components proposal, but Ewers declined and again demanded a refund of his deposit.  This has not been provided.

10.  Todd Dixon.

Mr. Dixon owns an auto repair business in Sprint, Pennsylvania.  He needed a building, and in July 2004 he called General Steel in response to a mail flier that offered savings up to 50%.  He spoke to "T," whom he understood to be a salesperson and told him that he needed a 60 by 100-foot building.  T initially stated that he could give Dixon a good price on a 50 by 100 building, but after consulting his partner he told T that that wouldn't work for him.  T told him that the 50 by 100-foot building was already gone anyway.  Then T found a building that fit Dixon's specifications, indicating that it was a building that someone else ordered but did not take, so that he could get a very good deal on it.  However, T warned that the buildings "are flying out of here" and emphasized that he would have to send in a deposit today if he wanted the building.  Dixon adamantly denied that the salesmen referred to rising steel prices, and repeated that the only reference was to the fact that General Steel was selling so many buildings that his would be gone.  Dixon sent in a $10,000 deposit.

About a week to ten days later Dixon received a components list and was surprised to learn that his building didn't even have openings for windows and doors, much less the windows and doors themselves.  He asked an individual named Kent, "Do you mean I bought only that?," meaning a shell with no openings, and was told "yes."  The components were going to add $28,000 to the cost of his building, and General Steel wanted another deposit of $8700 on the components.

Dixon asked to speak with a manager and spoke to Lee Bayshore, whom he said "laughed at me" when I asked for my deposit back.  Bayshore told him there was no way that he would ever get it back.  Dixon went back to "T," who referred him to Jordan Blum.  According to Dixon, he essentially begged Blum for mercy, indicating that he could not afford either to lose $10,000 or to pay for the components.  Blum offered to refund $2000 of the $10,000 if he would sign a confidentiality form.  Bruce Graham then faxed him a release form.  Dixon did not sign it.

11.  Rotimi I. Lawani.

Mr. Lawani is a tax compliance supervisor in Los Angeles, California.  He heard General Steel's radio advertisement, left a message on General Steel's 800 number, and received a call

29

back from a salesman named "Maz." Maz told him that his call had gone directly to the manufacturer, not a dealer, which would save him some money. Lawani was looking for a 5000 square-foot building and a 2000 square foot building. Maz quoted prices of approximately $35,000 and $15,000 to $17,000. Maz told him that the price was good only for that day, because of rising steel prices, and Maz added that if he would buy that day the owner of the company would throw in insulation for free. According to Lawani, he received the faxed purchase order shortly before 5:00 p.m. on Friday, July 16, 2004, and he had practically no time to read it or think about it before having to decide. So, he decided to go ahead and sent in a deposit of $16,700.

It appears to the Court that in his effort to support his complaint Mr. Lawani exaggerated one aspect of his story. He estimated that he spent something like 15 minutes on the phone with General Steel personnel before signing the contract and submitting his deposit. Telephone records, however, show that calls placed by General Steel to Lawani totaled 66.3 minutes (6.2 on July 12, 37.2 on July 13, and 22.9 on July 16, the latter including the fax of the contract to him). Ex. EEE. Knight estimates that there were another 70 minutes on incoming calls received from Lawani before the contract was signed.

I also note that Maz advised Lawani in writing on July 12 that "any prices quoted are only good for today." Ex. 20 at 0252. This confirms the urgency point, but it also shows that the transaction was not as sudden as the testimony implied, since he signed his contract on July 16. Ex. EEE does, however, confirm that the purchase order fax was sent to him at 5:29 Mountain Time, which would be 4:29 Pacific Time.

Lawani was told that a project coordinator would contact him, but he says that it didn't happen. After some complaining calls, someone named "Mitch" called him, asked some questions, and sent him a questionnaire. He was not pleased with the promptness or the quality of the assistance he was receiving. I note, however, that he signed the contract at the end of the day on Friday, July 16, 2004, and that the questionnaire was faxed to him on Wednesday, July 21, 2004. Ex. 20 at 0260.

His biggest complaint, however, is that he learned that the costs of components and adjustments would add $80,000 to the cost of the larger building, such that instead of $35,000, it was going to cost him in the range of $125,000 to $130,000 (his figures). I note that on July 27, 2004 Lawani did sign component purchase order forms with prices adding up to $84,898.51. Ex. 20 at 0254-55. However, on cross-examination he testified that he only wanted the building shells, and that he planned to purchase the components in California.

On July 28 he advised Ken King of General Steel by fax that the adjustments were not what he expected and were out of his price range. *Id.* at 0259. He filed a complaint with the Better Business Bureau on July 30, 2004, demanding the return of his deposit. *Id.* at 0249.

Called by the Defendants:
The Court is not sure of the dates of purchase of all of the four consumers called by the defendants, so the order is a guess.

1. <u>Robert A. Meyer</u>.

Mr. Meyer was the founding pastor of the Pinecrest Church in metro Denver in 1998.  In approximately the summer of 1999 he called General Steel after receiving a post card advertisement in the mail, and he ultimately purchased a building.  He does not remember any of the sales presentation.  He does remember that he visited General Steel's office in Lakewood, Colorado twice.  While there he looked at some printed materials, went over the contract form with someone, asked questions about the contract, and signed it.

The price he paid was approximately $76,000, and this was just for the shell with two "man doors."  He understood that General Steel was a re-seller, not a manufacturer.  He also understood that windows, doors and other components were not included.  He purchased insulation from General Steel but windows and doors elsewhere.

He was told that he could have one year of free storage, and the took advantage of it.  Later, he asked for additional storage and received eight more months at no charge.  He believes that his deposit was refundable up to a certain date, but that never became an issue.  The building was erected.  He has no complaints about the building or the process.

2. <u>Julie Hennenberg</u>.

Mrs. Hennenberg and her husband live in California.  They contacted General Steel in August 2002.  She doesn't know to whom her husband spoke, but she recalls that she spoke with "Paul."  Paul offered a building at "half-price," and told her that there were a limited number of buildings, so that she would have to act fast.  She understood that she was buying an existing building.  However, she also understood that there were things beyond the basic building that she would have to buy.  She signed two contracts, one for the building, and the other for additional items and changes.  She read, understood and signed both contracts.  She is using the building for hobbies.  The initial price for the building was approximately $9000, and her total cost was approximately $20,000.

She discovered after the erection of her building that it was manufactured by Star, not General Steel.  However, she does not care about that.  She is happy with the building and General Steel's service, which she characterized as timely and responsive.  She mentioned that she received one year of free storage.  She has recommended General Steel to a neighbor.

3. <u>Terry Mosteller</u>.

Ms. Mosteller, who lives in Mississippi, ran a video and tobacco store and cyber café out of a rented building.  She wanted to build her own building, but the prices she was quoted for conventional construction, and alternatives like a trailer or modular buildings, were too expensive.  She then heard General Steel's advertisement on Paul Harvey and called.

Ms. Mosteller did not indicate the name of the person to whom she first spoke.  She was told that General Steel had a clearance building available in Texas because a deal with someone else had fallen through, and that it would meet her requirements.  She was told that she could

come and pick the building up if she wanted to. She knew, however, that the price she was quoted, which was approximately $12,000, was for the building itself, and that there would be some extras. She was promised one year of free storage. She thinks that she might have had as many as 25 to 50 telephone calls with General Steel before she signed a contract.

It was recommended that she buy doors and windows from General Steel, but she was also told that she could shop around. She compared prices for gutters and found that she could get a better price from Lowe's. However, she went with General Steel because she was persuaded that the quality was better, and that it would be less hassle. The extras cost about $19,000. She eventually did have her own person pick up the building, to reduce shipping costs. It came from Tennessee, not Texas. A couple of local men erected the building for her, and it was so trouble-free that they are now erecting steel buildings for a living. She is happy with her building, and she has recommended General Steel to a minister friend.

### 4. Robert Carle.

Mr. Carle, who lives in Anchorage, Alaska, needed a building for storage and office space. He heard a General Steel radio advertisement, and he did some research on the Internet on Butler, General Steel and a few others. He called General Steel and spoke with Chris Hawthorne, whom he assumed was a salesman. The parties did not bring out the details of the initial call. He remembers that there was something about clearance buildings, but that was not significant to him. There was, however, a call back, wherein Hawthorne informed him that he had located a building that fit Carle's requirements. Hawthorne quoted a price of $23,000.

Hawthorne did not say that doors and windows were part of the price, and Carle assumed that they were not included. He asked Hawthorne about doors and windows, and Hawthorne faxed him a price list of components, including openings in the building shell. The total price, including the components Carle wanted, was approximately $101,000. Carle was satisfied with that price, so he put down a deposit. Carle received his building and apparently is satisfied with it.

## CONCLUSIONS

The CCPA was enacted to proscribe certain kinds of offensive business practices. *See People ex rel. Dunbar v. Gym of America, Inc.*, 493 P.2d 660, 664 (Colo. 1972). The proscribed conduct is set forth at C.R.S. 6-1-105. As relevant here, that section concerns deceptive trade practices in advertising or sale of "goods," "services" or "property."

Defendants argue that General Steel did not sell "goods," citing the definition of "consumer goods" in the Uniform Commercial Code, C.R.S. 4-9-102(a)(23)("goods that are used or bought for use primarily for personal, family or household purposes"). I disagree. The terms "goods" and "services" are not defined in the CCPA. However, they must be interpreted in light of the broad purpose of the statute to provide a remedy against consumer fraud. *Showpiece Homes Corp. v. Assurance Co. of America*, 38 P.3d 47, 58 (Colo. 2001)(insurance); *People ex rel. McFarlane v. Alpert Corp.*, 660 P.2d 1295, 1297 (Colo. 1982)(real property). Moreover, the CCPA applies to transactions with businesses as well as with individual consumers. *E.g. Rhino*

32

*Linings, USA v. Rocky Mountain Rhino Lining,* 62 P.3d 142 (Colo. 2003).  The advertising and sale of steel buildings and associated services such as assisting with the design and completion of the building constitutes the sale of goods or services within the meaning of the CCPA.

The CCPA applies to any "person" who engages in a proscribed practice, C.R.S. 6-1-105. Persons include individuals as well as businesses.  C.R.S. 6-1-102(6).  Accordingly, the Act may be applied to the individual defendants as well as the corporate defendants in this case.  *See Hoang v. Arbess*, 80 P.3d 863, 870 (Colo. App. 2003).

The Court concludes that General Steel, Knight, Kissire, Graham, Blum and Donelson have

(1) knowingly made false representations as to the characteristics of goods and services, contrary to § 6-1-105(1)(e) of the CCPA, as alleged in the first claim of the amended complaint;

(2) failed to disclose material information concerning goods and services known at the time of either the advertisement or sale of such goods or services, for the purpose of inducing consumers to enter into a transaction, contrary to §6-1-105(u) of the CCPA, as alleged in the second claim of the amended complaint;

(3) knowingly made false representations as to the source of goods or services, contrary to §6-1-105(b) of the CCPA, as alleged in the third claim of the amended complaint;

(4) made false or misleading statements as to the price of goods or services or the existence of or amounts of price reductions, contrary to §6-1-105(l) of the CCPA, as alleged in the fourth claim of the amended complaint.

These conclusions are based upon the Court's findings set forth above.  In brief summary:

General Steel made false and misleading representations and omitted material information in its advertising and sales practices that were frequent, continual and intentional over a period of years beginning at least by 1997 and continuing at least through the implementation of a compliance program in approximately February 2004.

Jeffrey Knight either created or approved the sales tactics that included the misrepresentations and omissions.  He controlled General Steel and oversaw essentially everything done by the company.

Kevin Kissire knowingly and intentionally made false representations and material omissions in sales pitches on a regular and frequent basis between February 1998 and February 2003.  He was instrumental in training other salespersons in such practices, including having a leading role in the refinement of the script that resulted in Exhibit 1.

Bruce Graham, as one of the first salesmen hired by General Steel, followed Knight's sales practices and therefore knowingly and intentionally made false representations and material omissions during the period of time that he was involved in sales, approximately during the period 1997 through February 2003.  The State did not prove that Graham has been involved in deceptive practices while involved in customer service from February 2003 through the present.

Jordan Blum knowingly and intentionally made, or indirectly made by instructing subordinates in the components department to make, false representations and material omissions in the process of selling bays (the historic oak tree story).  This practice began at least by early 2002 and continued through at least October 2003.

Jeffrey Donelson knowingly and intentionally made false representations and material omissions in violation of the Act on a frequent and continual basis from shortly after he joined the company as a salesman in 1999 at least through the implementation of the compliance program and the preliminary injunction.  Donelson mastered and refined several of the most misleading, but effective, sales techniques.

The Court concludes that the State did not prove its fifth claim against these defendants. The purchase order form, and in particular the Conditions page, did not provide all of the terms and conditions of the sale in readable, clear and unambiguous language.  This in turn contributed to the impact of the misrepresentations and omissions that support counts one through four. However, the Court does not find that the transactions in question were shown to be an "installment sale."  *See* C.R.S. 6-1-105((1)(m).  While the term "installment sale" is not defined in the CCPA, the transaction covered by the initial purchase order was the sale of one building for one price with one deposit.  The purchase of components was made by a separate contract for a separate price.  These transactions do not fit with this Court's understanding of an installment sale.  *Cf.* C.R.S. 4-2-612(1)(defining "installment contract" under the Uniform Commercial Code).

The Court concludes that the State did not prove its sixth claim against these defendants. The sales practices had some earmarks of "bait and switch" tactics.  General Steel advertised and the salespersons purported to sell "clearance" or "returned" or otherwise overstocked buildings whereas in fact they were generally selling new buildings.  However, the sales were on the same terms, whether the building was returned or new.  The deception lies in the manner in which the buildings were described and in which the consumer was persuaded that he could obtain an unusually good deal.  It wasn't that General Steel advertised its clearance buildings but refused to show or sell them.  Generally speaking there weren't any clearance buildings.  The Court concludes that the nature of the practices involved here is best described in other sections of the CCPA, as alleged in claims one through four, and not in C.R.S. 6-1-105(1)(n).

The Court concludes that no claims have been proven against defendant Capital Steel.

The CCPA grants broad authority to the courts in fashioning an appropriate remedy, which can be broken down into four categories:

Injunction.  Courts "may make such orders or judgments as may be necessary to prevent the use or employment by such person of any such deceptive trade practice." C.R.S. 6-1-110(1). The Court sets forth below a combination of prohibitory and mandatory injunctive orders that it deems to be necessary to assure that the deceptive practices will not be repeated in the future.

Compensation to Victims.  Courts "may make such orders or judgments . . . which may be necessary to completely compensate or restore to the original position of any person injured by means of any such practice or to prevent any unjust enrichment by any person through the use or employment of any deceptive trade practice." *Ibid.*  With respect to the individual consumers who testified at this trial, the Court concludes that the following relief is necessary to accomplish complete compensation or restoration:

Duane Reed was told that General Steel had a returned or surplus building that fit his requirements, one of only three or four left.  Unlike some of the other callers, he did not expect components to be included, perhaps because of his past experience with steel buildings.  He did, however, expect to receive blueprints followed by his building within a reasonable time.  Instead, after declining the component department's efforts to sell components and a "bay" (extra materials), he received nothing but a run-around from General Steel.  Poor customer service is not, by itself, actionable under the CCPA.  However, because he was induced to enter into a contract and submit a deposit based in part on false representations, he is entitled to the return of his deposit.

Don Hansen was misled by the false representation that he was buying an existing building that he could pick up "today" in Texas if he wished to.  He did ultimately receive a building, and there was no indication that it was not of good quality.  The Court finds that the primary injury proven with respect to Hansen was that he was induced to purchase 20 doors from General Steel at inflated prices by the false representation that failure to do so would void the warranty on the building.  The evidence established that Hansen paid $387 per door for 20 doors, whereas he could have purchased identical doors elsewhere for $187.  The Court concludes that he should be reimbursed $200 per door, or $4000.

Randy and Pam Hood were relatively unsophisticated consumers who were convinced by the misleading sales presentations that they were purchasing an existing, complete building for $11,226, plus shipping (total $12,370 per Ex. 13 at 0075).  They were pressured into signing the contract before receiving and having a reasonable opportunity to read and understand the Conditions page of the contract.  They ultimately received a building but paid $16,486 for it.  The Court concludes that they should be refunded the difference between what they paid and what was promised, i.e., $4116.

Greg Rodriguez, represented by counsel, entered into a settlement with General Steel that included a full release.  He is not entitled to further compensation.

Brian Krizek's testimony puts to rest any notion that General Steel avoided misrepresentations when dealing with churches or charitable groups.  He was induced to throw caution to the wind and rush into a large contract to purchase five buildings on the false representation that if he did not act immediately, they might be gone.  He is a good example of

how a well educated, financially experienced, "sophisticated" businessman could be taken by unscrupulous practices.  In the end, he got two buildings for the price of five.  However, he negotiated a settlement whereby his deposit would be credited as full payment for the two buildings that he received.  The Court has no basis on which to award further compensation to him in that circumstance.

Cuong Doan is another example of a "sophisticated" person, a medical doctor, who was misled.  He was induced by a false representation of urgency to pay scant attention to the words in the contract and to send in a $2500 deposit.  Later, he was induced to put down an additional $685 deposit for a bay (10 additional feet).  General Steel argues that the reason he could not take his building was that he could not obtain zoning approval.  However, Doan testified, credibly, that General Steel's representatives told him that the building would meet local building and zoning requirements as part of the sales pitch.  The most significant fact, however, is that the deposit was submitted based upon the creation of a false sense of urgency.  Despite Dr. Doan's statement that he will absorb the loss, the Court concludes that his deposits must be returned.

Dan Cafetz' case is unusual.  On the one hand, he was the victim of a misleading sales pitch, including the feigned misdirection of his initial call, the existence of a cancelled building in California that fit his requirements, and the false statement that this building might be gone if he didn't quickly submit a $4200 deposit.  On the other hand, he read the Conditions page of the contract before signing it.  Moreover, after discovering that components would cost extra and would push the total cost well above his budget, and unsuccessfully seeking a return of his deposit, he still signed a contract to purchase a 25 feet of additional material and submitted another $1600 deposit.  His explanation that he did this "to try to make the best of a bad situation" makes little sense and tends to confirm his lack of sophistication.  The Court concludes that because of the false sense of urgency he should be refunded his original $4200 deposit only.

Jim Mages, though an educated and intelligent individual, nevertheless sent in a deposit of $5700 based on the sales pitch and before receiving a fully legible contract.  He became suspicious of the claim that he was buying an existing building located in Iowa, and when investigated this claim and found it to be false, he was chastised for having done so.  The Court cannot award compensation for Jordan Blum's discourtesy.  However, the Court does conclude that the deposit was obtained by false and misleading sales representations, and that it should be refunded.

For similar reasons the Court concludes that George Ewers' deposit of $4200 should be refunded.

Todd Dixon did not, according to the evidence presented, receive some of the misleading representation s that had been made to earlier callers.  By that time, July 2004, changes had been made.  However, he was told that there was a building available that someone else had ordered but not taken, and that he needed to make a deposit immediately, that day, if he wanted it because buildings "are flying out of here."  He had no idea when he submitted his deposit of $10,000 that openings, doors and windows didn't come with the building.  Given the history of

similar practices and results, the Court concludes that the deposit was submitted at least in part based upon misleading statements, and that it should be returned.

Although Rotimi Lawani exaggerated the suddenness of his decision to purchase, the representation made by the salesman on July 12, 2004 that the price was good only that day was not true.  The Court infers that the salesman's insistence that Lawani sign a contract on July 16 in order to preserve the price was probably untrue as well.  What distinguishes his case from other unreturned deposit cases was his testimony that he wanted the building shells only, and that he planned to buy components locally.  The price of the components that was highlighted in his complaint is moot in that context.  If Mr. Lawani still wants the buildings, General Steel shall deliver them to him for the original purchase price with framed openings installed to his requirements but without components or other adjustments.

Civil Penalties.  The Act mandates the imposition of civil penalties of not more than $2000 per violation, up to a maximum of $100,000 for any related series of violations.  Each consumer or transaction constitutes a separate violation.  C.R.S. 6-1-112(1).  Penalties are applicable both to persons who violate the Act and to persons who cause others to do so.  *Ibid.*  Proof of actual injury or loss to a consumer is not a necessary prerequisite to the imposition of civil penalties.  *State ex rel. Woodard v. May Dept. Stores Co.*, 849 P.2d 802, 809 (Colo. 1992).

The State argues that there are four separate series of violations: sales, components, collections and Capital Steel.  The State asks the Court to award civil penalties of $400,000 against Knight (maximum for all four series); $300,000 against General Steel (maximum, three series); and $100,000 each against Graham, Blum, Donelson and Capital Steel (maximum, one series).

The State did not prove violations by Capital Steel.  Likewise, the State did not establish misrepresentations or omissions in General Steel's collection practices as such.  The problems were created by deceptive sales practices.  The Court does agree that the sales practices leading up to the initial contract and deposit are distinct from the sales practices of the components department.  That was a separate stage of the process.  As General Steel argued, the consumer may or may not agree to purchase components and accessories.  They dealt with different personnel.  If they elected to purchase components, they entered into separate contracts.

Accordingly, the Court concludes that the maximum possible civil penalties are $200,000 each for General Steel and Knight, since those defendants were responsible for the violations in both the initial building sales and the component sales areas, and $100,000 each for the other defendants.

No attempt was made to put precise numbers on the violations in the initial building sales phase.  However, there was a huge number of calls coming in (up to 10,000 per month at times).  According to Knight, during the peak year of 2002, General Steel was selling 200 or more buildings ("projects" was his term) per month.  Knight, Graham, Donelson and, of course, General Steel either used or caused others to use some or all of the improper sales practices over several years.  These facts easily support an inference that each of them committed more than enough violations to reach the cap.

An effort to sell components was made with every customer who signed a building purchase contract.  Mr. Martinez testified, and Mr. Wise implied, that Mr. Blum required them to use the story about the historic oak tree in the standard sales pitch regarding bays.  It is reasonable to infer that Mr. Blum caused others to use that deceptive practice more than enough times to reach the statutory maximum.

The statute provides no other guidance for the determination of an appropriate size of a civil penalty.  The purpose of the civil penalties section of the statute is both to punish wrongdoers and to serve as a deterrent and example to others.  *See May Dept. Stores v. State ex rel. Woodard,* 863 P.2d 967, 972 (Colo. 1993).  With that in mind, the Court concludes as follows:

Given the extent of the violations over a several-year period, the Court concludes that, except as provided below, General Steel and Jeffrey Knight deserve the maximum civil penalty allowed by law.  However, imposition of $200,000 civil penalties on both General Steel and Knight would in one sense be doubling the statutory maximum, since Knight wholly owns General Steel.  Moreover, consistent with serving as an example to others, the Court concludes that some credit must be given for Knight's initiation of a compliance review program before this action was filed.  The Court concludes that the civil penalty should be imposed upon Knight in the amount of $200,000, but that no separate penalty should be imposed on the company.

The other individual defendants knowingly and intentionally engaged in deceptive sales practices and profited from their successes.  However, they were following the company line and have been singled out among many salespersons and managers who used the same practices.  The Court also concludes that there is little rational basis to make comparative culpability judgments among these individuals.  Each, in his own way, was a contributor.  The Court will impose $20,000 civil penalties, representing 10% of the penalty imposed upon Knight, on each of these individuals.

In order to serve the intended purposes of punishment and deterrence, the Court orders that no more than half of the civil penalty imposed on each individual may be paid by General Steel, whether by direct payment or reimbursement or compensation adjustment or otherwise.  As for Kissire, the State did not request a civil penalty.  Nevertheless, the Court is imposing the same $20,000 civil penalty on him.

Litigation Costs.  The Act mandates that the Attorney General be awarded costs and attorney's fees for successful enforcement.  C.R.S. 6-1-113(4).

JUDGMENT

The Court directs that judgment enter on the date of this Order as follows:

1.  The Court makes the terms of paragraph 1(a) through 1(n) of the preliminary injunction order, as set forth in Addendum A, permanent.

2.  The Court orders that the monitoring programs described in paragraph 4 of the preliminary injunction and in the Court's order of June 4, 2004 shall continue until such time as the program might be altered or ended by further order of the Court.

3.  General Steel, Jeffrey Knight, Kevin Kissire, Bruce Graham, Jordan Blum and Jeffrey Donelson are permanently enjoined from engaging in any of the deceptive practices described in this order.  They are permanently enjoined from engaging in any actions contrary to the Colorado Consumer Protection Act.  They are enjoined from such actions whether conducted through General Steel or any other entity.

4.  Because the Court is concerned about the credibility of portions of Kevin Kissire's testimony, which raises further concerns regarding sales activities, the Court enjoins Kissire permanently from engaging in any sales activity of any kind in the State of Colorado for a period of 5 years, being the same length of time he worked for General Steel.

5.  General Steel is ordered to submit to the Court within 60 days of the date of this order, after first conferring with an appropriate representative of the State, an updated Ethics and Compliance Plan that is consistent with this order and that bears the approval in all its contents of its compliance consultant, Dr. Linda Ferrell.  This Plan must include specific provisions as to how it will be implemented and enforced.  The State will have 30 days to register any objection to he Plan, and if there is a dispute, the parties may set a hearing.

6.  General Steel must submit to the Court within 60 days of the date of this order, after first conferring with an appropriate representative of the State, a revised form of purchase order. The current first page shall be revised so as to state in readable, clear and unambiguous language what is included and not included in the contract price.  This will include, at a minimum, plain language indicating that the listed accessories and components are not included unless expressly checked off as included.  The Conditions shall be set forth on separate pages.  They will be set forth in a minimum 12-point font.  Each separate condition (which may include more than one sentence but should be limited to one subject matter) shall be separately set forth in a numbered paragraph.  There shall be a space between the numbered paragraphs.  To the left of each numbered paragraph shall be placed a line for the consumer to initial that he has read, understood and accepted the condition.  No condition will be enforceable unless the consumer initials it. The State will have 30 days to register any objection to the form of the purchase order, and if there is a dispute, the parties may set a hearing.  To any extent this order is inconsistent with the preliminary injunction, this order governs.

7.  With respect to compensation or restitution to the individual consumers who testified at the trial, the Court orders that General Steel pay to the State for transmission to the affected individuals the following sums:

a.  For Duane Reed: $3000
b.  Don Hansen: $4000
c.  For Randy and Pam Hood: $4116
d.  For Cuong Doan: $3185
e.  For Dan Cafetz: $4200
f.  For Jim Mages: $5700
g.  For George Ewers: $4200
h.  For Todd Dixon: $10,000

8.  The Court orders the defendants to pay to the State civil penalties as follows:

a.  Jeffrey Knight: $200,000.
b.  Kevin Kissire: $20,000.
c.  Bruce Graham: $20,000.
d.  Jordan Blum: $20,000.
e.  Jeffrey Donelson: $20,000.

9.  The State is awarded its costs and its necessary and reasonable attorney's fees, jointly and severally against all defendants except Capital Steel. The State shall submit its bill of costs and attorney's fees affidavit as provided at C.R.C.P. 121, section 1-22, but the Court extends the deadline for such filing to 30 days following the entry of judgment. Before such filing the State shall confer with defendants and attempt to resolve any disputes as to reasonableness and necessity. If costs or fees are disputed, the parties shall set a hearing as to the necessity and reasonableness of the disputed amounts. In that event, the Court orders that the defendants file with the Court and serve on the State evidence of all attorneys' fees and costs billed by the law firms that participated in the representation of the defendants in this case. The Court will consider, as one factor in determining what is a reasonable and necessary amount, the amounts incurred by the defendants in the case.

10.  All claims against Capital Steel are dismissed with prejudice.

11.  The fifth and sixth claims for relief are dismissed with prejudice as to all defendants.

12.  The Court extends the date for the filing of post-trial motions under C.R.C.P. 59 to 30 days following the entry of judgment, i.e., 30 days after this order.

13.  The Court extends the automatic stay under C.R.C.P. 62(a) with respect to the monetary remedies to 30 days following the entry of judgment. If any further stay is thereafter requested, the parties shall first confer and attempt to agree upon the form and amount of the supersedeas bond. If there is a dispute, then the parties may set a hearing, provided, however, that the stay will in any event not extend beyond 30 days.

14.  With the exception of Rule 59 motions, no motion may be filed by either party without a certificate that lead counsel for the parties have conferred and attempted to resolve the dispute.  Exchanges of letters or emails will not be accepted as a substitute for conferring.

15.  The Court directs the parties to submit a procedural proposal for the resolution of the State's claims with respect to consumers other than the 11 consumers the State called as witnesses at the trial.  If they cannot agree, after meeting, conferring and making a good faith effort, they may each submit a proposal.  The parties should include in their evaluation of this issue whether alternatives to court trials such as the use of a special master, arbitrator or other non-court means of hearing and resolving claims would be desirable.

Dated in Golden, Colorado this ___7_____ day of __Dec_____, 2004.

BY THE COURT:

_____
R. BROOKE JACKSON
District Court Judge